## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL GOLDENBERG, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 1:22-cv-10314 |
| | <u>CLASS ACTION</u> |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| NEOGENOMICS, INC., DOUGLAS VANOORT, MARK MALLON, KATHRYN MCKENZIE, and WILLIAM BONELLO, | |
| Defendants. | |

Plaintiff Daniel Goldenberg ("Goldenberg" or "Plaintiff"), by and through his counsel, alleges the following upon personal knowledge as to his own acts, and upon information and belief as to all other matters.  Plaintiff's information and belief is based on, among other things, the independent investigation of counsel.  This investigation includes, but is not limited to, a review and analysis of: (i) public filings by NeoGenomics, Inc. ("NeoGenomics" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of NeoGenomics conferences with investors and analysts; (iii) press releases and media reports concerning the Company; (iv) analyst reports concerning NeoGenomics; and (v) other public information and data regarding the Company.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of all persons and entities that purchased or otherwise acquired NeoGenomics securities between February 27, 2020 and April 26, 2022, inclusive (the "Class Period").

2.      The claims Plaintiff asserts herein are alleged against: (i) NeoGenomics; (ii) the Company's former Chief Executive Officer ("CEO") Douglas VanOort ("VanOort"); (iii) its former CEO Mark Mallon ("Mallon"); (iv) its former Chief Financial Officer ("CFO") Kathryn McKenzie ("McKenzie"); and (v) its current CFO William Bonello ("Bonello"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

3.      NeoGenomics provides cancer tests and testing services to doctors, clinics, hospitals, and pharmaceutical companies.  Among the Company's portfolio of tests are next generation sequencing ("NGS") tests.  NGS tests have become popular with pathologists in recent years because they can test multiple genes of a cancer simultaneously, making them more cost effective and efficient than older legacy tests that only look for a single specific genetic mutation.

4.      Throughout the Class Period, NeoGenomics consistently misrepresented to investors that it had a "comprehensive menu" of cancer tests that positioned it as a "one-stop-shop" for pathologists that needed cancer testing.  Moreover, the Company stated that it had "every kind of testing modality that you can use for cancer, including some of the fast-growing new ones, like next-generation sequencing," and had "a competitive advantage" as a "go-to reference lab with a comprehensive menu for just about any kind of tests that you want to have done in cancer [] and we keep our test menu very advanced."

5.      NeoGenomics also consistently asserted during the Class Period that it could "leverage" the supposedly "fixed cost" structure of its business to improve profitability as revenue increased.  NeoGenomics also repeatedly touted its "robust Compliance Program . . . overseen by our Board of Directors . . . to ensure compliance with the myriad of . . . laws, regulations and

governmental guidance applicable to our business," merely listing failure to comply among the many hypothetical risks that could impact the Company's results.

6.      These statements were materially false and misleading.  In truth: (i) NeoGenomics was anything but a "one-stop-shop" for cancer testing because it did not offer the most technologically advanced NGS tests, which led to a significant decrease in revenue as current and prospective customers went elsewhere for their testing needs; (ii) the Company's costs were not fixed because NeoGenomics needed to hire additional employees to process more complex customized testing demanded by customers utilizing the Company's outdated portfolio of tests, leading to operational challenges, decreased lab efficiency, and increased testing turnaround times; and (iii) NeoGenomics violated federal healthcare laws and regulations related to fraud, waste, and abuse.

7.      On November 4, 2021, NeoGenomics revealed that it was, "conducting an internal investigation with the assistance of outside counsel that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations" and had recently "notified the Office of the Inspector General of the U.S. Department of Health and Human Services of our investigation."  Additionally, the Company disclosed that it "accrued a reserve of $10.5 million for potential damage and liabilities associated with the federal healthcare program revenue received spanning multiple years."  On this news, the price of NeoGenomics common stock fell $8.18 per share, or 17.6%, from $46.53 per share on November 3, 2021 to $38.35 per share at the close of trading on November 4, 2021.

8.      After the close of trading on November 4, 2021, NeoGenomics provided some limited additional details about the internal investigation, specifically that the "federal healthcare

laws and regulations" at the center of the Company's investigation "include those relating to fraud, waste and abuse."

