UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL GOLDENBERG, *individually and on behalf of all others similarly situated*,<br><br>                              Plaintiff,<br><br>                    -v.-<br><br>NEOGENOMICS, INC., *et al.*,<br><br>                              Defendants. | 22 Civ. 10314 (JHR)<br><br>OPINION AND ORDER |

JENNIFER H. REARDEN, District Judge:

      Plaintiff Daniel Goldenberg brings this Private Securities Litigation Reform Act (the "PSLRA" or the "Act") action against Defendants NeoGenomics, Inc. ("NeoGenomics," or the "Company") and its former and current officers Douglas VanOort, Mark Mallon, Kathryn McKenzie, and William Bonello.  Plaintiff alleges that Defendants made materially false and misleading statements about the Company's cancer tests, operating structure, and compliance program that, when revealed, caused a decline in its stock price.  *See* ECF No. 1 (Compl.).  Before the Court are competing motions from Goldenberg and Movant Edilbert Caballes (collectively, "Prospective Lead Plaintiffs") for appointment as lead plaintiff, and for approval of their respective selections of lead counsel.  For the reasons stated below, Goldenberg's motion is GRANTED, and Caballes's motion is DENIED.

**I.  BACKGROUND**

      NeoGenomics provides cancer tests and testing services to doctors, clinics, hospitals, and pharmaceutical companies.  Compl. ¶ 3.  These services include "next generation sequencing" ("NGS") testing, a new technology that enables clinicians to test multiple genes of cancer simultaneously, making those tests more cost effective and efficient than older legacy tests that only look for a single specific mutation.  *Id* ¶¶ 3, 26.

On February 27, 2020, NeoGenomics held its earnings call for the fourth quarter of 2019. *See id.* ¶ 27. During that call, Defendant Douglas VanOort, the Company's Chief Executive Officer ("CEO"), announced that the Company's NGS tests were "very, very high-quality panels" and "should continue to fuel growth." *Id.* (quoting Fourth-Quarter 2019 Earnings Call). This marked the beginning of the class period. The next day, the Company filed its 2019 Form 10-K, touting its "testing capabilities" and stating that NeoGenomics "can be a true one stop shop for [its] clients as [the Company] can meet all of their oncology testing needs." *Id.* ¶¶ 28-30 (quoting 2019 Form 10-K, dated Feb. 28, 2020). The 10-K also characterized the Company's "robust Compliance Program" as "ensur[ing] compliance with the myriad of international, federal and state laws, regulations and governmental guidance applicable to [NeoGenomics's] business" (the "Compliance Allegation"). *Id.* ¶ 31 (quoting 2019 Form 10-K).

Through February 2022—in additional SEC filings, as well as shareholder meetings, earnings calls, and public conferences—the Company continued "touting [its] capabilities and competitive strengths." *Id.* ¶ 33; *see also id.* ¶¶ 34-37, 39-40, 42-45, 47-50, and 52. In addition, NeoGenomics routinely described its operating structure as "fixed cost," *see id.* ¶¶ 38, 41, 46, and 51, and included "substantially the same statements . . . touting the Company's efforts to comply with relevant regulations" in its 2020 Form 10-K as in its 2019 Form 10-K, *id.* ¶ 42.

Prospective Lead Plaintiffs aver that NeoGenomics made three corrective disclosures of these allegedly false statements. First, on November 4, 2021, Defendant Kathryn McKenzie, the Company's then-Chief Financial Officer ("CFO"), announced in NeoGenomics's third quarter 2021 earnings call that the Company was "voluntarily conducting an internal investigation with the assistance of outside counsel that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations." Compl. ¶ 55 (quoting Third-Quarter 2021 Earnings Call). NeoGenomics also stated that it had "voluntarily notified the Office of the

Inspector General of the U.S. Department of Health and Human Services of [its] investigation" and was "accru[ing] a reserve of $10.5 million for potential damage and liabilities." *Id.* (quoting Third-Quarter 2021 Earnings Call). NeoGenomics's stock fell 17.6%. *See id.* ¶ 56. After the close of trading, NeoGenomics filed its third quarter Form 10-Q, in which it added that its internal investigation included "federal healthcare laws and regulations" being investigated "relat[ed] to fraud, waste and abuse." *Id.* ¶ 57 (quoting 3Q21 Form 10-Q, dated Nov. 4, 2021).