9.      On March 28, 2022, NeoGenomics disclosed that "the Board of Directors and Mark Mallon, Chief Executive Officer, have agreed that Mr. Mallon will step down as CEO and member of the Board, effective immediately."  At the same time, the Company disclosed that it "currently expects revenue for Q1 2022 may be below the low end of its prior guidance of $118 - $120 million and EBITDA for Q1 2022 will be below the low end of its prior guidance of $(15) - $(12) million. The larger than anticipated EBITDA loss was primarily driven by higher than anticipated Clinical Services cost of goods sold.  The Company intends to take immediate action to address performance and costs . . . Additionally, the Company has withdrawn its 2022 annual financial guidance issued February 23, 2022."  On this news, the price of NeoGenomics common stock fell $5.30 per share, or 29.8%, from $17.79 per share on March 28, 2022 to $12.49 per share at the close of trading on March 29, 2022.

10.     Then, on April 27, 2022, NeoGenomics reported its first-quarter 2022 financial results including that revenue for the quarter was $117 million and EBITDA loss was $19 million, that "[c]onsolidated gross profit for the first quarter of 2022" had "decrease[d] 8.0% compared to the first quarter of 2021," and that "[o]perating expenses increased by $34 million, or 59%, compared to the first quarter of 2021."  The Company explained that "higher payroll and payroll-related costs to support the Company's strategic growth initiatives" drove the decreased profit and increased operating expenses.

11.     Also on April 27, 2022, NeoGenomics held a conference call to discuss its first-quarter 2022 results (the "1Q22 Earnings Call").  During the 1Q22 Earnings Call, the Company attributed its poor performance in substantial part to the fact that, "our test mix is weighted to

legacy modalities and disease-specific NGS offerings, while the market is moving towards larger, more comprehensive panels" and "we've seen a notable decrease in lab efficiency over the course of the past year . . . largely attributable to increased complexity of both our product offerings and our lab processes, due in part to efforts to respond to customer requests for customization." NeoGenomics further disclosed that it was "seeing increased competition on the NGS front as panels move or as customers move to demanding larger, more comprehensive NGS-only panels, and our offering is more oriented towards smaller targeted panels" and that the Company was "seeing bigger and bigger panels coming from some of these emerging companies . . . where we have not kept up."  On this news, the price of NeoGenomics common stock fell $0.41 per share, or 3.8%, from $10.85 per share on April 26, 2022 to $10.44 per share at the close of trading on April 27, 2022.

**JURISDICTION AND VENUE**

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  NeoGenomics's common stock trades on the NASDAQ, which is headquartered in this District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     As detailed in the Certification submitted herewith, Plaintiff Daniel Goldenberg purchased NeoGenomics securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged herein.

17.     Defendant NeoGenomics is a Nevada corporation, with its principal executive offices located at 9490 NeoGenomics Way, Fort Myers, FL 33912.  The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "NEO."

18.     Defendant VanOort served as the Company's CEO throughout the Class Period until April 19, 2021, at which time he transitioned to become the Executive Chair of the Board of Directors of NeoGenomics.  On October 12, 2021, the Company announced that Defendant VanOort would be stepping down as Executive Chair and would retire as a member of the Board before the end of the year.

19.     Defendant Mallon served as the Company's CEO from April 19, 2021 to March 28, 2022.

20.     Defendant McKenzie served as the Company's CFO throughout the Class Period until December 31, 2021.  NeoGenomics named Defendant McKenzie Chief Sustainability and Risk Officer as of January 1, 2022.

21.     Defendant Bonello is the Company's current CFO and has served in that capacity since January 1, 2022.  Previously during the Class Period, Defendant Bonello served as President of NeoGenomics's Informatics Division.

22.     VanOort, Mallon, McKenzie, and Bonello are collectively referred to herein as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

23.     The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

24.     Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     NeoGenomics operates a network of cancer testing laboratories in the United States, Europe, and Asia.  The Company operates two business segments.  Its Clinical Services Segment provides testing, interpretation, and consultative services to community-based pathology practices, hospital pathology labs, reference labs, and academic centers.  NeoGenomics's Pharma Services Segment supports pharmaceutical firms in their drug development programs by

supporting their clinical trials and research through working with the pharmaceutical firms on study design as well as performing required testing. In 2021, the Clinical Services Segment accounted for 83% of NeoGenomics's revenue, while the Pharma Services Segment accounted for 17% of the Company's revenue.

26.     NeoGenomics offers a variety of cancer tests, including tests utilizing NGS technology. NGS allows clinicians to test multiple genes of a cancer simultaneously on material extracted from a single biopsy or sample of a patient's blood. NGS tests have grown in popularity in recent years among pathologists because they are typically more cost effective and efficient than legacy tests, which are typically focused on looking for one single genetic mutation and, often require pathologists to order several individual tests to look for multiple genetic mutations.