Second, on March 28, 2022, NeoGenomics announced that its CEO would step down "effective immediately," and that it had suffered a "larger than anticipated EBITDA loss . . . primarily driven by higher than anticipated Clinical Services costs of goods sold." *Id.* ¶ 58 (quoting Mar. 28, 2022 Form 8-K). The Company withdrew its 2022 annual financial guidance, and its share price fell 29.8%. *Id.*

Third, on April 27, 2022, NeoGenomics revealed that its "[c]onsolidated gross profit [had] decreased" and its "[o]perating expenses [had] increased," in part because of "higher payroll and payroll-related costs." *Id.* ¶ 59 (alterations omitted) (quoting Apr. 27, 2022 Form 8-K). Defendant William Bonello, NeoGenomics's current CFO, further described the Company's "test mix" as "weighted to legacy modalities and disease-specific NGS offerings, while the market is moving towards larger, more comprehensive panels," leading to "increased competition." *Id.* ¶ 61 (quoting First-Quarter 2022 Earnings Call). Bonello went on to state that the Company "view[ed] 2022 as a rebuilding year, where [its] primary focus [was] to improve [its] current product offering, drive operational efficiency, and lay a foundation to support sustainable, profitable growth in 2023 and beyond." *Id.* ¶ 62 (alterations omitted) (quoting First-Quarter 2022 Earnings Call). The Company's share price fell by 3.8%. *See id.*

Against that backdrop, Goldenberg and Caballes purchased shares of NeoGenomics. Goldenberg purchased all of his shares on March 8, 2022—after the Company's first disclosure

(on November 4, 2021) but before its second and third disclosures (on March 28 and April 27, 2022, respectively).  *See* ECF No. 1 at 28 (Schedule A to the Compl.).  Caballes, for his part, purchased two-thirds of his shares between March and May 2021—that is, prior to any of the Company's three disclosures—and the rest on November 22, 2021, eighteen days after the first disclosure and prior to the second and third disclosures.  *See* ECF No. 17-3 (Caballes Loss Chart).

On December 6, 2022, Goldenberg filed suit, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  *See* Compl.  At the end of the sixty-day notice period provided by the PSLRA, *see* 15 U.S.C. § 78u-4(a)(3)(A), both Goldenberg and Caballes moved for appointment as the lead plaintiff in this case and for appointment of their choice for lead counsel.  *See* ECF Nos. 11 (Goldenberg Mot.) and 15 (Caballes Mot.).

## II.  LEGAL STANDARD

The PSLRA provides that a district court shall "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  15 U.S.C. § 78u-4(a)(3)(B)(i).  "The PSLRA creates a rebuttable presumption that the lead plaintiff should be the plaintiff who (a) has either filed a complaint or [timely] moved for lead plaintiff status; (b) has the largest financial interest in the relief sought; and (c) otherwise satisfies the typicality and adequacy requirements of Federal Rule of Civil Procedure 23."  *Phuong Ho v. NQ Mobile, Inc.*, 2014 WL 1389636, at *1 (S.D.N.Y. Apr. 9, 2014) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(1)).  "The presumption that a movant is the most adequate may be rebutted 'only upon proof by a member of the purported plaintiff class' that the presumptive lead plaintiff 'will not fairly and adequately protect the interests of the class' or 'is subject to unique defenses that render such plaintiff incapable of

4

adequately representing the class.'" *Seidel v. Noah Educ. Holdings Ltd.*, No. 08 Civ. 9203 (RJS), 2009 WL 700782, at *4 (S.D.N.Y. Mar. 9, 2009) (quoting § 78u-4(a)(3)(B)(iii)(II)).

### III. DISCUSSION

#### A. Selection of Lead Plaintiff

##### 1. Timeliness

Goldenberg timely moved for lead plaintiff appointment.  Pursuant to the PSLRA, within twenty days of the filing of an action, the plaintiff is required to publish notice of the action "in a widely circulated national business-oriented publication or wire service . . . advising members of the purported plaintiff class . . . of the pendency of the action, the claims asserted therein, and the purported class period."  15 U.S.C. § 78u-4(a)(3)(B)(i).  The notice also must inform that, within sixty days of the notice's publication, "any member of the purported class may move the court to serve as lead plaintiff of the purported class."  *Id.* § 78u-4(a)(3)(B)(ii).