**Materially False and Misleading Statements Issued During the Class Period**

27.     The Class Period begins on February 27, 2020, the date NeoGenomics announced its fourth-quarter and full-year 2019 financial results and held a conference call to discuss the results (the "4Q19 Earnings Call"). During the 4Q19 Earnings Call, Defendant VanOort stated, "we have really restructured in some respects our NGS panels, and we think they are very, very-high-quality panels. We continue to make improvements in them in terms of the number of genes and in our reporting capabilities, and the marketplace is reacting very favorably to that. So our next-generation sequencing panels in the clinical business should continue to fuel growth."

28.     On February 28, 2020, NeoGenomics filed its annual report for 2019 on Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K contained the following statement touting the Company's testing capabilities:

> NGS panels are one of our fastest growing testing areas and clients can often receive a significant amount of biomarker information from very limited samples. These comprehensive panels can allow for faster treatment decisions for patients as compared to a series of single-gene molecular tests being ordered sequentially.

NeoGenomics has one of the broadest Molecular menus in the industry and our targeted NeoTYPE panels include genes relevant to a particular cancer type, as well as other complementary tests such as immunohistochemistry and FISH. This comprehensive menu means that NeoGenomics can be a one-stop-shop for our clients who can get all of their oncology testing needs satisfied by our laboratory. This is attractive to our clients as patient samples do not need to be split and then managed across several laboratories. NeoGenomics expects our Molecular laboratory and NGS capabilities to be a key growth driver in the coming years.

29.     In the 2019 10-K, NeoGenomics also stated: "Our broad and innovative test menu of molecular, including NGS, immunohistochemistry, and other testing has helped make us a 'one stop shop' for many clients who value that all of their testing can be sent to one laboratory."

30.     In the 2019 10-K, NeoGenomics further represented that its "Competitive Strengths" included testing "Turnaround Times" and "Innovative Service Offerings."  Regarding turnaround times, NeoGenomics stated: "Our consistent timeliness of results by our Clinical Services segment is a competitive strength and a driver of additional testing requests by referring physicians.  Rapid turnaround times allow for the performance of other adjunctive tests within an acceptable diagnosis window in order to augment or confirm results and more fully inform treatment options."  Regarding its service offerings, the Company stated: "Our [testing] menu enables us to be a true one-stop-shop for our clients as we can meet all of their oncology testing needs."

31.     Additionally, in the 2019 10-K NeoGenomics touted its efforts to comply with relevant government regulations and merely listed failure to comply with such regulations as a risk, without discussing the ongoing violations, stating:

The health care industry is highly regulated and scrutinized with respect to fraud, abusive billing practices and improper financial relationships between health care companies and their referral sources. The Office of the Inspector General of HHS ("OIG") has published compliance program guidance, including the Compliance Program Guidance for Clinical Laboratories in August of 1998, and advisory opinions. The Company has implemented a robust Compliance Program, which is overseen by our Board of Directors.  Its objective is to ensure compliance with the myriad of international, federal and state laws, regulations and governmental

guidance applicable to our business. Our program consists of the development and implementation of standards of conduct, training/education of employees, monitoring and auditing Company practices, investigation, and response to reported or detected compliance issues.

. . .

Our operations are subject to strict laws prohibiting fraudulent billing and other abuse, and our failure to comply with such laws could result in substantial penalties.

Of particular importance to our operations is ensuring compliance with federal and state laws prohibiting fraudulent billing and the retention of overpayments. In particular, if we fail to comply with federal and state documentation, coding and billing rules, we could be subject to liability under the federal False Claims Act, including civil penalties, loss of licenses and exclusion from the Medicare and Medicaid programs.
. . .

Existing federal laws governing Medicare and Medicaid, as well as some other federal laws, also regulate certain aspects of the relationship between healthcare providers, including clinical laboratories, and their referral sources, including physicians, hospitals, and other laboratories. . . . Violation of these laws may result in criminal penalties, exclusion from participation in the Medicare, Medicaid, and other federal healthcare programs, repayment of all reimbursement received by us related to services tied to any impermissible referrals, and significant civil monetary penalties . . . We seek to structure our arrangements with physicians and other clients to be in compliance with the federal AKS, Stark Law and similar state laws, and to keep up-to-date on developments concerning their application by various means . . .