On December 6, 2022, notice of a class action lawsuit against NeoGenomics and certain officers was published over Business Wire, a widely circulated national business-oriented wire service.  *See* ECF No. 13-2 (Notice of Pendency of *Goldenberg v. NeoGenomics, Inc.*).  The Notice advised members of the proposed class of their right "to request that the Court appoint [them] as lead plaintiff," and specified that such a request was to be made no later than "February 6, 2023, which is the first business day after 60 days from the date of publication of this notice."  *Id.* at 2.  Goldenberg filed his motion on February 6, 2023.  *See* ECF No. 11.  Goldenberg also attached to his motion a sworn certification, in accordance with the requirements of § 78u-4(a)(2)(A)(i)–(vi) ("Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by

5

such plaintiff and filed with the complaint [attesting to the items enumerated under this provision]."). Goldenberg's motion was timely and properly submitted.

2. **Financial Interest**

The presumptive lead plaintiff is the person with "the largest financial interest" in this action. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). "[T]o determine the plaintiff with the largest financial interest, courts in this Circuit have considered the factors set forth in *Lax v. First Merchs. Acceptance Corp.*, No. 97-2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997), which are: (1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period; (3) the net funds expended during the class period; and (4) the approximate losses suffered." *Gronich v. Omega Healthcare Invs., Inc.*, No. 17 Civ. 8983 (NRB), 2018 WL 1626078, at *2 (S.D.N.Y. Mar. 27, 2018); *see Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 395 (S.D.N.Y. 2008). "Consistent with other courts in this Circuit, [courts in this District] place the greatest emphasis on the approximate loss suffered by the movant." *Id.*

First, Goldenberg purchased 18,435 total shares (compared to Caballes's 1,500). Second, Goldenberg purchased 18,435 net shares (compared to Caballes's 1,500). Third, Goldenberg spent $322,891 in net expenditures (compared to Caballes's $65,750). And finally, and of chief importance, Goldenberg suffered a loss of $174,591 (compared to Caballes's $52,870). The Court finds that Goldenberg has the largest financial interest in the relief sought by the class.

3. **Rule 23 Requirements**

After the Court has identified the plaintiff with the largest financial interest in the litigation, it must "focus on that plaintiff alone and be limited to determining whether he satisfies the other statutory requirements [of the PSLRA]." *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 535 (S.D.N.Y. 2015) (citation omitted). Specifically, "in order to serve as lead

plaintiff, the movant with the largest financial interest must also satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Sanchez v. Arrival SA*, No. 22 Civ. 172 (DG), 2022 WL 20539729, at *4 (E.D.N.Y. Apr. 15, 2022) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc)). Rule 23(a) requires that a class satisfy four criteria: numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a). "However, of the four prerequisites to class certification, only two—typicality and adequacy—directly address the personal characteristics of the class representative," *In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 436 (S.D.N.Y. 2008) (alterations and quotation marks omitted), and they are therefore "the only [Rule 23(a) requirements] relevant to the determination of lead plaintiff under the PSLRA," *Xianglin Shi v. Sina Corp.*, No. 05 Civ. 2154 (NRB), 2005 WL 1561438, at *2 (S.D.N.Y. July 1, 2005) (citation omitted). "At this stage in the litigation, only a preliminary showing of typicality and adequacy is required." *Gronich*, 2018 WL 1626078, at *3 (citation omitted).

Goldenberg has made a *prima facie* showing of typicality and adequacy. "The typicality threshold is satisfied where the presumptive lead plaintiff's claims arise from the same conduct from which the other class members' claims and injuries arise." *Simco v. Aegean Marine Petroleum Network Inc.*, No. 18 Civ. 4993 (NRB), 2018 WL 11226076, at *3 (S.D.N.Y. Oct. 30, 2018). Goldenberg alleges that he purchased NeoGenomics securities during the class period; that the purchased shares were artificially inflated by Defendants' materially false and misleading statements; and that he suffered damages as a result—hallmarks of typicality under Rule 23(a). *See, e.g.*, *Gronich*, 2018 WL 1626078, at *3 (typicality requirement met where presumptive lead plaintiff "allege[d] that he purchased [defendant-company's] securities during the Class Period in reliance upon the allegedly false and misleading statements by the defendants about [company's] business and financial condition, and that he suffered damages as a result"); *Teran v. Subaye, Inc.*, No. 11 Civ. 2614 (NRB), 2011 WL 4357362, at *5 (S.D.N.Y. Sept. 16,

2011) ("typicality threshold [wa]s satisfied" where "[presumptive lead plaintiff] and the other members of the class allege[d] that they purchased shares of [defendant-company] during the class period that were artificially inflated as a result of defendants' false and misleading statements concerning [company's] business, operations, and financial results and prospects"). Thus, Goldenberg meets the typicality requirement under Rule 23.