32.     On April 28, 2020, NeoGenomics held a conference call to discuss the Company's first-quarter 2020 financial results (the "1Q20 Earnings Call").  During the 1Q20 Earnings Call, Defendant McKenzie stated: "Prior to the impacts of COVID-19, we were once again seeing growth across all testing modalities, with particular strength in next-generation sequencing and molecular testing."

33.     On April 29, 2020, NeoGenomics filed its first-quarter 2020 Form 10-Q with the SEC (the "1Q20 10-Q"), which contained nearly identical statements to those referenced in ¶¶ 28-30 *supra,* touting the Company's testing capabilities and competitive strengths.

34.     On May 28, 2020, NeoGenomics held its Annual Shareholders Meeting.  During the meeting, Defendant VanOort stated, "we compete . . . by being a one-stop shop.  So for an oncology practice or for a hospital system, they can use NeoGenomics to do all of their testing, not just next-generation sequencing, but also immunohistochemistry testing, fish testing, flow cytometry and everything else."

35.     On July 28, 2020, NeoGenomics held a conference call to discuss the Company's second-quarter 2020 financial results (the "2Q20 Earnings Call").  During the 2Q20 Earnings Call, Defendant VanOort stated: "We now have a full suite of liquid biopsy tests, which further strengthens our next-generation sequencing product portfolio and solidifies our comprehensive oncology test menu."

36.     On July 31, 2020, NeoGenomics filed its second-quarter 2020 Form 10-Q with the SEC, which contained nearly identical statements to those referenced in ¶¶ 28-30 *supra,* touting the Company's testing capabilities and competitive strengths.

37.     On September 14, 2020, NeoGenomics participated in the Morgan Stanley Global Healthcare Conference.  During the conference, Defendant VanOort stated, "we are a one-stop shop for clients, physicians, pathologists, hospitals and pharmaceutical companies.  We use every kind of testing modality that you can use for cancer, including some of the fast-growing new ones, like next-generation sequencing, but we do everything.  So we're a one-stop shop."

38.     On October 27, 2020, NeoGenomics held a conference call to discuss the Company's third-quarter 2020 financial results (the "3Q20 Earnings Call").  During the 3Q20 Earnings Call, Defendant McKenzie stated, "gross margins improved approximately 1,100 basis points sequentially to 43%, reflecting a strong recovery in both clinical and pharma revenues on largely fixed COGS infrastructure."

39.    On October 29, 2020, NeoGenomics filed its third-quarter 2020 Form 10-Q with the SEC, which contained nearly identical statements to those referenced in ¶¶ 28-30 *supra,* touting the Company's testing capabilities and competitive strengths.

40.    On January 11, 2021, NeoGenomics participated in the JPMorgan Healthcare Conference.  During the conference, Defendant VanOort stated:

> NGS is a technology that allows us to interrogate a number of genes all simultaneously. And there are a lot of different applications for next-generation sequencing. There are small panels and large panels and targeted panels, DNA panels and RNA panels and some with both DNA and RNA. We can use next-generation sequencing for tissue samples or for circulating tumor samples, also referred to as liquid biopsy, and more. And consistent with NeoGenomics' comprehensive approach to our test menu, we also offer a wide variety of and range of next-generation sequencing tests. And this is one of the things that differentiates NeoGenomics. And we believe that we have a very high quality capability to meet the needs of nearly any client . . .

41.    On February 24, 2021, NeoGenomics held a conference call to discuss its fourth-quarter and full year 2020 financial results (the "4Q20 Earnings Call").  During the 4Q20 Earnings Call, Defendant McKenzie stated, "gross margins improved approximately 250 basis points sequentially in the fourth quarter to 45.6%, reflecting a continued recovery in both Clinical and Pharma revenues on a largely fixed cost COGS infrastructure."

42.    On February 25, 2021, NeoGenomics filed its annual report for 2020 on Form 10-K with the SEC (the "2020 10-K").  The 2020 10-K contained nearly identical statements to those referenced in ¶¶ 28-30 *supra,* touting the Company's testing capabilities and competitive strengths. The 2020 10-K also contained substantially the same statements identified in ¶ 31, *supra*, touting the Company's efforts to comply with relevant regulations and merely listing failure to comply with such regulations as a risk, without discussing the ongoing violations.