Goldenberg also meets the adequacy requirement. This requirement is satisfied where "(1) class counsel is qualified, experienced, and generally able to conduct the litigation, (2) there is no conflict between the proposed lead plaintiff and the members of the class, and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Teran*, 2011 WL 4357362, at *5. Goldenberg has retained Gibbs Law Firm as its lead counsel, which has experience prosecuting securities class actions. *See, e.g.*, *In re Peregrine Fin. Grp. Customer Litig.*, No. 12 Civ. 5546 (N.D. Ill.). Further, Goldenberg's financial interest should ensure vigorous advocacy on behalf of the class. Finally, there is no reason to believe that Goldenberg has interests that are adverse to those of the class members or any other noteworthy conflict.

Because Goldenberg has the largest financial interest and satisfies the Rule 23 requirements, he is presumptively the lead class plaintiff.

### 4. Caballes's Attempts to Rebut the Presumption

The presumption in favor of Goldenberg's lead plaintiff status may be rebutted "only upon proof" that he "will not fairly and adequately protect the interests of the class," or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Caballes contends that Goldenberg cannot serve as lead plaintiff because he (1) purchased all of his shares only *after* the Company had disclosed its internal investigation into its violations of federal healthcare laws and regulations, and (2) has a

history of criminal offenses that cast doubt on his ability to adequately represent the class. Neither argument persuades.

### a. The Timing of Goldenberg's Securities Purchases

As previously explained, all of Goldenberg's shares were purchased on March 8, 2022, after NeoGenomics's first disclosure (on November 4, 2021), but before its second and third disclosures (on March 28 and April 27, 2022, respectively). *See* Schedule A to the Compl. Caballes, on the other hand, bought two-thirds of his shares before any of the Company's three disclosures and one-third of his shares after the Company's first disclosure. Caballes Loss Chart. Caballes argues that this distinction "disqualifie[s]" Goldenberg. Caballes Opp. Br. 2.

To be sure, purchasing all of one's shares after the first of multiple corrective disclosures "*may* . . . subject [the lead plaintiff] to a unique defense" regarding that plaintiff's reliance on the integrity of the market price. *Lundy v. Ideanomics, Inc.*, No. 20 Civ. 4944 (GBD), 2020 WL 7389027, at *3 (S.D.N.Y. Dec. 16, 2020) (emphasis added) (disqualifying presumptive lead plaintiff who "purchased *all* his . . . shares after the . . . partial corrective disclosures but before the . . . final corrective disclosure" and distinguishing case where "movant purchased shares both before and after the initial corrective disclosure"); *see also Faris v. Longtop Fin. Techs. Ltd.*, No. 11 Civ. 3658 (SAS), 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011) (disqualifying prospective plaintiff who purchased all of its shares post-disclosure and granting motion of prospective lead plaintiff "that purchased the vast majority of its . . . shares before the first corrective disclosure"). Post-disclosure purchases are "not," however, "a per se bar to an appointment as lead plaintiff." *Lundy*, 2020 WL 7389027, at *3; *see also In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 346 (S.D.N.Y. 2009) ("Without more, [presumptive lead plaintiff's] purchase of these shares after the partial disclosures does not render [it] atypical or subject it to unique defenses.").

9

As alleged in the Complaint, the statements giving rise to the Compliance Allegation relate to NeoGenomics having touted its "robust Compliance Program." Compl. ¶¶ 5, 31, and 42 (quoting 2019 and 2020 Form 10-Ks). Caballes asserts that the Company's November 4, 2021 earnings call, third quarter 10-Q filed after the close of trading that day, and 2021 Form 10-K filed in February 2022—all of which mention the Company's internal investigation,[1] and all of which preceded the purchase of Goldenberg's shares—constituted "corrective disclosures" of those statements. Caballes Opp. Br. 3. In Caballes's view, those disclosures should disqualify Goldenberg for fear of "unique reliance-based defenses." *Id*. But the very same 2021 10-K Caballes describes as a corrective disclosure includes a near-verbatim "touting" of the Company's compliance program. That document was issued months after the initial disclosure of the internal investigation and before Goldenberg purchased his shares.