43.    On May 27, 2021, NeoGenomics held its Annual Shareholders Meeting.  During the meeting, Defendant Mallon told investors: "Another core strength is the breadth of our Test

Menu.  We cover all of the key modalities in cancer testing.  As I mentioned, over 700 tests and this includes the fastest growing, which is the molecular test, where we bring – have a unique position, where we actually try to customize the types of molecular tests, the panels, the number of mutations to be tested and not just molecular, but also adding in the necessary additional modalities to really get the most precise, customized, cost-effective solution for a particular cancer or a particular patient."

44.    On June 9, 2021, NeoGenomics participated in the Goldman Sachs Global Healthcare Conference.  During Defendant VanOort's prepared remarks, he stated, "we have the most comprehensive test menu that anyone has for oncology out there" and "[o]ne of the things that is quite unique and a competitive advantage is we are a go-to reference lab with a comprehensive menu for just about any kind of tests that you want to have done in cancer. . . . And so we have been a go-to one-stop shop reference lab for a lot of players in the ecosystem, and we keep our test menu very advanced.  And it's a real advantage for us."  Later during the conference, Defendant VanOort stated, "next-generation sequencing has a lot of different kinds of – it's not just one flavor.  I mean you can do next-generation sequencing for solid tumors.  You can do it for hematologic cancers.  You can do it for targeted profiles, large profiles, DNA, RNA, it's all kinds of stuff, various aspects.  You can also do now liquid biopsy next-generation sequencing.  And effectively, we do it all."

45.    On August 6, 2021, NeoGenomics held a conference call to discuss its second-quarter 2021 financial results (the "2Q21 Earnings Call").  On the 2Q21 Earnings Call, Defendant Mallon stated:

> I've been very impressed by several strengths of Neo in my first 100 days on the job. First, it's just how comprehensive our oncology platform at NeoGenomics truly is. As I have dug in, I see how our broad portfolio of services provides a value proposition to all the constituents of the oncology ecosystem, providers, . . . payers

and of course, patients. Our portfolio of multi-modality solutions is comprised of hundreds of assays that provide time-sensitive biomarker-specific answers for oncologists, pathologists, research scientists and pharma trial teams. Our customized targeted panels allow us to provide the right information at the right time for providers to patients at the right price for our direct bill and third-party payers. And that broad-based menu that differentiates [us] in clinical is also great value to our biopharma customers and is a real driver of growth for us.

46.    Also on the 2Q21 Earnings Call, Defendant McKenzie stated, "our gross margins improved to 44.1% in quarter 2, driven by efficiencies on increased volume in clinical and higher revenue in our Pharma Services division.  More consistent sample volumes allow for more predictable staffing levels, and we were able to see more normalized leverage on our largely fixed cost COGS infrastructure."

47.    On August 9, 2021, NeoGenomics filed its second-quarter 2021 Form 10-Q with the SEC, which contained nearly identical statements to those referenced in ¶¶ 28-30 *supra,* touting the Company's testing capabilities and competitive strengths.

48.    On November 4, 2021, NeoGenomics held a conference call to discuss its third-quarter 2021 financial results (the "3Q21 Earnings Call").  During the 3Q21 Earnings Call, Defendant Mallon stated:

We often hear NeoGenomics referred to as a fast follower. In fact, we have often used that term to describe our strategy for adopting new technologies. We've been able to execute this fast follower strategy because we have the scientific and medical know-how to quickly develop and launch new and often improved lab-developed tests, and because we have a trusted relationship with thousands of physicians who are already ordering a significant portion of their cancer testing from us.

49.    On November 4, 2021, NeoGenomics filed its third-quarter 2021 Form 10-Q with the SEC (the "3Q21 10-Q"), which contained nearly identical statements to those referenced in ¶¶ 28-30 *supra,* touting the Company's testing capabilities and competitive strengths.

50.    On February 23, 2022, NeoGenomics held a conference call to discuss its fourth-quarter and full-year 2021 financial results (the "4Q21 Earnings Call").  During the 4Q21 Earnings

Call, Defendant Mallon stated: "We've continued to strengthen our leadership position in the market through our comprehensive menu of tests focused only on cancer, our exceptional service levels, our managed care and hospital relationships and our overall partnership approach. These critical differentiating factors support new growth and drive high levels of customer retention."

51.     On the 4Q21 Earnings Call, an analyst asked how NeoGenomics planned to improve its gross margins. In response, Defendant Bonello stated: "A big part of it will be leverage of the existing fixed cost structure as revenue rebounds, and we emerge out of the COVID environment. And as we have a larger sales force that is hopefully generating revenue across that fixed COGS structure as well."