Moreover, while the Company announced that it "voluntarily notified the Office of the Inspector General of the U.S. Department of Health and Human Services of [its] investigation," Compl. ¶ 55, even a statement that Defendant "met with regulators does not necessarily amount to a corrective disclosure," *Ciccarello v. Alibaba Grp. Holding Ltd.*, No. 20 Civ. 9568 (GBD), 2022 WL 409087, at *3 (S.D.N.Y. Feb. 10, 2022). And although the Company also disclosed that its investigation "focuse[d] on the compliance of certain consulting and service agreements with federal healthcare laws, including those relating to fraud, waste and abuse," Compl. ¶ 57, a statement that Defendant "*may* not meet [regulatory] or disclosure requirements . . . was simply a possibility not a previously undisclosed fact," *Ciccarello*, 2022 WL 409087, at *3. "[A]t this

---

[1] While the Complaint does not specifically allege that the 2021 Form 10-K included statements regarding the Company's internal investigation, Caballes points to such statements in his opposition brief. *See* Caballes Opp. Br. 3 n.2 (citing 2021 Form 10-K at 29, 53, 94, dated Feb. 25, 2022).

stage in the litigation, there is no reason to reach any conclusions about the impact of the . . . [announcement] or rule on which disclosure revealed the alleged misrepresentations." *In re Facebook, Inc., IPO Secs. And Derivative Litig.*, 288 F.R.D. 26, 38 (S.D.N.Y. 2012). Accordingly, Caballes has not shown that the Company's initial disclosure was anything but a "partial disclosure," after which "the market priced in some additional risk," and NeoGenomics's "alleged misrepresentations and/or omissions continued to injure its investors." *Shapiro v. TG Therapeutics, Inc.*, 22 Civ. 6106 (JSR), 2022 WL 16555585, at *4 (S.D.N.Y. Oct. 31, 2022) (ultimately disqualifying presumptive lead plaintiff on unrelated grounds).

### b. Goldenberg's Alleged History of Criminal Offenses

Caballes also argues that Goldenberg should be disqualified from lead plaintiff status because of his purported "history of criminal offenses that cast doubt on his ability to adequately represent the class." Caballes Opp. Br. 5. Caballes highlights independent research showing that Goldenberg "has been charged with at least five violations of Florida's criminal laws." *Id*. For his part, Goldenberg declares that he was "convicted of only a single minor offense—a misdemeanor for shoplifting a compact disc" when he was in high school more than 25 years ago. ECF No. 27-1 (Goldenberg Decl.) ¶ 4. A subsequent charge relating to a bad check stemmed from an "honest mistake" involving Goldenberg having "recently switched banks," then a "computer error" several years later, and was "immediately dismissed." *Id.* ¶¶ 5-7.

Caballes seems to concede that Goldenberg's misdemeanor shoplifting conviction has no bearing on his "honesty and trustworthiness" or ability to lead a class. *Wentworth*, 2020 WL 13527954, at *5 (quoting *Savino*, 164 F.3d at 87). Caballes's arguments involve solely the bad checks charge, and he cites distinguishable authority dealing only with felony and fraud convictions. *See* Caballes Opp. Br. 5-6 ("The offense related to [passing bad checks] is particularly relevant because it raised questions as to Goldenberg's honesty, trustworthiness, and

11

adequacy[.]"). Indeed, a 25-year-old misdemeanor shoplifting conviction is the sort of "minor, unrelated allegation[] of wrongdoing" that is "insufficient to render a proposed class representative inadequate." *Wentworth*, 2020 WL 13527954, at *6 (counting cases).

**B. Appointment of Lead Counsel**

"[S]ubject to approval of the court," the PSLRA directs "the most adequate plaintiff" to "select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). "There is a strong presumption in favor of approving a properly-selected lead plaintiff's decision as to counsel." *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 623 (S.D.N.Y. 2015). Here, Goldenberg has selected Gibbs Law Group LLP. The firm's resume indicates that it has extensive experience in the field of securities litigation and "is qualified, experienced, and generally able to conduct the litigation." *Maliarov v. Eros Int'l PLC*, No. 15 Civ. 8956 (AJN), 2016 WL 1367246, at *7 (S.D.N.Y. Apr. 5, 2016) (quoting *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 131 (S.D.N.Y. 2011)). Accordingly, Goldenberg's selection of Gibbs Law Group LLP is approved.

## IV.   CONCLUSION

Plaintiff Daniel Goldenberg's motion for appointment as lead plaintiff and approval of his selection of lead counsel, ECF No. 11, is GRANTED. Movant Edilbert Caballes's competing motion for appointment as lead plaintiff, ECF No. 15, is DENIED.

The Clerk of Court is directed to terminate ECF Nos. 11 and 15.

SO ORDERED.

Dated: September 30, 2023
      New York, New York

*Jennifer H. Rearden*
JENNIFER H. REARDEN
United States District Judge