52.     On February 25, 2022, NeoGenomics filed its annual report for 2021 on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K contained nearly identical statements to those referenced in ¶¶ 28, 30 *supra,* touting the Company's testing capabilities and competitive strengths.

53.     On March 7, 2022, NeoGenomics participated in a Raymond James Institutional Investors Conference. During the conference, Defendant Bonello stated: "We believe that the underlying market that we serve is – grows at maybe a 6% to 8% rate. And from a volume standpoint, we've grown about twice that fast, obviously through taking market share, combination of getting more testing from our existing clients as well as continuously adding new clients." Later on the call, Bonello also stated: "Our molecular testing has fallen down in the low single digits range of growth, and part of that is because people are ordering panels. Still ordering from us, but ordering the panels instead of ordering the single-gene PCR test."

54.     The statements referenced in ¶¶ 27-53 were materially false and misleading because: (i) NeoGenomics was anything but a "one-stop shop" for cancer testing because it did

not offer the most technologically advanced NGS tests, which led to a significant decrease in revenue as current and prospective customers went elsewhere for their testing needs; (ii) the Company's costs were not fixed because NeoGenomics needed to hire additional employees to process more complex customized testing demanded by customers utilizing the Company's outdated portfolio of tests, leading to operational challenges, decreased lab efficiency, and increased testing turnaround times; and (iii) NeoGenomics violated federal healthcare laws and regulations related to fraud, waste, and abuse.

### The Truth is Revealed

55.     On November 4, 2021, during the Company's 3Q21 Earnings Call, Defendant McKenzie revealed that: "We are voluntarily conducting an internal investigation with the assistance of outside counsel that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations." She added that, "[b]ased on preliminary findings of this internal investigation, we voluntarily notified the Office of the Inspector General of the U.S. Department of Health and Human Services of our investigation in November 2021. Though our review of this matter is ongoing, we have accrued a reserve of $10.5 million for potential damage and liabilities associated with the federal healthcare program revenue received spanning multiple years in connection with the agreements at issue that were identified during the course of this internal investigation."

56.     On this news, the price of NeoGenomics common stock fell $8.18 per share, or 17.6%, from $46.53 per share on November 3, 2021 to $38.35 per share at the close of trading on November 4, 2021.

57.     NeoGenomics's 3Q21 10-Q, which the Company filed with the SEC after the close of trading on November 4, 2021, provided a more fulsome disclosure regarding the internal investigation and referral to the Department of Health and Human Services.  Specifically:

> With the assistance of outside counsel, the Company is voluntarily conducting an internal investigation that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations, including those relating to fraud, waste and abuse. Based on this internal investigation, the Company voluntarily notified the Office of Inspector General of the U.S. Department of Health and Human Services ('OIG') of the Company's internal investigation in November 2021. The Company's review of this matter is ongoing. As of September 30, 2021, the Company has accrued a reserve of $10.5 million in other long-term liabilities on the Consolidated Balance Sheets for potential damages and liabilities primarily associated with the federal healthcare program revenue received by the Company in connection with the agreements at issue that were identified during the course of this internal investigation. This reserve reflects management's best estimate of the minimum probable loss associated with this matter. As a result of the ongoing investigation and interactions with regulatory authorities, the Company may accrue additional reserves for any related potential damages and liabilities arising out of this matter.

58.     On March 28, 2022, NeoGenomics filed a Current Report on Form 8-K with the SEC (the "March 28, 2022 8-K"), disclosing that "the Board of Directors and Mark Mallon, Chief Executive Officer, have agreed that Mr. Mallon will step down as CEO and member of the Board, effective immediately."  Also in the March 28, 2022 8-K, NeoGenomics disclosed that: "The Company currently expects revenue for Q1 2022 may be below the low end of its prior guidance of $118 - $120 million and EBITDA for Q1 2022 will be below the low end of its prior guidance of $(15) - $(12) million.  The larger than anticipated EBITDA loss was primarily driven by higher than anticipated Clinical Services cost of goods sold.  The Company intends to take immediate action to address performance and costs . . . Additionally, the Company has withdrawn its 2022 annual financial guidance issued February 23, 2022."  On this news, the price of NeoGenomics common stock fell $5.30 per share, or 29.8%, from $17.79 per share on March 28, 2022 to $12.49 per share at the close of trading on March 29, 2022.

59.     Before the start of trading on April 27, 2022, NeoGenomics filed a Current Report on Form 8-K with the SEC disclosing the Company's first-quarter 2022 financial results (the "April 27, 2022 8-K").  In the April 27, 2022 8-K, NeoGenomics revealed that revenue for the quarter was $117 million and EBITDA loss was $19 million.  In the April 27, 2022 8-K, the Company further revealed that: "Consolidated gross profit for the first quarter of 2022" had "decrease[d] 8.0% compared to the first quarter of 2021" in part due to "higher payroll and payroll-related costs."  NeoGenomics also revealed that: "Operating expenses increased by $34 million, or 59%, compared to the first quarter of 2021" driven, in part, by "higher payroll and payroll-related costs to support the Company's strategic growth initiatives."

60.     Also on April 27, 2022, NeoGenomics held its 1Q22 Earnings Call.  During the call, NeoGenomics discussed the factors underlying the Company's poor performance and the actions it was taking to improve performance and return to profitable growth.

61.     Defendant Bonello stated: "Our volume growth is being impacted by a couple of factors.  First, our test mix is weighted to legacy modalities and disease-specific NGS offerings, while the market is moving towards larger, more comprehensive panels.  Second, operational challenges have made it difficult to add new business at our historical rates.  We are taking a number of steps to upgrade our NGS product offering and improve our lab operations."  Bonello further stated, "we are seeing some increased competition on the NGS front as panels move or as customers move to demanding larger, more comprehensive NGS-only panels, and our offering is more oriented towards smaller targeted panels."

62.     Also on the call, Bonello stated, "we've seen a notable decrease in lab efficiency over the course of the past year.  This decrease is largely attributable to increased complexity of both our product offerings and our lab processes, due in part to efforts to respond to customer

requests for customization.  We are already taking action to reduce this complexity.  These actions include eliminating low-margin services, streamlining our NGS processes to drive reductions in labor, supplies and bioinformatics costs, while simultaneously improving turnaround time and implementing AI to increase lab tech productivity."  Summarizing, Bonello further stated: "We view 2022 as a rebuilding year, where our primary focus is to improve our current product offering, drive operational efficiency, . . . and lay a foundation to support sustainable, profitable growth in 2023 and beyond."  On this news, the price of NeoGenomics common stock fell $0.41 per share, or 3.8%, from $10.85 per share on April 26, 2022 to $10.44 per share at the close of trading on April 27, 2022.

63.    Finally, on May 12, 2022, NeoGenomics participated in the Bank of America Healthcare Conference.  During the conference, Defendant Bonello revealed that, "over the past couple of years, we've seen perhaps a more pronounced transition to adoption of larger complete genomic profile NGS panels, then maybe the pace we had anticipated."  Also during the conference, he added: "We're in the process of developing our own NGS only [test] rather than multimodality panels that are also complete genomic profiling and sort of more on par with what are in some of the competitive panels as well as improving our turnaround times."

64.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of NeoGenomics securities, Plaintiff and other Class members have suffered significant losses and damages.

**LOSS CAUSATION**

65.    During the Class Period, as detailed herein, the Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market in violation of the Exchange Act.  This artificially inflated the price of NeoGenomics securities and

operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and
fraudulent conduct were disclosed to the market on November 4, 2021, March 28, 2022, and April
27, 2022, as alleged herein, the price of NeoGenomics securities fell precipitously, as the prior
artificial inflation came out of the price.  As a result of their purchases of NeoGenomics securities
during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*,
damages.

<u>**CLASS ACTION ALLEGATIONS**</u>

66.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules
of Civil Procedure on behalf of all persons who purchased or otherwise acquired NeoGenomics
publicly traded securities during the Class Period (the "Class").  Excluded from the Class are
Defendants and their families, directors, and officers of NeoGenomics and their families and
affiliates.

67.     The members of the Class are so numerous that joinder of all members is
impracticable.  The disposition of their claims in a class action will provide substantial benefits to
the parties and the Court.  As of May 9, 2022, there were more than 123.6 million shares of
NeoGenomics common stock outstanding, owned by at least thousands of investors.

68.     There is a well-defined community of interest in the questions of law and fact
involved in this case.  Questions of law and fact common to the members of the Class which
predominate over questions which may affect individual Class members include:

     A.  Whether Defendants violated the Exchange Act;

     B.  Whether Defendants omitted and/or misrepresented material facts;

C.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.  Whether the price of NeoGenomics securities was artificially inflated;

F.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.  The extent of damage sustained by Class members and the appropriate measure of damages.

69.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

70.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

72.     NeoGenomics's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.

73.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement

was false or misleading and the statement was made by or authorized and/or approved by an executive officer of NeoGenomics who knew that the statement was false.

## PRESUMPTION OF RELIANCE

74.    At all relevant times, the market for NeoGenomics securities was an efficient market for the following reasons, among others:

A.    NeoGenomics shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

B.    As a regulated issuer, NeoGenomics filed periodic public reports with the SEC;

C.    NeoGenomics regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.    NeoGenomics was followed by many securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

75.    As a result of the foregoing, the market for NeoGenomics securities promptly digested current information regarding NeoGenomics from all publicly available sources and reflected such information in the price.   Under these circumstances, all purchasers of NeoGenomics securities during the Class Period suffered similar injury through their purchase of NeoGenomics securities at artificially inflated prices and the presumption of reliance applies.

76.     A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class' claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

77.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

78.     During the Class Period, Defendants carried out a plan, scheme, and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase NeoGenomics securities at artificially inflated prices.

79.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for NeoGenomics securities in violation of Section 10(b)

of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.     Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal that: (i) NeoGenomics's was not a "one-stop shop" for

cancer testing which led to a significant decrease in revenue as current and prospective customers

went elsewhere for their testing needs; (ii) the Company's costs were not fixed because

NeoGenomics needed to hire additional employees to process more complex customized testing

demanded by customers utilizing the Company's outdated portfolio of tests, leading to operational

challenges, decreased lab efficiency, and increased testing turnaround times; and (iii) NeoGenomics violated federal healthcare laws and regulations related to fraud, waste, and abuse.

81.     During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose of concealing NeoGenomics's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NeoGenomics securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

85.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

86.     Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

87.     Defendants VanOort, McKenzie, Mallon, and Bonello acted as controlling persons of NeoGenomics within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about NeoGenomics, the Individual Defendants had the power and ability to control the actions of NeoGenomics and its employees.

88.     By reason of such conduct, the Defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

89.     **WHEREFORE**, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

<h2 style="text-align:center"><u>JURY DEMAND</u></h2>

90.    Plaintiff demands a jury trial.

Dated: December 6, 2022                              Respectfully submitted,

*/s/ Javier Bleichmar*
Javier Bleichmar
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, New York 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com

*Local Counsel for Plaintiff Daniel Goldenberg*

David Stein (*pro hac vice* forthcoming)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ds@classlawgroup.com

*Counsel for Plaintiff Daniel Goldenberg*

## **CERTIFICATION**

I, Daniel Goldenberg, hereby certify as follows:

1.      I have reviewed the Complaint against NeoGenomics, Inc. ("NeoGenomics"), Douglas VanOort, Mark Mallon, Kathryn McKenzie, and William Bonello alleging violations of the federal securities laws and have authorized its filing.

2.      I did not purchase or sell securities of NeoGenomics at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

4.      My transactions in the NeoGenomics securities that are the subject of this litigation during the Class Period are reflected in Schedule A, attached hereto.

5.      I have not sought to serve as a representative party in a class action filed under the federal securities laws in the last three years.

6.      Beyond my *pro rata* share of any recovery, I will not accept payment for serving as lead plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this  2      day of December 2022.


_____
Daniel Goldenberg

**SCHEDULE A**
TRANSACTIONS IN
NEOGENOMICS, INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 03/08/2022 | 200.00 | 18.10 | ($3,620.00) |
| Purchase | 03/08/2022 | 300.00 | 17.98 | ($5,394.00) |
| Purchase | 03/08/2022 | 300.00 | 18.02 | ($5,406.00) |
| Purchase | 03/08/2022 | 300.00 | 18.17 | ($5,451.00) |
| Purchase | 03/08/2022 | 435.00 | 17.98 | ($7,821.30) |
| Purchase | 03/08/2022 | 700.00 | 18.07 | ($12,649.00) |
| Purchase | 03/08/2022 | 925.00 | 18.19 | ($16,825.10) |
| Purchase | 03/08/2022 | 1,402.00 | 18.00 | ($25,236.00) |
| Purchase | 03/08/2022 | 1,740.00 | 18.05 | ($31,407.00) |
| Purchase | 03/08/2022 | 1,909.00 | 18.06 | ($34,476.54) |
| Purchase | 03/08/2022 | 3,507.00 | 18.01 | ($63,161.07) |
| Purchase | 03/08/2022 | 6,717.00 | 18.08 | ($121,443.36) |