**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANIEL GOLDENBERG, individually and on behalf of all others similarly situated,<br><br><br>Plaintiff,<br><br>v.<br><br>NEOGENOMICS, INC., DOUGLAS VANOORT, MARK MALLON, KATHRYN MCKENZIE, and WILLIAM BONELLO,<br><br><br>Defendants. | Case No. 1:22-CV-10314-JHR<br><br><u>CLASS ACTION</u><br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

## TABLE OF CONTENTS

I.    Nature of the Action ................................................................................................ 1

II.   Jurisdiction and Venue ............................................................................................ 5

III.  Parties ...................................................................................................................... 6

IV.   Substantive Allegations ......................................................................................... 10

      A.  Company Background ..................................................................................... 10

          1.  NeoGenomics provides cancer testing and other services, receiving
              payments from sources that include federally funded programs. ................. 10

          2.  VanOort aspires to transform NeoGenomics from a small start-up
              into the leading cancer testing company in the world. ...................................... 13

      B.  The Company falsely and misleadingly claims that its top competitive
          strengths are: (1) rapid turnaround times, and (2) innovative service
          offerings, meaning technologically superior NGS and "one-stop-shopping"
          for oncologists ................................................................................................ 14

          1.  The Company touted its turnaround times as its top "Competitive
              Strength," even though lagging test results were a grave and longstanding
              problem that lost the Company customers and revenue. ................................ 17

              a.    NeoGenomics claims to deliver "consistent timeliness of results"
                    with "rapid" and "industry leading turnaround times." ........................... 17

              b.    NeoGenomics claims that its speedy turnaround times fuel
                    growth and positively drive demand for the Company's clinical
                    testing services................................................................................ 19

              c.    Defendants concealed material facts, including that the Company's
                    turnaround times were unacceptable, consistently lagged behind
                    the competition, and caused NeoGenomics to lose customers and
                    revenue. ............................................................................................ 21

          2.  The Company's second claimed competitive strength of "Innovative
              Service Offerings" was also false and misleading in touting NGS
              superiority and "one-stop-shopping." ................................................................. 27

              a.    NeoGenomics claims its NGS offerings are technologically
                    superior, allowing it to deliver useful results even with small
                    samples. ............................................................................................ 28

i

b.    NeoGenomics claims that its NGS testing superiority was a "key growth driver" responsible for a significant portion of the Company's organic growth. ............................................................. 29

c.    NeoGenomics claimed that NGS offerings helped make the Company a "one-stop shop" that could meet all of customers' oncology testing needs. ................................................................. 31

d.    In reality, NeoGenomics "was not good at NGS," its technology was "antiquated," its NGS tests frequently failed to deliver usable results for oncologists and their patients, and rather than being a "one-stop shop," NeoGenomics outsourced test requests to competitors. ................................................................. 34

C. NeoGenomics misleadingly fails to disclose that its small LCI Group's revenue equals about 40% of the Company's organic revenue growth—and about 70% of the Clinical Services division's organic revenue growth— during the Class Period. ................................................................. 41

1.   The Company's LCI group provides consulting services to healthcare providers to help them "in-source" low-cost testing in exchange for referring high-value testing to NeoGenomics. ................................. 44

2.   LCI becomes the single largest driver of revenue growth in the Clinical Services division and likely the entire Company. ............................... 46

3.   LCI's practices were not only unethical, but unlawful, violating the federal Anti-Kickback Statute. ........................................................ 52

4.   In April 2021, the Company suspends all new contracts for LCI. ............. 54

5.   Shutting down new LCI business had a massive and undisclosed impact on NeoGenomics' revenue growth. ........................................... 55

6.   Later in 2021, the Company implicitly admits liability for Anti-Kickback Statute violations by reporting them to the OIG and taking a $10.5 million liability reserve. ............................................................ 58

7.   NeoGenomics cleans house in the wake of its compliance failing and the subsequent government investigation. .................................... 59

V.   The Truth Begins to Emerge ........................................................ 60

A. Disclosure on November 4, 2021 ................................................ 60

B. Disclosure on March 28, 2022 ................................................................. 65

C. Disclosure on April 27, 2022 .................................................................. 68

VI.    Loss Causation/Economic Loss Allegations ............................................. 70

VII.   Post-Class Period Events............................................................................ 72

VIII.  Additional Evidence of Scienter ............................................................... 74

A. Statements of current and former NeoGenomics employees establish
scienter ............................................................................................................. 75

1. Executive leadership's knowledge relating to the Company's problems
with unacceptable turnaround times, poor NGS deliveries, and inability
to deliver one-stop-shopping. ...................................................................... 75

2. Executive leadership's knowledge relating to LCI's outsize impact on
organic revenue growth and about impact of terminating LCI on organic
revenue going forward.................................................................................. 84

a. The outsize impact of LCI on the Company's organic revenue
growth.......................................................................................................... 84

b. Defendants' knowledge of the outsize LCI revenue.......................... 86

c. LCI was critical to NeoGenomics' core operations. ............................ 89

B. The abrupt departures of two CEOs, the head of LCI, and the Chief
Compliance Officer all within less than a year of each other strongly
support an inference of scienter.................................................................... 90

IX.    Defendants' Materially False and Misleading Statements  and Omissions During
the Class Period ............................................................................................ 92

A. NeoGenomics touts its consistently strong, industry leading turnaround
times as fueling growth and positively driving demand for the Company's
Clinical testing services, while omitting the fact that the turnaround times
consistently disappointed, causing the Company to lose customers and
revenue ............................................................................................................ 94

1. Defendants' claims that NeoGenomics delivers consistently strong
and industry leading turnaround times ...................................................... 94

2.  Defendants' claims that the Company's speedy turnaround times were a top competitive strength, fueling growth and positively driving demand for the Company's clinical testing services ......................................... 98

B.  NeoGenomics touts its "Innovative Service Offerings" as a top "Competitive Strength," including by virtue of technologically superior next generation sequencing (NGS) and ability to provide one-stop-shopping for healthcare providers, while neither truly drove revenue growth as the NGS offerings lagged technologically behind the competition and the Company resorted to outsourcing test requests to competitor laboratories. ......................................... 102

1.  NeoGenomics claims to utilize superior NGS technology that empowers healthcare providers to derive useful clinical information from very small patient samples. ........................................................................................ 102

2.  NeoGenomics claims that its NGS offerings drive growth for the Company ............................................................................................................ 107

3.  The Company touts one-stop-shopping as a driver of growth and demand because of healthcare providers' preference to rely on a single laboratory. ............................................................................................................ 114

C.  NeoGenomics concealed the outsize revenue impact of LCI and then, upon freezing new LCI business, the Company misrepresented its prospects for future revenue while failing to disclose that a major driver of revenue had been terminated ..................................................................................................... 118

1.  NeoGenomics concealed the fact that LCI was one of the largest drivers of revenue at the Company .................................................................... 118

2.  NeoGenomics concealed the known impact that freezing new business and otherwise beginning to dismantle LCI would have on revenue. ............................................................................................................... 119

3.  NeoGenomics misrepresented the extent of the revenue impact even when it finally disclosed the compliance investigation. ......................... 122

D.  NeoGenomics' failure to disclose the LCI group's outsize impact on revenue growth, as well as the freezing of new LCI business and steps taken to begin dismantling the group, was also contrary to a duty to disclose arising under Item 303 of Regulation S-K. ............................................................. 125

X.    Applicability of Presumption of Reliance:  Fraud on The Market Doctrine ....... 129

XI.    No Safe Harbor ....................................................................................................... 130

XII.   Class Action Allegations ............................................................................... 132

XIII.  Counts ......................................................................................................... 133

    A.  Count I: Violation of § 10(b) of the Exchange Act and Rule 10b-5
    Promulgated Thereunder Against All Defendants ...................................... 133

    B.   Count II: Violation of Section 20(a) of the Exchange Act Against the
    Individual Defendants ............................................................................... 136

XIV.   Prayer for Relief ......................................................................................... 137

XV.    Jury Trial Demand ...................................................................................... 137

**Confidential Witnesses**

Lead Plaintiff's investigation included interviews with former NeoGenomics employees and executives knowledgeable about the facts and events relevant to the allegations described herein. The accounts they provided concerning the Company's core business operations and the true drivers of demand and growth stand in stark contrast to the Company's statements throughout the Class Period. In total, 13 witnesses provided information (including 4 of the 11 employees comprising the Laboratory Collaborations and Implementations group (LCI)), all of them were employed at NeoGenomics during the Class Period, and all were in positions where they were able to learn the facts described as part of their job function. The witnesses are referred to herein as Confidential Witnesses or "CW__," and their positions and tenure at NeoGenomics follow below:

- CW-1 was employed by NeoGenomics from January 2020 to October 2021. From January 2020 to January 2021, CW-1 worked as Senior Vice President, Pharma Services. From January 2021 to October 2021, CW-1 worked as Chief Operating Officer, Clinical. In the COO role, CW-1 reported to Defendant VanOort and later to Defendant Mallon.

- CW-2 was employed by NeoGenomics from October 2017 to June 2022. CW-2 worked as Global Manager of Strategic Communications (October 2017 to May 2019), Global Director of Collaboration and Scientific Engagement (May 2019 to February 2021), and Senior Director of Scientific Collaborations and Engagement

(February 2021 to June 2022). CW-2 reported to the Chief Medical Officer and Chief Scientific Officer.

- CW-3 was employed by NeoGenomics from December 2018 to May 2021 as the Chief Scientific Officer and Chief Medical Officer.

- CW-4 was employed by NeoGenomics from September 2016 to May 2022. From January 2019 to May 2022, CW-4 was Director, Laboratory Collaborations. CW-4 reported to Vice President of Oncology Services and Laboratory Collaborations Ryan Angell. Angell reported to Senior Vice President, Clinical Division Gina Wallar.

- CW-5 was employed by NeoGenomics from May 2018 to January 2023. CW-5 worked as an oncology Business Development Manager for the Central Region (May to December 2018), a national director for the LCI Group (January to April 2019), and Regional Director for the Southeast Region (May 2019 to January 2023). CW-5 reported to Vice President of Sales Michele Buzhardt, who led sales for the Clinical Services division.

- CW-6 was employed by NeoGenomics from December 2020 to March 2022. From December 2020 to November 2021, CW-6 worked as an Engagement Manager. From November 2021 to March 2022, CW-6 was Head of Data Strategy and Analytics.

- CW-7 was employed by NeoGenomics from July 2021 to August 2022 as Director, Informatics. CW-7 reported to Vice President, Sales and Commercial Strategy, Informatics Kyle Dunn, and Head of Biopharma Sales and Business Development Lindsey Gasparini. Dunn and Gasparini both reported to Defendant Bonello.

- CW-8 was employed by NeoGenomics from September 2015 to July 2022. CW-8 worked as Director of Bioinformatics, Molecular Laboratory (September 2015 – October 2018), Director of Research Development and Clinical Bioinformatics (November 2018 to March 2019), Vice President of Research and Development (March 2019 to 2021), and Chief Scientific Officer, Clinical Division (2021 to July 2022). As Chief Scientific Officer, CW-8 was a member of the executive team and reported to Defendant VanOort and later to Defendant Mallon.

- CW-9 was employed by NeoGenomics from April 2012 to January 2021. From January 2016 to January 2021, CW-9 worked as a Laboratory Supervisor. CW-9 reported to the Operations Manager of the FISH Department, who in turn reported to the Site Director of NeoGenomics' Aliso Viejo facility.

- CW-10 was employed by NeoGenomics from December 2015 to April 2021 as a Clinical Lab Supervisor and Clinical Lab Manager. CW-10 was then employed by NeoGenomics from October 2021 to August 2023 as a Director of Operations for Pharma Services. CW-10 reported to Aliso Viejo Site Director Bryan Hill and worked closely with Vice President of Clinical Operations Jason Allchin.

- CW-11 was employed by NeoGenomics from September 2015 to November 2022. From June 2019 to November 2022, CW-11 worked as a manager in the LCI Group. CW-11 reported to Vice President of Oncology Services and Laboratory Collaborations Ryan Angell, who in turn reported to Senior Vice President, Clinical Division Gina Wallar.

- CW-12 was employed by NeoGenomics from March 2019 to March 2023 as Implementation Manager, Laboratory Collaborations. As such, CW-12 was one of only a handful of employees at the Company that was part of the LCI Group for the entire duration of the Class Period. CW-12 reported to Vice President of Oncology Services and Laboratory Collaborations Ryan Angell. Angell reported to Senior Vice President, Clinical Division Gina Wallar.

- CW-13 was employed by NeoGenomics from January 2019 to June 2020 as a Director of Compliance and Ethics. CW-13 reported to Chief Compliance Officer Stephanie Bywater, who in turn reported to Defendant VanOort.

Lead Plaintiff Daniel Goldenberg, individually and on behalf of all other persons and entities who purchased or acquired common stock of NeoGenomics, Inc., ("NeoGenomics" or "the Company") between February 27, 2020, and April 26, 2022, inclusive (the "Class Period") alleges the following based upon personal knowledge as to his own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief is based on counsel's investigation, which included, among other things: (i) a review and analysis of NeoGenomics' public filings with the U.S. Securities and Exchange Commission and other public documents, including analyst reports, conference calls with analysts, and the Company's public website and press releases; (ii) interviews with former NeoGenomics employees and executives on a confidential basis, each of whom is knowledgeable about the specific facts attributed to them; and (iii) a review and analysis of news articles and other coverage pertaining to NeoGenomics. Many of the facts relevant to Lead Plaintiff's allegations are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial further evidentiary support will be revealed after a reasonable opportunity to obtain discovery.

## I.    Nature of the Action

1.    This is a proposed class action, brought under federal securities law, that arises from material misrepresentations and omissions made by NeoGenomics and several of its officers and directors.

2.      NeoGenomics performs clinical testing to inform treatment for cancer patients. The Company competes with larger, better-known laboratories like Quest Diagnostics and Labcorp.

3.      Despite facing serious competition, NeoGenomics showed strong organic revenue growth in 2019, 2020, and 2021. In each of those years, NeoGenomics' clinical division grew by $20+ million. But beginning in late 2021, revenue growth dropped off, causing the Company's share price to plummet.

4.      NeoGenomics' public explanations did not make sense. Among other things, NeoGenomics pointed to aspects of the Company that it had long claimed were its top competitive strengths.

5.      At the same time that it began disclosing disappointing revenue numbers, the Company also revealed a federal investigation into a compliance matter. But NeoGenomics claimed that the compliance matter would have no "meaningful impact to revenue." That investigation remains ongoing, and the Company has still never told the full truth about its impact.

6.      Extensive interviews with more than a dozen well-placed former NeoGenomics executives and employees have now revealed the true reasons for the slowdown. Those interviews reveal that for over two years, NeoGenomics was telling investors a false and misleading story about what was driving its growth.

7.      Back when the Company was experiencing strong growth, NeoGenomics touted two main "competitive strengths." The first was the speed with which it

delivered test results. The second was its innovative services, including Next Generation Sequencing (NGS).

8. This narrative worked well to explain the Company's growth. After all, speedy test results are crucial for cancer treatment. And NeoGenomics explained well how its innovative NGS offerings were superior to other labs' offerings, while helping make NeoGenomics a "one-stop shop" for oncology groups (who dislike having to send tissue samples to multiple laboratories).

9. Investors were taken by this narrative, and the market for NeoGenomics' stock surged, hitting record highs during 2021.

10. But the story Defendants offered investors wasn't true. To the contrary, when it came to testing speed, NeoGenomics failed dramatically. Its glacial turnaround times were repeat topics at Company-wide meetings and board-of-director meetings— and cost the Company important clients and revenue. As a former employee put it: "What they were doing," in misrepresenting turnaround times, "was immoral." "Patients were literally dying" awaiting their test results.

11. The claims about the Company's innovative test menu were baseless too. Interviews have revealed that NeoGenomics' NGS offerings were antiquated. As part of Lead Plaintiff's investigation, the Company's former clinical Chief Operating Officer put it succinctly: "Neo was not good at NGS." The NGS offerings were so deficient, that as often as half the time, the Company delivered no usable results for cancer treatment. And even the Company's "one-stop" claim was false; NeoGenomics outsourced test orders to competitors rather than performing all testing in-house.

12.     Why would a company posting impressive revenue gains so plainly misrepresent what was driving those gains? In NeoGenomics' case, it was because the Company's largest driver of revenue was a small group with only 11 people at its height—a group called the Laboratory Collaborations and Implementations group (or LCI). LCI helped physician groups and hospitals set up their own labs. In exchange, those hospitals and physician groups were expected to refer their more complex and expensive testing to NeoGenomics. This arrangement proved to be wildly successful, generating between $20 and $50 million in revenue annually—equal to about 40% of the entire company's organic growth. That is, until the compliance matter and investigation began in April 2021. At that point, and unbeknownst to investors, NeoGenomics ordered LCI to stop doing new business, abruptly curtailing one of its top drivers of growth.

13.     As noted above, on November 4, 2021, NeoGenomics revealed that it had reported compliance violations to regulators and that it had missed on its quarterly revenue. This was the beginning of the end for the Company's inflated share price. The stock dropped nearly 18% on the news. But even then, NeoGenomics chose not to go public with the fact that LCI had been generating so much of the Company's revenue or that it new LCI business was now frozen. Instead, NeoGenomics lied to investors, saying "there is not going to be a meaningful impact to revenue."

14.     But the Company predictably continued to miss its revenue and earnings projections in the two quarters that followed. On March 29, 2022, NeoGenomics announced that it expected first-quarter revenue to "be below the low end of its prior

4

guidance," and the Company withdrew its 2022 financial guidance, issued just a month earlier. The stock immediately plummeted by nearly 30%. Less than a month later, the Company reported that "[c]onsolidated gross profit for the first quarter of 2022" had decreased 8% "compared to the first quarter of 2021." The stock then fell nearly 4% more.

15.     Only at that point did Defendant Bonello acknowledge that the Company had been spending considerable time and money trying to shore up its "operational challenges," including "to upgrade our NGS product offering and improve our lab operations." Later in 2022, when NeoGenomics was on its third CEO in as many years, it confessed that it had been failing operationally "for years." The new CEO not only said, "there is no doubt that we need to significantly improve," but the first item he highlighted for improvement was "reducing turnaround time." Once touted as the Company's top competitive strength, turnaround time was finally confirmed to be one of NeoGenomics' longstanding weaknesses.

## II.     Jurisdiction and Venue

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and transactions giving rise to the violations of law

complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. NeoGenomics common stock trades on the NASDAQ, which is headquartered in this District.

19.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    Parties

20.     Lead Plaintiff Daniel Goldenberg purchased NeoGenomics securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged herein. Lead Plaintiff's NeoGenomics transactions are set forth in his certification, previously filed on December 6, 2022. ECF No. 1.

21.     Defendant NeoGenomics is a Nevada corporation, with its principal executive offices located at 9490 NeoGenomics Way, Fort Myers, Florida. Throughout the Class Period, the Company's common stock traded, and continues to trade, in an efficient market on the NASDAQ under the ticker symbol "NEO."

22.     Defendant VanOort served as the Company's CEO throughout the Class Period until April 19, 2021, at which time he became the Executive Chair of NeoGenomics' Board of Directors. On October 12, 2021, the Company announced that VanOort would be stepping down as Executive Chair and would retire as a member of the Board before the end of the year. As the Company's CEO, VanOort disseminated

false and misleading information to investors during NeoGenomics' conference calls, signed and certified several of NeoGenomics' false and misleading SEC filings, and was a direct and substantial participant in the fraud.

23.     Defendant Mallon served as the Company's CEO from April 19, 2021, to March 28, 2022. As the Company's CEO, Mallon disseminated false and misleading information to investors during NeoGenomics' conference calls, signed and certified several of NeoGenomics' false and misleading SEC filings, and was a direct and substantial participant in the fraud.

24.     Defendant McKenzie served as the Company's CFO throughout the Class Period until December 31, 2021. NeoGenomics named McKenzie Chief Sustainability and Risk Officer as of January 1, 2022. As the Company's CFO, McKenzie signed and certified several of NeoGenomics' false and misleading SEC filing and was a direct and substantial participant in the fraud.

25.     Defendant Bonello is the Company's current CFO and has served in that capacity since January 1, 2022. Previously during the Class Period, Bonello served as President of NeoGenomics' Informatics Division and as Director of Investor Relations. As the Company's CFO, Bonello signed and certified one of NeoGenomics' false and misleading SEC filings and was a direct and substantial participant in the fraud.

26.     VanOort, Mallon, McKenzie, and Bonello are collectively referred to as the "Individual Defendants."

27.     Each of the Individual Defendants, because of their respective positions within the Company, possessed the power and authority to control the contents of the

Company's reports to the SEC, press releases, and presentations to securities analysts,

money and portfolio managers, and institutional investors. Throughout the Class

Period, each of the Individual Defendants, as senior executive officers of NeoGenomics,

was directly involved in the management and day-to-day operations of the Company at

the highest levels and, as further detailed herein, was privy to confidential and

proprietary information concerning NeoGenomics and was involved in drafting,

producing, reviewing, and disseminating the false and misleading statements and

information alleged herein, was aware of, or recklessly disregarded, the false and

misleading statements being issued regarding the Company, and approved or ratified

these statements, in violation of the federal securities laws.

     28.    Each of the Individual Defendants had access to non-public information

about the Company and its current business, operations, services, competition, and

present and future business prospects via access to internal corporate documents,

conversations, and connections with other corporate officers and employees, attendance

at management and/or board meetings, and reports and other information provided to

them in connection therewith. Because of their positions with the Company and their

access to material non-public information available to them but not to the public, the

Individual Defendants knew of and participated in the fraudulent scheme alleged

herein, knew and/or recklessly disregarded that the adverse facts specified herein had

not been disclosed to and were being concealed from the public, and knew and/or

recklessly disregarded that the affirmative representations being made were then

materially false and misleading.

29.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30.     The Individual Defendants were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each individual Defendant was provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

31.     Because of their positions of control and authority as senior officers, and because of their access to and use of material, non-public information available to them, the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the

positive representations and omissions that were being made were then materially false and/or misleading. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV.    Substantive Allegations

### A.  Company Background

**1.  NeoGenomics provides cancer testing and other services, receiving payments from sources that include federally funded programs.**

32.    NeoGenomics is a cancer diagnostics and information services company servicing oncologists, pathologists, pharmaceutical companies, and academic centers. The Company operates laboratories in the United States, Europe, and Asia.

33.    NeoGenomics comprises two business divisions: Clinical Services and Pharma Services.

34.    NeoGenomics' Clinical Services division serves as an oncology reference lab for health care providers, including oncology groups, hospitals, and pathology practices. Clinicians send blood and tissue samples to NeoGenomics for laboratory testing and interpretation on behalf of patients potentially in need of cancer treatment.

35.    Clinical Services is by far the most significant division within the Company when it comes to revenue. The Clinical Services division accounted for approximately 85% of annual revenue during the Class Period. That revenue is generated as the Company receives and executes on clinical test orders from its

customers. NeoGenomics collects revenue from clients through either direct billing, commercial insurance, or from Medicare and other government payors.

36.    NeoGenomics' Pharma Services division supports pharmaceutical firms' drug development efforts by providing testing for clinical trials and other research. Pharma Services accounted for an average of 15% of revenue annually during the Class Period. NeoGenomics' Pharma Services division also includes an "Informatics" group, which provides pharmaceutical companies with data the Company has collected from patient tests.

37.    Both Clinical Services and Pharma Services customers utilize the Company's diagnostic test offerings. As of February 25, 2022, when the Company filed its 10-K for FY 2021, NeoGenomics offered several testing methodologies, including:

   a. Flow cytometry, which uses a laser to analyze cell characteristics. Flow cytometry may be performed on liquid or solid tissue samples.

   b. Fluorescence In-Situ Hybridization (FISH), a molecular cytogenetic technique that uses fluorescent probes to identify gene alterations on chromosomes.

   c. Molecular testing involving the analysis of DNA and RNA, as well as the structure and function of genes at the molecular level. Molecular testing technologies include liquid biopsy tests, which identify tumor DNA in the bloodstream, and NGS tests, which search multiple genes simultaneously for mutations or disease markers. Because of this, NGS testing is thought to facilitate more precise diagnoses and lead to more tailored treatments

11

with better outcomes for patients. NGS tests have grown in popularity in recent years among pathologists for this reason and because they can be more cost effective and efficient than legacy tests like flow cytometry and FISH.

d. NeoGenomics historically focused on diagnostics and testing for blood, or hematologic cancers like lymphoma, myeloma, and leukemia, across several of the modalities listed above. NeoGenomics frequently refers to hematologic cancer and hematologic-cancer-specific assays[1] by the shorthand "heme." During the Class Period, the Company expanded its offerings for "solid tumor" cancer testing, in particular, solid-tumor-NGS testing. Solid-tumor cancers include breast, ovarian, skin, and prostate cancers.

38. These tests are performed in the Company's laboratories around the world. As of December 31, 2021, the Company operated laboratories in Fort Myers and Tampa, Florida; Aliso Viejo, Carlsbad, and San Diego, California; Research Triangle Park, North Carolina; Houston, Texas; Atlanta, Georgia; Nashville, Tennessee; Phoenix, Arizona; Cambridge, United Kingdom; Rolle, Switzerland; and Singapore.

---

[1] Defendants use the term "assay" to refer to the various diagnostic procedures that the Company offers in connection with collecting information about cancer tissue, including the presence of cancer cells in the body.

39.     NeoGenomics' primary competitors are other reference laboratory networks like Quest Diagnostics, Labcorp, Caris Life Sciences, Foundation Medicine, Guardant Health, Labcorp, and Tempus Labs.

40.     NeoGenomics competes to be a leading diagnostics company. Unlike large laboratory networks like Quest Diagnostics and Labcorp, NeoGenomics focuses on oncology testing. Unlike specialized oncology laboratories like Guardant Health and Foundation Medicine, NeoGenomics does not focus on a single type of test or technology. The Company also positions itself as unique because it has both a Clinical Services and a Pharma Services division operating within one company.

41.     NeoGenomics pursued both organic growth (using the Company's own resources to increase output and drive sales and revenue) and inorganic growth (through acquisitions) during the Class Period. With regard to organic growth, as alleged in Section IV-B, below, apart from a temporary spike driven by the sale of COVID-19 PCR tests, NeoGenomics pointed to its fast turnaround times for clinical test results as well as its innovative service offerings (including its NGS and one-stop shopping) as key drivers. With regard to inorganic growth, NeoGenomics has acquired several companies, including Genoptix, Inc., a clinical oncology laboratory, on December 10, 2018.

**2. VanOort aspires to transform NeoGenomics from a small start-up into the leading cancer testing company in the world.**

42.     When VanOort started as CEO of NeoGenomics in 2009 the Company was a tiny player in the cancer testing market, with only 114 employees and a market

capitalization of just $26 million. VanOort's stated goal was nothing less than to turn the fledgling NeoGenomics into "the leading cancer testing and information company in the world." In some ways, VanOort achieved that goal. By the time he retired from the Company in October 2021, NeoGenomics had grown to more than 1,700 employees and a market capitalization of more than $6 *billion*. But unbeknownst to investors, the Company was unable to deliver on its touted rapid turnaround times and was not the "one-stop shop" it claimed to be, failing to provide its promised innovative service offerings or prompt test results, and outsourcing testing to its competitors. And so less than a month later, on November 4, 2021, previously undisclosed problems began to manifest, and the Company experienced protracted public difficulties relating to revenue, earnings, and internal compliance efforts.

**B.  The Company falsely and misleadingly claims that its top competitive strengths are: (1) rapid turnaround times, and (2) innovative service offerings, meaning technologically superior NGS and "one-stop-shopping" for oncologists.**

43.    Throughout the Class Period, NeoGenomics' SEC filings consistently touted the same two items as the Company's top "Competitive Strengths."[2] The Company always touted as its top strength, its "Turnaround Times," *i.e.*, the speed with which the Company completed and returned test results. Second, the Company always touted its "Innovative Service Offerings," which prominently included technologically

---

[2] Each of the quotations in this introductory subsection is repeated below (in subsections IV-B-1 or IV-B-2) along with citations to its source.

superior NGS tests that contributed to the Company being "a true 'one-stop shop'" for testing needs.

44.    However, as extensive interviews with more than a dozen former NeoGenomics executives and employees have revealed, rather than being competitive strengths and drivers of demand and revenue, these were among the biggest problems that the Company faced throughout the Class Period.

45.    To start with the first claim, the Company touted its turnaround times as "industry leading" and "rapid," and boasted of "consistent timeliness." The Company said this strength was "a driver of additional testing requests." But high-ranking former Company employees confirm that those claims were false and misleading. As detailed below, the Company had had "major turnaround issues" and "had been having issues with turnaround times forever." For one type of NGS testing, for example, a former executive has confirmed that NeoGenomics "knew we could not do it in three weeks, but we will promise two weeks and hope we can get there," even as it was "clear" to Company executives that the "majority of cases were not being reported in the two week timeframe." As another former employee recalled, NeoGenomics' test results were taking so long that "patients were literally dying" waiting for results.

46.    As for the Company's second claim, that its innovative service offerings drove growth due to technologically superior NGS offerings and a one-stop shopping menu, the former executives and employees have provided information that renders this claim false and misleading too. The Company's former Chief Operating Officer (COO) of Clinical Services put it succinctly: "Neo was not good at NGS." Underlying

those conclusions, interviews have revealed that the Company was "using antiquated technology," with NGS particularly beset with slow turnaround times. The NGS offerings were so deficient that—as often as half of the time—when the Company tried to run NGS, the outcome would be no usable result at all. This meant a new tissue sample would have to be collected and the NGS testing would have to be attempted all over again. As the Company's former Chief Scientific Officer has explained, the company had a "really high … rate" of unusable test results, to the point that "strategy sessions" were needed to discuss the problem with VanOort. Meanwhile, these NGS and related problems meant NeoGenomics' service offerings were not true one-stop-shopping: the Company often sent tissue samples out to its competitors to do testing that it couldn't handle itself. As a former employee confirmed, the Company had to maintain a formal Send Out Department that handled the outsourcing.

47.    In short, turnaround times and test offerings were not drivers of demand and growth; they were causing NeoGenomics to lose customers—not attract or retain them. Former employees report that Company personnel were "very aware of and concerned" about the turnaround time problems, discussing them at Companywide meetings, with multiple CEOs, and with the board of directors. But the Company never remediated the problems during the Class Period. Former employees confirm that the Company's later-revealed revenue disappointments "had a lot to do with lost business as a result of the turnaround times." Similarly, customers fled NeoGenomics because of the NGS problems too: customers were "very upset" when the company so often returned unusable NGS results, repeatedly choosing to do their business with

16

NeoGenomics' competitors instead. A former employee reports that the Company strategically hid these failings: with NeoGenomics "losing such big clients," the goal of senior management became to "drive for more volume" to give the appearance "that we were growing."

1. **The Company touted its turnaround times as its top "Competitive Strength," even though lagging test results were a grave and longstanding problem that lost the Company customers and revenue.**

48.    Throughout the Class Period, the Company boasted about its Clinical Services department's success with rapid turnaround times. Indeed, in each of its annual and quarterly SEC reports, NeoGenomics listed "Turnaround Times" as the very first item within its list of "Competitive Strengths."

49.    The Company's turnaround-time boasts made some sense, given that prompt test results are of paramount importance. After all, the Company's Clinical Services division was providing test results to healthcare providers treating cancer patients. They needed the results quickly to make timely life-or-death treatment decisions. As NeoGenomics' former COO of Clinical Services put it, turnaround times were the "glass ball" that could not be dropped.

a. **NeoGenomics claims to deliver "consistent timeliness of results" with "rapid" and "industry leading turnaround times."**

50.    Defendants touted their superlative turnaround times throughout the Class Period. For example, during an earnings call on August 6, 2021, Mallon stated that the Company's efforts had "translated into industry leading turnaround times in many of our test modalities."

51.    In much the same vein, every NeoGenomics 10-K during the Class Period stated that the Company was "offering industry-leading turnaround times." And each 10-K and 10-Q during the Class Period emphasized the "consistent timeliness of results by our Clinical Services segment" and explained that by "providing information to our clients in a rapid manner, physicians can begin treating their patients as soon as possible."

52.    The Company made these claims even as the COVID pandemic raged. On April 9, 2020, NeoGenomics issued a press release with a COVID-19 business update, in which VanOort praised turnaround times: "Throughout this crisis we have continued to provide . . . excellent quality, turn-around time." Later that month, during the Q1 2020 earnings call on April 28, 2020, VanOort stated, "our turnaround time is frankly improved during this pandemic."

53.    All of these claims succeeded in creating the impression that the Company consistently provided fast test results. Dan Brennan, Tom Stevens, and Kyle Boucher of Cowen and Company, analysts that followed NeoGenomics during the Class Period, recommended the stock to investors in December 2021 while noting the Company's "Consistent, fast turnaround time."

54.    Defendants' claims were false and misleading, as detailed below, since the Company experienced severe and persistent turnaround-time failings throughout the Class Period—consistently lagging behind competitors' turnaround times. Defendants misled investors by omitting true and material facts about its turnaround times, as detailed below.

**b. NeoGenomics claims that its speedy turnaround times fuel growth and positively drive demand for the Company's clinical testing services.**

55.    At the same time, NeoGenomics was telling investors that the speed of its test results distinguished the Company from competitors, driving growth and demand for the Company's services. Defendants' constant refrain throughout the Class Period was that the Company's speed constituted a major competitive strength of the Company—one which consistently and positively drove demand for the Company's services.

56.    For example, in its 10-K annual reports throughout the class period NeoGenomics listed "Turnaround Times" as its top "Competitive Strength[]," elaborating that the Company's speedy results were "a competitive strength and a driver of additional testing requests by referring physicians." The Company's quarterly reports during the Class Period made identical claims. Each Class-Period 10-K further claimed that the Company was working "to gain market share" through its industry-leading turnaround times.

57.    Defendants repeated these and similar statements on earnings calls and in presentations throughout the Class Period. For example, in a February 19, 2021, presentation, VanOort pointed to the Company's exceptional service as "why we grow; one reason we grow organically like we do," clarifying later that when it comes to "services, it's turnaround time." Indeed, as late in the Class Period as February 23, 2022, on the Q4 2021 earnings call, Mallon claimed that the Company had "continued to strengthen our leadership position in the market" through "exceptional service

19

levels"—a reference to speedy turnaround times—and that the achievement "support[s] new growth and drive[s] high levels of customer retention."

58.     These claims succeeded in creating the impression that the Company's speedy turnaround times drove growth and demand for the Company's services, making NeoGenomics a good bet with investors. Analyst Puneet Souda of SVB Leerink, for example, touted the Company's stock between February 2020 and April 2022 as "Outperform (Buy)," with the caveat being that NeoGenomics "competes with large lab operations . . . [which] offer similar portfolios and services," meaning that the Company's ability to realize market share hinged on its ability to "differentiate[ ] itself on . . . speed."

59.     These statements were false and misleading, as the Company's turnaround times represented a chronic and grave problem that often caused the Company to struggle to compete, to struggle to gain and retain clients, and which caused the Company to lose (rather than gain) revenue. Defendants misleadingly omitted material facts, detailed below, about NeoGenomics' consistently failing to return timely results, causing customers to leave the Company, not join it, as well as the fact that LCI was the true major driver of organic growth for the Company during the Class Period.

**c. Defendants concealed material facts, including that the Company's turnaround times were unacceptable, consistently lagged behind the competition, and caused NeoGenomics to lose customers and revenue.**

60.    Turnaround times were indeed very important to NeoGenomics' customers. As CW-1, the Company's former COO of Clinical Services said, the "relationships with pathologists" were "the glass ball" that could not be dropped, which meant "we can't screw up turnaround times." CW-2, who served as Global Director and Senior Director of Scientific Collaboration and Engagement during the Class Period, made a similar point, stressing how physicians typically tell their patients that a given test is necessary and that the results of the test will be available within a specified timeframe. CW-2 explained that the diagnostics company, then, has to be reliable in terms of turning around the lab results.

61.    Yet NeoGenomics consistently dropped the ball on turnaround times. This fact has been confirmed by *ten* separate former Company executives and employees, each of whom worked at the Company during the Class Period:

- CW-1 confirmed that slow turnaround times had plagued NeoGenomics for a "long time." "It was constant," CW-1 recalled. CW-1 stated that the problems dated back to at least January 2020, and persisted through at least October 2021, when CW-1 departed.

- CW-3, with NeoGenomics from December 2018 until May 2021 as Chief Scientific Officer and then Chief Medical Officer, confirmed "there were problems with turnaround time" that the Company's leadership "did not

address." CW-3 said the Company "had been having issues with turnaround times forever."

- CW-4, who worked for the Company from September 2016 to May 2022, confirmed that the Company dealt with "major turnaround issues" that were "ongoing" since at least 2019.

- CW-5, with the Company from May 2018 to January 2023, confirmed that NeoGenomics' struggle with turnaround times "went on for years" and was "always an issue"—since at least 2019—and was never remediated. CW-5 recalled, "It was horrible."

- CW-6, a manager and then head of Data Strategy and Analytics from December 2020 to March 2022, also confirmed that NeoGenomics experienced delayed turnaround times throughout CW-6's employment. CW-6 stated, "Across the board, people were not happy with turnaround times." "Everything was taking too long to get results back."

- CW-7, who worked for NeoGenomics between July 2021 and August 2022, and who held the title of Director, Informatics, confirmed that the Clinical Services group was "struggling on turnaround times," and that it "was a big issue."

- CW-8, who worked for NeoGenomics from September 2015 to July 2022, including as Chief Scientific Officer of the Clinical Services division, also confirmed there were persistent issues with turnaround times at

NeoGenomics, which were regularly discussed at the Company's highest
levels.

▪ CW-2, with NeoGenomics from October 2017 to June 2022, confirmed that
throughout CW-2's tenure, the Company struggled with turnaround time for
many of its tests.

▪ CW-9, who worked at the Company from 2012 until January 2021, also
confirmed that turnaround time was a major issue at NeoGenomics and had
remained a problem for the last few years that CW-9 remained at the
Company.

▪ CW-10, who worked as a Clinical Lab Supervisor and Clinical Lab Manager
from December 2015 to April 2021 and again from October 2021 to August
2023, stated that turnaround time was an important metric for the molecular
laboratory and the other departments at the Aliso Viejo laboratory, but over
the last few years of CW-10's employment at NeoGenomics, "no one ever met
the turnaround time." CW-10 recalled higher-ups asking why "turnaround
time looks so bad."

62.    NeoGenomics' turnaround-time had serious consequences for its
customers and their patients. CW-4 recalled a doctor in Athens, Georgia, calling CW-4
roughly "180 days" after having submitted an NGS test request to let CW-4 know that
the patient had died waiting for therapy because NeoGenomics had not been able to
provide test results. CW-5 recalled another instance, in 2021, when NeoGenomics could
not perform a "stage IV breast cancer" test. CW-5 recalled, "There was a management

call and they wanted us to push the test." CW-5 emphasized that "time was not on the side" of the patients who were waiting for their test results. CW-5 recalled, that because patients could not be treated until the tests were completed, while they awaited the NeoGenomics test results, "patients were literally dying."

63.     "What they were doing was immoral," said CW-5. "The marketing material was never changed to reflect the accurate turnaround times," CW-5 stated. The sales staff complained and pleaded with management to "be honest on the marketing material" or to improve turnaround times. However, CW-5 said that management "refused" to do either, despite being aware of the problem. According to CW-5, management was unwilling to publish accurate turnaround times because the competition was able to deliver on turnaround times equal to or better than NeoGenomics' published turnaround times.

64.     CW-8 elaborated on this point, commenting on NeoGenomics' inability to timely deliver solid tumor test results. CW-8 was involved in troubleshooting and "solutioning" the turnaround time issue. CW-8 recalled that the Company initially represented that the turnaround time for solid-tumor NGS testing was three weeks, but that around 2019 NeoGenomics' competitors began touting 10-day turnaround times for NGS testing, prompting the Company to reduce its represented turnaround time to two weeks. CW-8 said that NeoGenomics "knew we could not do it in three weeks, but we will promise two weeks and hope we can get there." By 2020, CW-8 said it was "clear" to CW-8 and other executives that the "majority of cases were not being reported in the two week timeframe": "We were not hitting our mark at all — not even close at all. It

was not like" there were an "extreme few that fell outside the turnaround time" goal of two weeks, it was the "majority of cases."

65.   The Company's turnaround failures caused business to suffer. CW-6 stated that Company sales representatives conveyed on Friday morning calls that "turnaround times were always a point of contention from clients."

66.   CW-5 stated there was "always pressure put on [the] sales [team] to bring on clients and about why did we lose them [the customers]." CW-5 said that the sales representatives repeatedly explained that they were losing customers because of the turnaround time issues. According to CW-5, the Company paid significant compensation to its sales representatives, $400,000 to $500,000 per year—much more than other sales representatives in the industry with the hope that they would "keep their mouths shut" and "do what they could to smooth over issues," and "drive volume."

67.   CW-9 stated that Sutter Health, a "big client" based in San Francisco, "separated" from NeoGenomics because of turnaround time problems. NeoGenomics also lost business from another important client, the Arizona-based Cancer Center of America. CW-9 stated that the two organizations "were on and off, on and off" as clients with NeoGenomics and had to be placed on a "priority client list because we were at risk of losing them." CW-7 likewise stated that Company personnel were "very aware of and concerned" about the Company's turnaround time struggle, and that the problem was on the radar of the Informatics division staff because the issue was causing NeoGenomics to "lose customers." CW-10 also confirmed that slow turnaround

times were causing the Company to lose business. CW-10 stated that there was "a lot of pressure" in the laboratory "regarding turnaround times," because the sales representatives complained that NeoGenomics was losing customers as a result of the testing delays.

68.     CW-1 explained that, upon taking over Clinical Services operations, CW-1 spoke "to commercial" (the Clinical Services sales team) "quite a bit to try to understand what was going on from a customer perspective." They informed CW-1 that it was "hard for me to sell this product when I know we are not going to be able to deliver on turnaround time." CW-1 said, "Absolutely, commercial would tell you" NeoGenomics was losing customers because of the turnaround delays. While CW-1 could not quantify the number of customers lost, CW-1 was sure that the Company was losing customers and noted that this loss of customers was occurring even though the nature of the business made it a "pain to leave Neo and go to another vendor." CW-8 likewise confirmed, despite not working in sales and so not having direct communications with customers, that CW-8 had heard that the Company had lost customers due to the problems.

69.     Former NeoGenomics employees also connected the turnaround-time failings, and ensuing loss of customers, to the revenue problems that the Company would ultimately disclose. CW-4 stated that the downward revision of revenue guidance had been due in part to the Company's "having major turnaround issues," confirming that the Clinical Services division was losing revenue as a result of the turnaround time problems. CW-5 corroborated that assertion. CW-5 stated that the

later-reported disappointing revenue "had a lot to do with lost business as a result of the turnaround times."

70.    CW-5 emphasized that customer turnover was a significant issue for NeoGenomics. The Company was "losing such big clients," CW-5 said, including Scripps, Kaiser, and one "big one" in the Northeast U.S. CW-5 said the goal of senior management was to "drive for more volume" in order to conceal the loss of business and "because it showed that we were growing," which helped "keep the stock" price high.

71.    Despite the severity and consistency of the above turnaround-time problems, Defendants failed to disclose the above information to investors throughout the Class Period.

**2.  The Company's second claimed competitive strength of "Innovative Service Offerings" was also false and misleading in touting NGS superiority and "one-stop-shopping."**

72.    Throughout the Class Period, the Company also touted "Innovative Service Offerings," listing them as the second of the Company's top "Competitive Strengths" in each of its Form 10-K and 10-Q filings. These services were touted as featuring "one of the broadest . . . Next Generation Sequencing test menus in the world," which "enables [NeoGenomics] to be a true 'one-stop shop' for our clients as we can meet all of their oncology testing needs."

**a. NeoGenomics claims its NGS offerings are technologically superior, allowing it to deliver useful results even with small samples.**

73.    Throughout the Class Period, the Company also boasted about its NGS offerings, claiming that their advanced technology delivered useful results even when analyzing small tissue samples.

74.    For example, at the 18th Annual Morgan Stanley Global Healthcare Conference on September 14, 2020, VanOort spoke of the time and energy the Company had devoted to developing what "we think is one of the highest quality next generation sequencing assays available today in the country." The result, VanOort said during the JP Morgan 39th Annual Healthcare Virtual Conference on January 11, 2021, was that NeoGenomics, brings "the same innovative, high-quality oncology testing as you might expect to receive [at] a leading academic center to communities across America."

75.    Defendants frequently tied the Company's superior NGS offerings specifically to "solid tumor" testing. During the Raymond James Virtual Human Health Innovation Conference on June 18, 2020, for example, VanOort boasted that the Company had "the highest quality next generation sequencing assays available today in the country . . . for solid tumor disease." Then, at the 18th Annual Morgan Stanley Global Healthcare Conference on September 14, 2020, VanOort reiterated that the Company had a "very, very high quality solid tumor next-generation sequencing assay."

76.    The Company also frequently tied its NGS technology to being able to deliver test results even from small tissue samples. In its Form 10-Ks for 2019, 2020, and

2021, the Company claimed that, thanks to the Company's "NGS panels," its "clients can often receive a significant amount of biomarker information from very limited samples." The Company repeated that claim in all of its 10-Qs filed in 2020 and 2021, reiterating that its NGS offerings produced "a significant amount of biomarker information from very limited samples."

77.    Defendants' claims were false and misleading, as detailed below, since the Company's NGS offerings were antiquated and lagged behind the competition—in particular in connection with solid-tumor NGS testing. Defendants omitted those and other material facts, including that the Company's NGS failed to deliver usable results because of purportedly too-small sample sizes.

> **b.  NeoGenomics claims that its NGS testing superiority was a "key growth driver" responsible for a significant portion of the Company's organic growth.**

78.    Throughout the Class Period, the Company also connected its NGS offerings to the Company's revenue and growth. For example, during the Company's Q4 2019 earnings call on February 27, 2020, after praising the significant technological advances in the NGS offerings, VanOort stated: "[T]he marketplace is reacting very favorably to that. So our next-generation sequencing panels in the clinical business should continue to fuel growth." Indeed, the Company frequently stated that its "organic growth is being driven partly by next-generation sequencing," and that as a result, "next-generation sequencing panels . . . should continue to fuel growth."

79.    In fact, in the Company's Form 10-Ks for 2019, 2020, and 2021, as well as its Form 10-Q for each quarter in 2020 and 2021, the Company boasted that "NGS

panels are one of our fastest growing testing areas" and that NeoGenomics "expect[s] our Molecular laboratory and NGS capabilities to be a key growth driver in the coming years."

80.     The Company made this point in different ways throughout the Class Period. For example, during its Q4 2020 Earnings Call, on February 24, 2021, McKenzie reported revenue growth "driven by strong growth in NGS." During the Raymond James Virtual Human Health Innovation Conference on June 18, 2020, VanOort said that "there are three particular areas of growth that we like to talk with investors about. The first one is next generation sequencing . . . ." During NeoGenomics' Q3 2020 Earnings Call on October 27, 2020, VanOort cited "next generation sequencing" as a strength, with "a lot of natural growth for us in next-generation sequencing over the last number of quarters . . . and we would expect to grow next-generation sequencing kinds of products at an outsized pace even going forward."

81.     During the Company's Q4 2020 Earnings Call on February 24, 2021, VanOort emphasized again that "Our fastest areas of growth continue to be next generation sequencing . . . ." VanOort continued discussing "year-over-year growth" and cited growth in the Clinical Services division "driven by next generation sequencing volume growth." "[T]hings like next-generation sequencing," VanOort said, "are the kinds of products that are going to drive outsized growth for us in the future." VanOort continued, reiterating that, "Our next-generation sequencing product line is continuing to grow nicely."

82.    In the context of each of the above statements and documents, Defendants omitted the fact that the Company's NGS testing services lagged technologically behind the competition and frequently failed to deliver usable results because of purportedly too-small sample sizes, as detailed below.

83.    Defendants' claims were false and misleading, as explained further below, since the Company's NGS failings frequently cost the Company customers and revenues and did not truly constitute a strong driver of growth or revenue. Defendants omitted material facts, including that the Company's NGS testing services lagged technologically behind the competition, frequently failing to deliver usable results, and that the Company lost customers and revenue as a result, as well as the fact that LCI was the true major driver of organic growth for the Company during the Class Period.

**c. NeoGenomics claimed that NGS offerings helped make the Company a "one-stop shop" that could meet all of customers' oncology testing needs.**

84.    Throughout the Class Period, the Company touted its broad menu of clinical test offerings, including NGS notably, as driving demand for the Company's services. The Company claimed that it had "one of the broadest . . . Next Generation Sequencing test menus in the world," which "enables us to be a true 'one-stop shop' for our clients as we can meet all of their oncology needs." NeoGenomics featured this

quote in the "Competitive Strengths" section of each of its SEC filings during the Class Period.[3]

85.    The Company claimed that the broad menu appealed to oncologists' desire to conduct one-stop-shopping at NeoGenomics, which meant they could avoid splitting patient samples between multiple laboratories.

86.    For example, in the Company's Form 10-K for FY 2019, filed February 28, 2020, the Company touted its "comprehensive menu" which "means that NeoGenomics can be a one-stop-shop for our clients who can get all of their oncology testing needs satisfied by our laboratory. This is attractive to our clients as patient samples do not need to be split and then managed across several laboratories." The Company said it expected such capabilities to be "a key growth driver in the coming years." NeoGenomics repeated this language in its 10-K for FY 2020 and in its 10-K for FY 2021.[4]

87.    In the Company's Form 10-K for FY 2019, NeoGenomics also stated, "Our broad and innovative test menu . . . has helped make us a 'one stop shop' for many clients who value that all of their testing can be sent to one laboratory." The Company repeatedly claimed to be a "one-stop shop" throughout its 10-K, stating that the broad testing menu "remains a strong selling point" since clients "can send [NeoGenomics] all

---

[3] In its 10-Qs for Q2 2020 and Q3 2020, NeoGenomics hyphenated "Next-Generation Sequencing." In its 10-K for FY 2021, NeoGenomics abbreviated "Next Generation Sequencing" as "NGS."
[4] In its 10-Ks for FY 2020 and FY 2021, NeoGenomics placed "one-stop shop" in quotation marks.

of their oncology testing rather than using multiple labs." Later in its 10-K, the

Company said: "We continue to realize growth . . . by developing and maintaining one

of the most comprehensive cancer testing menus in the industry. Our broad test menu .

. . allows us to gain market share from competitors as well as attract new clients looking

for a one-stop shop."

88.     During the Bank of America Securities Health Care Conference on May 14,

2020, when asked how NeoGenomics differentiates itself from its competitors, VanOort

said: "[W]e differentiate ourselves from the large laboratory companies like Quest and

LabCorp and Mayo . . . by being a one-stop-shop for our clients . . . . [A]ny test virtually

that a pathologist or an oncologist wants to be able to diagnose, monitor, treat their

patient, they can be pretty assured that NeoGenomics is going to offer that test for

them."

89.     Likewise, during the 18th Annual Morgan Stanley Global Healthcare

Conference on September 14, 2020, VanOort again touted that the company is "a one-

stop-shop for clients, physicians, pathologists, hospitals," and said what those

customers "like about NeoGenomics is they don't have to split a sample, because they

know if they send a sample to NeoGenomics, we can do immunohistochemistry, FISH

testing, flow cytometry, molecular testing, next-generation sequence [sic], et cetera. So

we can do it all."

90.     VanOort told investors at the William Blair 40th Annual Growth Stock

Conference on June 10, 2020: "[T]here really is no other player like NeoGenomics. We

really are unique in a lot of respects . . . . [W]e are a very comprehensive one-stop shop for our clients."

91.    Defendants' claims were false and misleading, as detailed below, since the Company was not a true one-stop shop for oncology testing; it often outsourced test requests to competitor labs, angering customers. These facts and other related facts, discussed in the next subsection, were concealed by Defendants during the Class Period.

> **d.    In reality, NeoGenomics "was not good at NGS," its technology was "antiquated," its NGS tests frequently failed to deliver usable results for oncologists and their patients, and rather than being a "one-stop shop," NeoGenomics outsourced test requests to competitors.**

92.    Defendants were overstating to investors the quality of NeoGenomics' NGS testing and its ability to drive revenue growth for the Company. While the Company touted its NGS capabilities as a competitive strength to the market, NEO insiders say that the Company's NGS testing was not all that sophisticated and instead was outpaced by the competition.

93.    CW-7 said, of the Company's NGS testing, that "their capabilities were definitely not as sophisticated as the image [the Company] tried to portray." CW-7 explained that other companies—Caris Life Sciences, Foundation Medicine, and Tempus—were "businesses that were built around newer NGS technologies." Per CW-7, NeoGenomics was "trying to stay competitive, but had built its business on old assays." The Company was playing catch-up, CW-7 explained, "coming from a legacy business, using antiquated technology."

94.     As CW-1 (former COO of Clinical Services) put it, "Neo was not good at NGS." CW-1 noted that the Company had a significant lack of bioinformatics experience necessary to deliver on NGS. CW-1 also explained that NeoGenomics' NGS capabilities were not comparable to other players in the industry.

95.     Former Chief Scientific Officer of Clinical Services CW-8 confirmed that even after Mallon had taken over as CEO in April 2021, the Company still was not "competitive" in the solid tumor NGS business; the Company had been struggling since at least 2019 with solid tumor NGS.

96.     The Company's NGS deficiencies manifested in multiple ways. For one, the Company's turnaround-time problems, discussed above, plagued NGS testing especially. CW-9 stated that the Company's Molecular Department, which is where NeoGenomics conducted NGS testing, "was a mess," had the worst turnaround time problems of all departments at the Aliso Viejo facility, and was "never doing anything on time." CW-4 likewise stated that turnaround problems had been most pronounced with NGS testing, and CW-3 reported that the turnaround time problem had been "isolated to NGS" before spreading "across the board." CW-5 too stated that the delays existed across the board on testing modalities, but that NGS testing "was the most significant in delays"; "it was the most pronounced for NGS testing."[5]

---

[5] Several of these individuals noted that the problems were not isolated to NGS. CW-9 said that the FISH Department's "turnaround times were always an issue. We never could report a case out within the expected turnaround time. . . . It was a chronic problem." CW-4 agreed that the problem had also impacted FISH testing. And CW-1 stated that the Company "always struggled" with timely completion of anatomic

97.     In addition, the Company's NGS results were frequently unusable. Contrary to Defendants' claims that the NGS offering could return detailed information from limited samples, much of the time the Company returned no results at all—while blaming the sample size.

98.     CW-5 explained that two possible outcomes of NGS solid tumor testing are "QNS" (quantity not sufficient) and "TNP" (test not performed).[6] For instance, if the tumor sample was not sufficient in size, a lab might not be able to run the test and would report a result of QNS. For NeoGenomics competitors, including Caris, Tempus, and Foundation Medicine, CW-5 stated that "even a 10 percent QNS rate would be high." At NeoGenomics, the QNS rate could be "50 percent" or more, per CW-5. CW-5 stated that this phenomenon occurred in connection with "many" NeoGenomics accounts. CW-5 specifically identified Texas Oncology — the "largest community practice in Texas" — as one NeoGenomics customer who had an astoundingly high QNS rate for solid tumor NGS testing. CW-5 said that the QNS rate for Texas Oncology "hovered around 50 percent if not more." CW-5 recounted how the physicians waited "20 days or longer for results," only to get a QNS finding, and this issue persisted.

99.     CW-1 confirmed being aware of high rates of QNS or TNP results from the NGS laboratory. CW-8 also confirmed the problem, stating that NeoGenomics had an ongoing issue with QNS findings for NGS testing, which was impeding the

---

pathology and histology steps (which CW-1 said are the "front end of everything" in preparing samples for testing).
[6] This explanation that "TNP" stands for "test not performed" came from CW-8.

Company's ability to be competitive in the solid tumor space. "QNS was always a problem for solid tumor" testing at NeoGenomics, said CW-8.

100.    CW-8 recalled that NeoGenomics had a "really high QNS and [TNP] rate" for solid tumor lung cancer testing. CW-8 stated, "You never want to go back to the doctor and say this sample is taking three weeks to do," and "by the way, the sample did not pass and we have to re-run it and it is going to take another three weeks." But CW-8 said, "Neo did this all the time. It would be three weeks and the physician would still not have a report, and that was normal." CW-8 said that typically the test failed because there was not enough sample by the time NGS testing was performed.

101.    CW-8 participated in "strategy sessions" with VanOort in which the QNS issue was discussed. Once Mallon took over as CEO in April 2021, CW-8 said that Mallon viewed solid-tumor NGS as a "huge opportunity." (Indeed, VanOort had already been touting the Company's "very, very high quality solid tumor next-generation sequencing assay," including during the 18th Annual Morgan Stanley Global Healthcare Conference on September 14, 2020.) But CW-8 explained that for the Company to ever take advantage of the hypothetical market opportunity would first require "fixing" persistent issues "with turnaround time and QNS." CW-8 said that two of the "main things" that the Company still needed to accomplish if it wanted to retain, let alone grow, NGS solid tumor business were delivering timely test results and avoiding having to report QNS or TNP results. CW-8 said the Company had been failing in both areas with respect to the solid tumor business for a year or more before

Mallon even joined the company. CW-8 emphasized that as Mallon joined the

Company, NeoGenomics had a "huge NGS problem."

102.    CW-8 further stated that later in 2021, the Company began spending

money to ameliorate the QNS issue. CW-7 also stated that NeoGenomics was "trying to

stay competitive, but had built its business on old assays," CW-7 explained, noting that

NeoGenomics could "still catch up, but was way behind the curve." NeoGenomics was

"coming from a legacy business, using antiquated technology and was moving to the

21st Century," which was going to be "costly and complex," according to CW-7.

103.    CW-10, a Clinical Lab Supervisor in the Company's molecular laboratory,

was responsible for issuing "test cannot be performed" reports to customers. CW-10

said that there was often not enough tissue to test, causing the laboratory to have to

issue a QNS result. The high rate of QNS results was a "main concern" of the

NeoGenomics Clinical Services sales team, who, according to CW-10, promised clients

that the laboratory would be able to work with "whatever" the customers submitted.

"Clients got mad," CW-10 recalled.

104.    NeoGenomics' revenue suffered from the Company's inability to deliver

timely, usable NGS results. CW-1 stated that sales personnel had told him they found it

was difficult to meet their NGS sales goals because of the turnaround time issues. Per

CW-5, Texas Oncology and other clients were "very upset" with NeoGenomics' QNS

and TNP rates. CW-5 noted that "sales really had to struggle to keep the clients" in the

face of this issue and as a result of the turnaround time issues. Ultimately, CW-5 said

that NeoGenomics lost a lot of clients as a result of the QNS and TNP rates. The "clients

went to Foundation [Medicine] and other competitors," CW-5 noted. CW-5 stated that customer turnover was a significant issue for NeoGenomics. CW-5 said the company lost Scripps, Kaiser, and one "big one" in the Northeast U.S. CW-8 confirmed that the Company lost customers from the NGS turnaround and QNS problems and emphasized that NeoGenomics was not competitive in the solid tumor business as a result.

105.    Further, contrary to NeoGenomics' claims that NGS helped it provide one-stop-shopping, allowing oncologists to avoid using multiple laboratories, throughout the Class Period, the Company outsourced testing to competitor laboratories—paying them to do testing that the Company should have been handling in-house.

106.    CW-5 confirmed that NeoGenomics sent tests that it could not handle in-house out to other reference labs. CW-5 said that sending tests to other labs "caused a lot of issues." CW-5 explained that physicians "thought NeoGenomics was doing all the testing." But when physicians would receive the test results, the documents that reported the test results listed the other lab that had completed the test, CW-5 said, and physicians were disconcerted upon receiving the results. CW-1 confirmed that because the Company's clinical operations were short-staffed—which tied into the slow turnaround times—NeoGenomics at times outsourced testing. This involved sending testing out to other companies' labs, which "created more complications."

107.    CW-9 similarly stated that while it was important for the Company to be considered a "one-stop shop," since oncologists did not want to have to split samples

between different lab companies, NeoGenomics outsourced tests to other laboratory companies, including the FISH Department's UroVysion test. CW-9 said the Company outsourced tests "when they were overwhelmed." CW-9 said that there was a dedicated Send Out Department at the Aliso Viejo facility, specifically tasked with handling the outsourcing of testing to other laboratories. CW-9 recalled hearing from CW-9's manager, as well as other colleagues, that send-outs were common in the department that conducted NGS testing.

108.   CW-6 likewise recalled claims by the Company that it performed all testing in-house, and that it was a one-stop shop, but said that the Company was sending out testing to other reference labs, including to Labcorp. CW-6 identified a problem created by the Company's outsourcing of testing: it undermined the quality of the Company's data. CW-6 stated that a Company database had holes and "missing information where" the Company "did not have a test result value for a test order that had been sent out to a reference lab." CW-7 likewise confirmed that the Company's practice of outsourcing tests to other labs created "holes" in the Company's data. In attempting to "clean" the data, CW-6 had to "chase" the test "chain" and individually input data into an aggregated data set. The phenomenon was sufficiently common that CW-6 could not fix it personally and instead gave a presentation to Company executives that laid out the scope of the problem and proposed how to solve it.

109.   Finally, though the Company touted the breadth of its offerings as a positive driver of revenue—claiming that customers were drawn to NeoGenomics as a one-stop shop because of its broad test menu—former employees contradicted that

claim. CW-1 studied the issue and concluded that there were "way too many assays," a considerable portion of which were not regularly ordered. CW-2 confirmed that many tests were "never ordered." CW-1 also explained that having so many test assays "was confusing to the customer," and that the Company's customers, faced with hundreds of different options, "did not even know what to order." CW-2 likewise stated that the Company's testing order form was "frustrating" for many because it was so long and comprehensive. CW-2 confirmed that many doctors did not likely know what all the tests on the order form were or what the purpose of all the tests were. CW-1 recommended to senior executives (including both VanOort and Mallon) as well as the board of directors that the Company reduce the number of test assays it offered; CW-1 stated that the top executives at the Company agreed with those recommendations.

110.    Throughout the Class Period, Defendants omitted all of the above material information, misleading investors.

**C. NeoGenomics misleadingly fails to disclose that its small LCI Group's revenue equals about 40% of the Company's organic revenue growth—and about 70% of the Clinical Services division's organic revenue growth—during the Class Period.**

111.    Defendants had repeatedly told investors during the Class Period that NeoGenomics' top competitive strengths, including those fueling demand and growth, were its competitive advantages in its core laboratory operations, as discussed above. In reality, the Company's small Laboratory Collaborations and Implementations group (LCI) drove the vast majority of organic growth in the Clinical Services division through

the Class Period, equal to about 40% of all Companywide organic revenue growth during the Class Period.

112.    Leading up to the beginning of the Class Period, NeoGenomics began aggressively pushing LCI to boost revenue and gain market share over competitors. LCI was a group within the Clinical Services division that provided assistance to physician groups and hospitals to help them set up their own in-house labs and perform the basic flow cytometry testing that NeoGenomics might have otherwise conducted, thereby inducing the referring healthcare providers to send a greater share of their high-priced, high-margin testing to NeoGenomics.

113.    The practice was phenomenally successful at driving new revenue. In fact, as described below, during the Class Period, LCI was responsible for generating revenue equal to approximately 70% of organic revenue growth in the Clinical Services division, equal to about 40% of the organic revenue growth for the entire Company.

114.    The problem was that, as any company providing medical services reimbursable by Medicare and Medicaid knows well, the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), is very strict in restricting the provision of goods or services to referring doctors in order to prevent exactly these types of kickback arrangements (*see infra* para. 134). Testing companies like NeoGenomics cannot give away anything of value to referring doctors, not even so much as a free pen. Nor can they provide services at less than market value, though that was happening with LCI. NeoGenomics' LCI operations thus constituted an unethical—and illegal—kickback arrangement, as the Company has now implicitly conceded in the wake of self-reporting the conduct to

the Office of the Inspector General of the U.S. Department of Health and Human Services (OIG) and U.S. Department of Justice (DOJ).

115.    Despite the phenomenal success of LCI, NeoGenomics never publicly identified LCI as generating material organic revenue growth. Instead, the Company consistently pointed to other factors driving its growth (discussed above), even though those cited factors were not actually driving substantial growth for the Company and were instead competitive weaknesses that the Company was able to hide from investors during the Class Period thanks to the largescale revenue growth generated by LCI.[7]

116.    Eventually, Mallon replaced VanOort as CEO, and Mallon fired the head of LCI the day he took over as CEO, ordered a freeze on all new LCI business, and then began to dismantle the LCI group. Six months later, Mallon had the Company self-report its compliance failing to the OIG.

117.    The Company knew full well the catastrophic impact that this would have on revenue growth, but continued to mislead the market about what was coming, denying that the compliance issue would have *any* impact on revenue, while blaming COVID-19 variants for disappointing revenue numbers in fall 2021. Meanwhile, the Company began spending to try to eventually reduce turnaround times, drive new sales, and improve test offerings and NGS capabilities. Per statements made during the Q3 2021 earnings call, these efforts included "doubling the size of our customer-facing sales force" in order to "support growth initiatives for our existing business" and new

---

[7] The Company also cited temporary growth in connection with the sale of COVID PCR tests.

assays. To whatever degree those longer-term efforts may have found success later on, well after the Class Period ended, during the Class Period the Company's poor performance plagued its top line throughout the remainder of 2021 and caused it to have to withdraw its 2022 guidance by March 2022. In the spring of 2022, the Company still did not come clean about the impact of shutting down LCI, instead it vaguely and confusingly blamed poor lab efficiency and increased cost of goods sold for the earnings misses, despite having previously touted these very same factors as competitive strengths. Investors who had bought in when the Company claimed demand and growth were fueled by strong fundamentals among other things, were left holding the bag as hundreds of million in shareholder value was lost due to the Company's misrepresentations and omissions.

1. **The Company's LCI group provides consulting services to healthcare providers to help them "in-source" low-cost testing in exchange for referring high-value testing to NeoGenomics.**

118.    Looking for new ways to increase market share, NeoGenomics began working to expand lab collaboration efforts in the years leading up to the Class Period. According to CW-11, an LCI manager from June 2019 to November 2022, LCI was essentially a consulting service to assist large referring physician groups in setting up and running their own flow cytometry laboratories. CW-4, a former Director of Laboratory Collaborations, who worked for the Company from September 2016 until May 2022, explained that flow cytometry, or "flow" for short, was a "low cost, low margin test" that NeoGenomics performed for about $300 per test. The idea behind LCI

was that by forming a "partnership" with referring labs and helping establish their own

flow labs, NeoGenomics would in return receive the "downstream" testing that was far

more profitable for NeoGenomics. CW-11 said that this "downstream business"

included tests that often had to be run after an initial flow test was completed, such as

NGS studies, which were more complicated than flow. CW-4 said that LCI explained

the business rationale internally as "giving up a $300 test for a $4,500 test."

119.    According to CW-12, who was an implementation manager in LCI

throughout the entire Class Period, employees were "not supposed to say" that LCI

collaborations resulted in downstream testing, and that while LCI clients were not

contractually obligated to send the Company its downstream testing needs,

participation in LCI "almost guaranteed" an increase in downstream testing. CW-12

explained that many of the LCI clients had already been sending tests to NeoGenomics;

however, the amount of testing these clients sent to NeoGenomics almost always

increased after they began collaborating with the LCI group, and in some cases it

doubled.

120.    According to CW-11, NeoGenomic's LCI consultants helped referring

physicians order the necessary instruments and build out lab space. After the

instruments were delivered and set up there was a validation process, wherein the lab

performed flow cytometry using sample cases before eventually using real patient

samples, CW-11 explained. Typically, LCI could have the client's new flow lab up and

running in about 60 to 90 days, CW-11 said. At that point, the client would be able to

perform, and bill for, part of the technical component of each flow test, with NeoGenomics handling the remaining technical and interpretive work.

## 2. LCI becomes the single largest driver of revenue growth in the Clinical Services division and likely the entire Company.

121.    The LCI strategy was a massive success for NeoGenomics, as many of the Company's former employees who worked in and with LCI have confirmed.

122.    The group's first contract with Tennessee Oncology in 2017 was "such a significant revenue stream" that NeoGenomics created LCI as a separate team within the Clinical Services organization, said CW-11. LCI proceeded to grow rapidly between 2017 and 2019, adding more personnel, both salespeople to offer LCI services to new and existing NeoGenomics customers and lab technicians to perform the tests. And LCI signed contracts with more and more huge client accounts, such as New York Cancer & Blood, the Center for Hematology and Oncology in Dallas, Fredericksburg Hematology and Oncology, Alabama Oncology and West Clinic in Memphis according to CW-11 and CW-5.

123.    CW-5, who worked for the Company from May 2018 to January 2023 in various roles within the Clinical Services division (including as National Director for LCI and then as Regional Director for the Southeast Region), referred to the LCI client base as "big, huge accounts," explaining that the LCI team "only called on big, big groups" of physicians. When NeoGenomics froze new LCI partnerships in 2021, the Group had a portfolio of 32 physician practices, according to CW-11 and CW-12. This

figure is also corroborated by CW-4, who recounted that LCI began with 3 accounts and added 13 in its first year and 17 more in its second year.

124.    NeoGenomics meticulously tracked the revenue coming in as a result of the LCI group, and the group was credited with testing that came to the Company as a result of their consulting efforts. CW-4 detailed the process by which revenue attributable to LCI's consulting efforts was calculated and credited to LCI employees as commission. The LCI group members were commissioned on "new business" the LCI accounts generated above and beyond what those accounts had generated before they became LCI clients. There was a "monthly audit of testing." The LCI group provided the names of the LCI clients to NeoGenomics' finance department which would then calculate the testing "volume and revenue" that could be attributed to the LCI group. Using the names of the LCI clients it received, the finance department evaluated the revenue attributable to the LCI group. For example, if a client had previously been sending NeoGenomics 10,000 tests per year as a Clinical Services customer, and after signing its LCI contract the same client sent NeoGenomics 60,000 tests per year, then the increase of 50,000 in the number of tests was considered business generated by the LCI division and the related revenue was apportioned to the LCI team.

125.    The new revenue that was attributable to LCI was massive. CW-4 recalled that LCI was responsible for generating approximately $20 million in revenue in 2019, $35 million in 2020, and $50 million in 2021. CW-11 recalled that, during the Company's national sales meeting just prior to the outbreak of COVID-19 in early 2020, the

numbers presented indicated that "*new revenue flagged for LCI accounts represented 70 percent of new business.*"[8]

126.    As illustrated in the table below, LCI's annual revenue made the operation the *single largest driver of Clinical Services revenue* during the Class Period. As CW-11 put it, LCI was "a large revenue stream for the Clinical Services business as a whole." And the Clinical Services division was responsible for approximately 85% of all revenue in the Company during the 2019, 2020, and 2021 fiscal years. *See* FY 2019 Form 10-K, p. 43 (clinical ÷ total revenue = 0.88); FY 2020 Form 10-K, p. 45 (clinical ÷ total revenue = 0.86); FY 2021 Form 10-K  (clinical ÷ total revenue = 0.83). Accordingly, LCI was likely the single largest generator of organic revenue in the Company, responsible for a huge share of the Company's organic revenue growth that was closely tracked by market analysts.

127.    Row (a) in the table below reflects annual Clinical Services revenue. (All dollar amounts listed in the chart are in millions.) Row (b) depicts year-over-year dollar-amount increases in Clinical Services revenue (*e.g.*, in 2019, there was a $28 million increase as compared to 2018). Row (c) depicts the same year-over-year Clinical Services revenue increase, but in percentage terms rather than dollar amounts. Row (d) lists the approximate annual revenue generated by (and attributed to) LCI. Row (e) depicts the year-over-year increase in LCI revenue. Row (f) depicts the percentage of overall Clinical Services growth for which LCI was responsible. (Mathematically, this

---

[8] All emphasis has been added unless otherwise indicated.

can be gleaned by dividing row (e) row (b).) Finally, the bottom row reflects what

Clinical Services growth would have been absent the outsize LCI impact on revenue:

Clinical Services revenue would have grown at the negligible rate of approximately 2%

for each of the years 2020 and 2021 (see row (g)), as compared to the 6-8% growth that

the division experienced with LCI's help (see row (b)):

|  | Description | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| (a) | Annual Clinical Services Revenue[9] | $333 | $361 | $382 | $404 |
| (b) | $ Year-Over-Year Increase in Clinical Services Revenue | | $28 | $21 | $22 |
| (c) | % Year-Over-Year Increase in Clinical Services Revenue | | 8% | 6% | 6% |
| (d) | Annual LCI Revenue | | $20 | $35 | $50 |
| (e) | Increase in LCI Revenue | | | $15 | $15 |
| (f) | Increase in LCI Revenue as a % of Increase in Clinical Services Revenue | | | 71% | 69% |
| (g) | Change in Clinical Services Revenue Without Including LCI | | | 2% | 2% |

---

[9] The 2019, 2020, and 2021 figures in Row (a) can be viewed in NeoGenomics' 10-Ks for FY 2019, FY 2020, and FY 2021. The 2018 figure in Row (a) is calculated by adding $91.3 million of revenue from Genoptix, which NeoGenomics acquired in that year, to the 2018 Clinical Services revenue reported in NeoGenomics' 10-K for FY 2018. The Genoptix revenue is calculated by subtracting NeoGenomics' 2018 total revenue of $276.7 million from its 2018 *pro forma* total revenue (with Genoptix) of $368 million, reported in its 10-K for FY 2019. (The use of total revenue in this calculation is proper because Genoptix revenue was categorized as clinical revenue. *See* NeoGenomics Investor Presentation, August 2021) The figures in Row (d) are estimates based on the recollection of CW-4, who was Director of LCI during those years. The figures in the

128.    The financial success of LCI was widely known and acknowledged throughout the Company. For example, CW-4 was honored with the Company's "President's Club" honor and was awarded the "Sales Rep of the Year." CW-2, who worked for NeoGenomics from October 2017 to June 2022 (including as global director of collaboration and scientific engagement from May 2019 to February 2021, and then as senior director of scientific collaboration and engagement), said that the LCI group was considered the "A" team, and that the head of the group was a "rain maker." CW-11 said that, as an LCI manager, CW-11 was at times making commissions of $20,000 or more *per month* at its peak. CW-8, who reported directly to VanOort and Mallon, also corroborated that LCI head Ryan Angell "brought in a lot of revenue" for NeoGenomics. CW-8 said that Angell's boss, Gina Wallar the Senior V.P. of the Clinical Division, loved him because he was "so popular with the clients," a "cash cow" and "the biggest person on the revenue block" in Clinical Services.

129.    Both CW-4 and CW-11 also stated that NeoGenomics made sales projections for the amount of new revenue LCI would generate annually. As for those projections, CW-4 recalled that LCI "blew them out of the water" each year. CW-12 also noted that LCI was an important source of revenue during the COVID pandemic,

---

table have been rounded to the nearest million (in dollars) and nearest integer (when in percentage). In 2020, the Company temporarily engaged in the sale of COVID PCR tests, which accounted for $27.8 million in 2020 Clinical Services revenue. The Company decided at the beginning of 2021 to exit from COVID PCR testing; its COVID PCR testing revenue in 2021 was only $1.6 million. The Company disclosed the transitory revenue from PCR testing in multiple places, including its 10-Ks for FY 2021 and FY 2022.

explaining that LCI clients represented steady volume and growth for the company during the pandemic.

130.    The phenomenal success of LCI in driving the Company's organic revenue growth also succeeded in increasing the Company's market share.

131.    Even as the LCI group became the likely single largest driver of organic revenue growth in the Company during the Class Period, the Company never told investors about the outsize financial importance of the group. The Company's quarterly and annual SEC filings, for instance, briefly referenced LCI's efforts, but never acknowledged that LCI was one of the Company's most important drivers of revenue and growth. For example, in February 2020, when the Company held an earnings call to discuss the 2019 fiscal year's financial numbers, the Company never mentioned that LCI had generated about $20 million in revenue that year. Likewise, during the various times it discussed 2020 revenue, including in its April, July, and October quarterly filings, the Company never credited LCI for its outsize impact on organic revenue and growth, even though LCI had generated about $35 million in revenue. The Company kept quiet throughout 2021 and did not disclose LCI revenue in its May, August, and November quarterly filings of that year. Not even in February 2022, when discussing the 2021 fiscal year numbers, did the Company mention LCI's financial impact—even though the group managed to generate $50 million that year even as a freeze was put on new LCI business in April 2021 and the dismantling of the group began. In sum, throughout the Class Period, the Company never once identified LCI as a key driver of revenue, even as the group delivered new revenue equal to about 70% of the Clinical

Services division's revenue growth, and equal to about 40% of the whole Company's organic growth.

### 3. LCI's practices were not only unethical, but unlawful, violating the federal Anti-Kickback Statute.

132.    As the Company would eventually implicitly admit to the OIG, the LCI group's practice of providing consulting services at less than fair market value to health care providers in exchange for testing referrals (some of which were reimbursable by government programs like Medicare or Medicaid) violated the federal Anti-Kickback Statute.

133.    CW-4 confirmed that the compliance issue reported to the OIG related to LCI and contracts that LCI signed with physicians and oncologists.

134.    The AKS is a federal law that looms large over any entity that conducts business in the healthcare sector. Broad in scope, the AKS imposes civil and, in some cases, felony criminal liability on individuals and organizations that offer or receive anything of value to induce or reward referrals of federal health care program business. That expressly includes providing "services for free or for other than fair market value." 42 U.S.C.A. § 1320a-7a (West).

135.    Or, as CW-6, a former Company Engagement Manager and head of Data Strategy and Analytics (employed with the Company from December 2020 to March 2022), put it, "[E]ven putting a printer in a physician's office could be a kickback," emphasizing that at every other reference lab they had worked it was "literally beaten into us that the federal government is watching you." But NeoGenomics had a highly

sales-driven culture. The Company's former Director of Compliance and Ethics (employed by NeoGenomics from January 2019 to June 2020), CW-13, explained that the culture at NeoGenomics was centered on a propensity to look the other way regarding compliance issues for the sake of sales and revenue, and that this culture was evident even among the most senior executive leadership, all the way up to VanOort.

136.    Here, LCI's services were provided to referring physicians for far less than market rates, conferring a substantial financial benefit on the referring physicians to induce increased downstream testing referrals. Several former NeoGenomics employees provided details concerning the arrangements. According to CW-12, who was an LCI Implementation Manager from March 2019 to March 2023, LCI charged clients a flat one-time fee of $15,000 to set up the lab, validate flow cytometry tests, and train personnel over the course of several months. This was less than market rate, as evidenced by the not only the self-reporting and ensuing OIG and DOJ investigations (*see infra* para. 151), but also the fact that NeoGenomics would later seek reimbursement from LCI clients for below-market services rendered for as much as $60,000 to $80,000 per client.

137.    These practices were known to senior management. The Vice President of Oncology Services and Laboratory Collaborations, Ryan Angell, was in routine, direct contact with VanOort was CEO, per CW-12. CW-11 described VanOort as a "hands-on CEO and was aware of what was going on across the business."

138.    CW-11 stated that Angell was "let go because he fudged language in contracts" with LCI clients that resulted in the "issues with anti-bribery, anti-kickback

law in regard to paying clients for referrals." CW-11 conveyed that both CW-11 and Angell believed that NeoGenomics' more senior management "chose [Angell] as the scapegoat."

### 4.  In April 2021, the Company suspends all new contracts for LCI.

139.    On April 19, 2021, Mallon took over for VanOort as CEO. According to CW-4, it was Mallon (with the input of Chief Compliance Officer Stephanie Bywater) who "closed our division." "Mallon thought that if it made that much money for the company, it had to be dirty," CW-4 said. CW-4 recalled that Mallon shut down LCI about a year before CW-4 departed the Company in May 2022, meaning the shuttering occurred in or around May 2021.

140.    CW-11 likewise recalled that new business development for LCI came to a halt in or around April 2021. CW-11 stated that an internal compliance audit had flagged that certain language had been removed from LCI contracts, and that once the audit raised alarm bells within NeoGenomics, the Company "self-reported to the OIG," prompting an investigation into LCI's practices. CW-12 confirmed that Mallon "self-reported" the matter "to the OIG," while suspending any new LCI business—all within weeks of joining the company.

141.    CW-5 also confirmed that the LCI-related business was under investigation at NeoGenomics as of early 2021, at which time the Company "stopped all contracts and went back and looked at them, and LCI was put on hold for a long time."

142.    NeoGenomics continued to service the existing LCI clients and receive

testing referrals from these clients, but no new LCI contracts were permitted, according

to CW-11.

143.    CW-11 was later fired, after being told that the consulting service CW-11

and others in LCI had been "providing was a benefit to the client and not to

Neo[Genomics]" and that NeoGenomics was supposed to have "billed for [CW-11's]

time onsite with accounts."

### 5. Shutting down new LCI business had a massive and undisclosed impact on NeoGenomics' revenue growth.

144.    NeoGenomics said nothing publicly about the compliance violations

within the Company for approximately six months. More importantly, to this day the

Company has *never* publicly acknowledged the severe impact on revenue that that the

LCI-closure had, even though it was widely known within the Company.

145.    CW-4 stated that the actions taken with respect to LCI group were a

"major factor" that contributed to the Company not being able to attain revenue

projections, emphasizing that "shutting down LCI had a huge effect on revenue." CW-4

also confirmed that Angell specifically warned Mallon that his actions in beginning to

dismantle LCI would have a negative impact on the Company's revenue. Asked to

quantify the magnitude of the expected loss, CW-4 said that Mallon "should have

expected to lose every bit of $30 million per year," as a result of the actions. As CW-8

put it, with respect Angell's termination, "*all of a sudden the biggest person on the revenue

block was fired.*"

146.    CW-11 recalled that the freeze on new LCI business "directly affected" LCI employees, who relied heavily on substantial commissions from LCI revenue. With LCI being dismantled, and revenue negatively impacted, CW-11 took a "$180,000 pay cut" in the form of lost commissions.

147.    Additionally, CW-5 described how the kickback scheme and subsequent OIG and DOJ investigation caused NeoGenomics to lose some of its biggest clients. Through direct conversations with LCI's National Sales Director, Sarah Clark, CW-5 learned that the director had been tasked with "going to each of the [LCI] clients and talking to them to get them to pay back money" to NeoGenomics. "Each of the [LCI] accounts was different," so there were varying amounts the clients were asked to pay back, said CW-5. But CW-12 explained that some of the under-charges were as much as $60,000 to $80,000 per client. CW-5 learned from the LCI National Sales Director that "no one wanted to do that," *i.e.*, reimburse NeoGenomics, and that some of them were "furious" and "stormed out of the room." When clients refused, CW-5 recalled, NeoGenomics resorted to "threaten[ing] the accounts" that "the OIG [would be] coming after" them and that they were "going to be under investigation" if they did not pay.

148.    CW-4 added that multiple LCI clients stopped referring their downstream testing because it became "so onerous" to work with NeoGenomics after it fired the LCI members servicing those accounts—or substantially restricted those clients' access to them. CW-11, who serviced these accounts, recalls that clients said: "This is weird. What the heck is going on?" These accounts "did not want to send" NeoGenomics the testing "anymore" after the Company culled LCI's ranks, said CW-4.

56

149.    CW-5 said that NeoGenomics "made a lot of LCI clients mad," and that NeoGenomics lost some of these "big, huge accounts" as a result of the investigation and compliance issues. Specifically, CW-5 recalled that NeoGenomics lost the Center for Blood and Cancer in Texas, and New York Cancer and Blood, which "was a huge account." CW-4 confirmed that New York Cancer and Blood stopped sending testing to NeoGenomics as a result of these changes, as did Tennessee Cancer. According to CW-12, NeoGenomics' treatment of LCI clients resulted the loss of six to seven accounts by fall 2021, including Cancer Specialists of North Florida and Charleston Hematology and Oncology. CW-5 explained that this attrition contributed to the reduction in revenue that was reported in early 2022, along with lost business due to turnaround time.

150.    Perhaps the clearest and most immediate impact on revenue growth was the fact that, at the time new LCI business was suspended by Mallon, there were 11 clients ready to sign new LCI contracts with another 30 or so prospective clients in the "pipeline," according to CW-12. CW-12 said that Mallon's actions delayed closing deals with the 11 pending customers, and that ultimately only about half of them ended up signing. The lost customers included at least one that was very significant in size, with numerous physician group sites, said CW-12. CW-12 explained that just one small client, such as Stockton Hematology in California (a fairly new client at the time), which had two or three sites, was projected to bring in $4 million in annual revenue. Using this revenue-projection as a basis, CW-12 said, "Imagine what a large group with 10 sites that are sending in testing" represented in revenue. "We had so many [clients] ready to sign, we could not believe he [Mallon] did that. We were shocked," said CW-12.

**6. Later in 2021, the Company implicitly admits liability for Anti-Kickback Statute violations by reporting them to the OIG and taking a $10.5 million liability reserve.**

151.    On November 4, 2021, NeoGenomics made its first public disclosure about the compliance matter, stating on its Q3 2021 earnings call that the Company was "conducting an internal investigation with the assistance of outside counsel that focuses on the compliance of certain consulting and service agreements with federal health laws and regulations" and had recently "notified the Office of the Inspector General of the U.S. Department of Health and Human Services of our investigations." Additionally, the Company disclosed that it "accrued a reserve of $10.5 million for potential damage and liabilities associated with the Federal Health Care program revenue received spanning multiple years." On this news, the price of NeoGenomics common stock fell $8.18 per share, or 17.6%, from $46.53 per share on November 3, 2021, to $38.35 per share at the close of trading on November 4, 2021.

152.    After the close of trading on November 4, 2021, NeoGenomics provided some limited additional details about the internal investigation during its quarterly earnings call with market analysts. During the call discussing third-quarter earnings, the Company said that "[b]ased on preliminary findings of this internal investigation, we voluntarily notified the Office of Inspector General of the U.S. Department of Health and Human Services of our investigation in November of 2021." In its Q3 2021 Form 10-Q filed the same day, the Company disclosed that the "federal healthcare laws and regulations" at the center of the Company's investigation "include those relating to fraud, waste and abuse." The Company never mentioned LCI.

153.    One analyst specifically asked during the Company's earnings call whether "the findings from the investigation all feed into a lower volume number for the implied Q4 guide or if those are related or not." Mallon not only sidestepped the question, but misleadingly responded that the issues were "linked to a small number of contracts and customers." President and Chief Operating Officer, Lab Operations George Cardoza also stated that "[w]e don't expect that this will have a meaningful impact on our go-forward revenue," which was false. Even though the Company was concurrently announcing disappointing revenue numbers, Cardoza denied that that the compliance matter was related, saying instead that "the top-line [disappointing revenue] really relates to the delta variant." CFO McKenzie stated that "we have worked closely internally as well [as] with our external counsel in evaluating any impact to historical financial statements," and that the Company did "no[t] need to restate any financials as a result of this investigation." In other words, rather than addressing the magnitude of impact on revenue that would inevitably follow from the LCI changes, the Company downplayed the issue.

**7. NeoGenomics cleans house in the wake of its compliance failing and the subsequent government investigation.**

154.    Various executives and employees left or were let go in the wake of the kickback scandal. VanOort escaped the chopping block because he announced his retirement on February 24, 2021. But Angell was fired. Bywater, the Company's Chief Compliance Officer, exited too. Rank and file LCI employees were also let go and told that their positions were not viable because they were providing a benefit to the client

rather than NeoGenomics. And ultimately, Mallon resigned in March 2022, less than year into his tenure as CEO, just months after the Company's compliance failing and the resultant OIG and DOJ investigations were announced.

## V.    The Truth Begins to Emerge

155.    Eventually, with the LCI revenue pipeline frozen and no resolution to the Company's fundamental operational weaknesses, NeoGenomics' revenue growth began to slow, exactly as Defendants had been warned of by the LCI team. Thus, beginning in November 2021 and continuing through April 2022, the true condition of the poor Company revenue health and some scant details regarding LCI began to seep out into the market, which naturally led to a decline in the stock price. As a result, the artificial inflation caused by Defendants' misrepresentations and omissions about its operations and revenue growth dissipated, and investors such as Lead Plaintiff who purchased NeoGenomics stock during the Class Period suffered damages, as discussed further below (*see infra* paras. 180-86).

### A.  Disclosure on November 4, 2021

156.    On November 4, 2021, NeoGenomics reported in its Q3 2021 Form 10-Q a miss on projected revenues and lowered its 2021 revenue, purportedly because the COVID-19 delta variant had a greater impact than expected. Furthermore, NeoGenomics publicly revealed that the Company was having compliance issues and that it had reported those issues to the federal government. Specifically, the Company stated that it was "conducting an internal investigation with the assistance of outside

counsel that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations" and had recently "notified the Office of [the] Inspector General of the US Department of Health and Human Services of our investigations." Additionally, the Company disclosed that it "accrued a reserve of $10.5 million for potential damages and liabilities associated with Federal Health Care program revenue received spanning multiple years."

157.    The NeoGenomics' press release of that same date announcing the Company's financials for the third quarter of 2021 revealed the faltering revenue: "[c]onsolidated revenue for the third quarter of 2021 was $121 million, a decrease of 3% over the same period in 2020. Clinical Services revenue of $102 million was a decrease year-over-year of 6%." The Company also reported that it missed its revenue projection and was lowering its full-year 2021 guidance.

158.    On that date, the Company also held its Q3 2021 earnings call, during which time McKenzie selectively provided additional, albeit materially incomplete and misleading, information about the compliance matter and investigation: "Based on preliminary findings of this internal investigation, we voluntarily notified the Office of [the] Inspector General of the US Department of Health and Human Services of our investigations in November of 2021." In the Company's Q3 2021 Form 10-Q, NeoGenomics stated that the "federal healthcare laws and regulations" at the center of the Company's investigation "include[ed] those relating to fraud, waste and abuse."

159.    Notably, however, the Company's disclosure selectively omitted material information that ensured that NeoGenomics stock price would remain artificially

inflated. For example, NeoGenomics omitted that: (i) LCI was the focus of the compliance matter, and it had been generating a substantial portion of NeoGenomics' new organic revenue; and (ii) the Company had frozen new LCI business while beginning to dismantle the LCI group, immediately curbing revenue growth while also negatively impacting relationships with preexisting LCI customers.

160.    The Company's November 4, public revelations about the worsening revenue picture, as well as about the Company reporting to the federal government issues pertaining to its legal and regulatory compliance with certain consulting and service agreements, amounted to partial disclosures that the Company's previous representations touting its so-called "competitive strengths," including its "industry-leading turnaround times," were materially false and misleading.

161.    In response to the partial disclosures as well as this materialization of latent risks that had been foreseeable to Defendants, the price of NeoGenomics common stock fell $8.18 per share from its closing price of $46.53 per share on November 3, 2021, to $38.35 per share at the close of trading on November 4, 2021, reflecting a decline of approximately 17.6%. This decrease was a result of a portion of the artificial inflation caused by Defendants' false and misleading statements and omissions being removed from the stock price. Trading volume on November 4, 2021, was 3,702,879 shares, nearly *7.5 times* the previous day's volume of 500,020 shares, and significantly above the average daily Class Period trading volume of approximately 1,011,854 shares.

162.    In addition, the negative reaction to the partial disclosure was materially negated by NeoGenomics falsely assuring investors that it did not expect the

compliance matter and investigation to have a meaningful impact on revenue going forward, even though, unbeknownst to investors: (i) LCI had been generating a substantial portion of new organic revenue for the Company; (ii) the Company had ordered a freeze on new LCI business, ensuring an indefinite hiatus on new LCI revenue; and (iii) the Company had fired the head of LCI, ordered the termination of existing LCI contracts, and otherwise taken steps to begin dismantling LCI, ensuring a negative impact on growth as well as sources of preexisting revenue (*see infra* paras. 312-316). Indeed, while the Company concurrently disclosed the federal government's investigation into the Company's compliance matter, as well as disappointing revenue numbers, Cardoza affirmatively denied that that those matters were related, instead falsely stating that "the top-line [disappointing revenue] really relates to the delta variant." Further similar misleading statements can be found *infra* in Section VIII-C-iii.)

163. In conjunction with those material misstatements and omissions, NeoGenomics also continued to make materially and false misleading statements about the purported key drivers of revenue growth. For example, during the Q3 2021 earnings call on November 4, 2021, Mallon continued to mislead investors about the condition of the Company's revenue growth drivers, stating that "[t]he attributes that have made Neo successful in the past remain as foundational drivers for growth." Mallon also responded to an analyst question about whether NeoGenomics was lagging behind the evolving diagnostics landscape by echoing materially false statements made throughout the Class Period: "I think the things that have led to our success we've got to maintain those[,] with great service, great turnaround time . . . ."

164.    While securities analysts subsequently mentioned NeoGenomics'

revelations (*i.e.*, the compliance matter and the involvement of the federal government;

revenue disappointment), they continued to express confidence – based on the

Company's misrepresentations and omissions – about the Company's ability to drive

organic revenue growth. For example, on November, 4, 2021, following the Q3 2021

earnings call, analysts Mark Massaro and Vivian Bias of BTIG issued a report stating

that the Company "disclosed on its call today that they are undergoing an internal

investigation on a small number of customers. While this is not ideal, we are not overly

concerned." The analysts continued: "These updates are enough to put the stock 'on

sale today' with a -16% move, but given scarcity value and a strong underlying business

and market positioning, ***we have zero hesitation recommending investors buy the stock***

***here on today's weakness***. We reiterate our Buy rating, $60 PT."

165.    In fact, during the months following the Company's partial disclosures on

November 4, 2021, securities analysts continued to maintain the "buy" rating on

NeoGenomics stock. For example, on December 16, 2021, analysts Dan Brennan, Tom

Stevens, and Kyle Boucher of Cowen and Company issued a report, which stated: "We

see an attractive investment opportunity at current levels, ahead of the expected stock

re-rating, which should occur as confidence increases in the growth acceleration story

soon to unfold."

166.    In connection with those statements, on February 23, 2022, analysts Brian

Weinstein, Griffin Soriano, and Dustin Scaringe of William Blair issued a report that

commented on the federal government's investigation and its impact on the Company:

On the OIG investigation, there were not significant updates, and the investigation continues, although a large part of it is complete. The company slightly increased the accrued liability for this matter by about $700,000 (to roughly $11 million), and management said it has done everything it needs to do to meet the expectations of the government. The timing of the investigation will largely be driven by feedback from the government, which is difficult to predict, *but at this point we feel as good as we can from an outsider's seat as it relates to what happened and the likely ramifications to the business (which do not appear to be fundamental in any way).*

167.    In truth, unbeknownst to the market, the Company's actual major driver of organic revenue growth, LCI, had halted new business due to the compliance concerns and the Company had begun dismantling the group, negatively impacting preexisting revenue streams as well as revenue growth.  Lead Plaintiff and other members of the Class were damaged when the artificial inflation of the common stock gradually dissipated as the market became aware of the true condition of the Company's revenue problems through partial corrective disclosures.  Lead Plaintiff and other members of the Class were also damaged through the materialization of the risks that Defendants had concealed, but which were proximately caused by weaknesses in the Company's so-called "competitive strengths," the outsize importance of LCI, and the impact of freezing and beginning to dismantle the LCI team.

**B.  Disclosure on March 28, 2022**

168.    As time moved forward and the Company's organic revenue growth continued to disappoint, it became increasingly challenging for NeoGenomics to continue misleading investors by continuing to (i) falsely tout the Company's revenue

drivers and "competitive strengths" as being its rapid turnaround times and innovative

service offerings; and (ii) wrongly conceal that the actual positive driver of organic

revenue growth for the Company had been LCI, which was no longer contributing in

the same way to revenue growth. On March 28, 2022, NeoGenomics filed a Form 8-K

with the SEC, disclosing that "the Board of Directors (the 'Board') and Mark Mallon,

Chief Executive Officer, have agreed that Mr. Mallon will step down as CEO and

member of the Board, effective immediately." Defendants also disclosed that:

> The Company currently expects ***revenue for Q1 2022 may be below the low end of its prior guidance of $118 - $120 million and EBITDA for Q1 2022 will be below the low end of its prior guidance of $(15) - $(12) million***. The larger than anticipated EBITDA loss was primarily driven by higher than anticipated Clinical Services cost of goods sold. The Company intends to take immediate action to address performance and costs . . . . Additionally, ***the Company has withdrawn its 2022 annual financial guidance*** issued February 23, 2022.

169.    This was a partial disclosure relating to the worsening revenue picture

and previously touted competitive strengths. On this news, the price of NeoGenomics

common stock declined $5.30 per share, or 29.8%, from $17.79 per share on March 28,

2022, to $12.49 per share at the close of trading on March 29, 2022. This decrease in the

share price of NeoGenomics stock was a result of a foreseeable result associated with

the materialization of the risks concealed by Defendants' material misrepresentations

and omissions about the Company's purported competitive strengths, as well as their

continued concealment of material information about LCI and its impact on

NeoGenomics' revenue growth. Trading volume on March 29, 2022, was 20,137,383

shares, nearly 19 times the previous day's volume of 1,085,035 shares, and significantly

above the average daily Class Period trading volume of approximately 1,011,854 million shares.

170.    In response to NeoGenomics' partial revelations, securities analysts expressed surprise and started raising questions about Defendants' explanations for the lower revenue and financial performance. For example, on March 29, 2022, analysts Brian Weinstein, Griffin Soriano, and Dustin Scaringe of William Blair issued a report that commented on Mallon abruptly stepping down as the Company's CEO and raised corresponding questions about the Company's purported "core . . . strengths":

> When announced as CEO at NeoGenomics, [Mallon] indicated his focus would be on molecular diagnostics, informatics, and driving revenue on the comparatively small, but growing in importance, pharma services side of the business.
>
> The hire was notable in that Mallon had no prior leadership roles in lab operations or reference lab sales and marketing. *While we were a bit uncomfortable with that at the time, our view has been that the core business was sailing along* and the emphasis on pharma opportunities that leveraged core NeoGenomics' strengths would outweigh any operational holes in the résumé.
>
> *Unfortunately, it had become clear to the board over the last few weeks that the core business has not been managed tightly enough and performance has slipped to levels that were not acceptable and were somewhat masked by the COVID-19 dynamics.*

171.    Furthermore, in connection with the Company's revelations concerning its disappointing earnings, securities analysts slowly started to realize doubts about the Company's purported "operational strengths". For example, in further discussing Mallon stepping down as the Company's CEO, the analysts at William Blair commented:

But *with March being a clean month (no COVID headwinds) and the business not seeing the level of growth that was communicated in what was viewed as already lowered 2022 guidance* (specifically around the March recovery), along with higher-than-expected expenses still flowing through the P&L statement (inflation on materials, supply chain, and labor costs as well as some internal spending issues were noted to us), the company felt a change was needed.

172.    The next year, on April 11, 2023, Derik de Bruin and other analysts from BofA Global Research reported, looking back to this period in early 2022: "As a reminder, in early 2022, NEO withdrew its FY sales guidance, as the company's NGS based therapy selection portfolio had become 'stale' and test turnaround times (TAT) were taking too long."

**C.  Disclosure on April 27, 2022**

173.    On April 27, 2022, prior to the start of trading, NeoGenomics filed a Form 8-K with the SEC that disclosed the Company's Q1 2022 financial results. In its Form 8-K, NeoGenomics revealed that revenue for the quarter was $117 million and EBITDA loss was $19 million. The Company further revealed that: "[c]onsolidated gross profit for the first quarter of 2022" had "decrease[d] 8.0% compared to the first quarter of 2021" in part because of "higher payroll and payroll-related costs." The Company further disclosed that: "[o]perating expenses increased by $34 million, or 59%, compared to the first quarter of 2021" driven, in part, by "higher payroll and payroll-related costs to support the Company's strategic growth initiatives."

174.    That morning, NeoGenomics held its Q1 2022 earnings call, during which NeoGenomics executives, including Bonello, discussed the factors contributing to the

Company's poor financial results and the actions it was taking to improve performance and return to profitable growth. In doing so, NeoGenomics revealed information that belied the veracity of Class Period statements touting the Company's rapid turnaround times and innovative service offerings.

175.   For example, during the Q1 2022 earnings call on April 27, 2022, Bonello acknowledged that:

> Our volume growth is being impacted by a couple of factors. First, *our test mix is weighted to legacy modalities* and disease-specific NGS offerings, *while the market is moving towards larger, more comprehensive panels*. Second[,] *operational challenges have made it difficult to add new business at our historical rates*. We are taking a number of steps *to upgrade our NGS product offering* and *improve our lab operations* . . . .

176.   Bonello also stated, "[W]e are seeing some increased competition on the NGS front as panels move or as customers move to demanding larger, more comprehensive NGS only panels[,] and our offering is more oriented towards smaller targeted panels." He further stated, "[W]e've seen a notable decrease in lab efficiency over the course of the past year. This decrease is largely attributable to increased complexity of both our product offerings and our lab processes, due in part to efforts to respond to customer requests for customization."

177.   During that same earnings call, analysts directly asked the Company very directly "how does your NGS turnaround time compare to peers now?" Clinical Division President Dr. David Sholehvar's response finally acknowledged turnaround time to be a weakness that the Company was addressing, stating "honestly it's still a

work in progress for us. I mean that is one of the key areas we talked about the process excellence team to streamline our approaches in the lab in a few key areas and that's actually one of our few key areas."

178.    In response to these revelations and the materialization of the aforementioned risks, the price of NeoGenomics common stock fell $0.41 per share, or 3.8%, from $10.85 per share on April 26, 2022 to $10.44 per share at the close of trading on April 27, 2022. The trading volume on April 27, 2022, the day after the last day of the Class Period, was 1,839,371.

179.    These statements partially disclosed the latent weaknesses in NeoGenomics' core business operations that were concealed by Defendants' false and misleading statements and omissions.

## VI.    Loss Causation/Economic Loss Allegations

180.    As detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of NeoGenomics common stock throughout the Class Period. Defendants' unlawful conduct directly caused the losses incurred by Lead Plaintiff and the other members of the Class. The materially false and misleading statements and omissions set forth above concerning, among other things, NeoGenomics' competitive strengths and drivers of demand and growth were widely disseminated to the securities markets, investment analysts and the investing public. In fact, as was widely known at the highest levels of the Company, these areas were significant weaknesses, not strengths.

181.    At the same time, Defendants also concealed LCI as a primary driver of the Company's organic growth.

182.    Defendants' misrepresentations and omissions therefore misled the market about the core strengths and weaknesses of the Company, making the Company seem much more fundamentally sound that it actually was, which artificially inflated NeoGenomics' stock price during the Class Period.

183.    Had NeoGenomics been truthful about its (i) consistent struggle to meet customer turnaround time expectations (resulting in lost customers and lost revenue), (ii) failure to develop its NGS testing relative to competitors, (iii) the fact that the majority of its revenue growth was reliant on the 11-person LCI team, and (iv) the freezing of new LCI business and the other efforts taken in, around, and after April 2021 with respect to the dismantling of the LCI team, the market value of NeoGenomics stock would have been far less.

184.    As a result, Lead Plaintiff and the other members of the Class purchased NeoGenomics common stock at artificially inflated prices. Lead Plaintiff and other members of the Class were damaged when the artificial inflation of the common stock gradually dissipated as the market became aware of the true condition of the Company's revenue problems through partial corrective disclosures and through the materialization of the latent risks associated with NeoGenomics' misrepresentation and omission of the true drivers of revenue growth.

185.    In conjunction with, and subsequent to, the partial disclosures, Defendants continued to make contemporaneous misstatements in connection with

partial disclosures in November 2021[10] and March 2022. By doing so, Defendants

mitigated the impact of the partial corrective disclosures on NeoGenomics stock price

and prevented the full truth about the Company's competitive strengths and organic

revenue growth from being disclosed at once.

186.    When the true facts became known with respect to Defendants' materially

false and misleading statements concerning, among other things, the key drivers for

organic growth, including the Company's purported "competitive strengths" and/or

the materialization of the risks that had been fraudulently concealed by Defendants but

which were proximately caused by weaknesses with the Company's so-called

"competitive strengths," the outsize importance of LCI, and the impact of freezing and

beginning to dismantle the LCI team, the price of NeoGenomics common stock declined

even further as additional artificial inflation was removed from the market price of

these securities, causing substantial damage to Lead Plaintiff and other members of the

Class.

187.    Discovery and expert analysis may reveal further partial disclosures of

corrective information.

## VII.    Post-Class Period Events

188.    Additional information came to light following the Company's partial

disclosures during and at the end of the Class Period.

---

[10] *See, e.g.* para. 164 ("falsely stating that their internal investigation, which they had reported to the Federal Government, was "linked to a small number of customers and contracts").

189.    Regarding the OIG "Regulatory Matter," in its 10-Q for Q2 2022, NeoGenomics revealed that the "Company was notified on June 30, 2022[,] that the Department of Justice ("DOJ") will be participating in the investigation" with the OIG. (Q2 Form 10-Q for 2022, filed August 9, 2022, signed Tetrault and Bonello)

190.    None of the Company's subsequent quarterly or annual filings for 2022 or 2023 contains any further update or information about the OIG investigation.

191.    On July 21, 2022, NeoGenomics announced that Christopher Smith would be taking over for the acting CEO, Lynn Tetrault, effective August 15, 2022.

192.    In its Q3 2022 10-Q, filed November 8, 2022, and signed by Smith and Bonello, NeoGenomics removed the following statement from the "Competitive Strengths" section that had appeared in its annual and quarterly filings throughout the Class Period: "Our consistent timeliness of results by our Clinical Services segment is a competitive strength and a driver of additional testing requests by referring physicians." (*Compare* Form 10-K for 2021, filed February 25, 2022, *with* Q3 2022 Form 10-Q, filed November 8, 2022).

193.    On the subsequent earnings call, Smith effectively admitted that what had previously been touted as a top competitive strength, had instead been a weakness that contributed to poor economic performance during the Class Period. Smith admitted that, although NeoGenomics had seen "meaningful improvements in turnaround time, a key indicator in our markets," during the third quarter, turnaround times were an area where "we have a lot of room for improvement." (3Q 2022 Earnings Call Transcript).

194.    Smith continued, recognizing that NeoGenomics had failed to execute on effective strategy initiatives "for years"—*i.e.*, during the Class Period: "[T]here is no doubt that we need to significantly improve execution. I believe that we've had some of the elements of an effective strategy in place for years, but we simply have not executed on those initiatives." What NeoGenomics needed, "[f]rom a customer-facing standpoint," Smith explained, was "to enhance the customer experience and win on service." The first item on the to-do list: "reduc[e] turnaround time." (3Q 2022 Earnings Call Transcript)

195.    These post-Class-Period statements acknowledge that during the Class Period the Company had failed to consistently deliver timely test results, and that its lab-operations failures were deep-seated problems at the Company.

196.    Finally, on October 19, 2023, counsel for Lead Plaintiff submitted a request under the Freedom of Information Act (FOIA) to the OIG. Lead Plaintiff's request asked for correspondence between OIG and NeoGenomics regarding the compliance matter disclosed in November 2021, including the OIG's investigation. The OIG denied Lead Plaintiff's FOIA request on November 21, 2023. In its denial, the OIG confirmed that it had "been informed that there is an open and ongoing investigation concerning the subject of your request."

## VIII.  <u>Additional Evidence of Scienter</u>

197.    The following allegations support the conclusion that Defendants knew or were deliberately reckless in not knowing the materially false and misleading nature of the misrepresentations and omissions discussed in Section IV and listed in Section IX.

A. **Statements of current and former NeoGenomics employees establish scienter**

1. **Executive leadership's knowledge relating to the Company's problems with unacceptable turnaround times, poor NGS deliveries, and inability to deliver one-stop-shopping.**

198.    NeoGenomics' ability to deliver timely test results to its customers was of paramount importance within the Company throughout the Class Period. As CW-1, the COO of Clinical put it, "The glass ball" that could not be dropped was "customers and relationships with pathologists," which meant that "we can't screw up turnaround times."

199.    The Individual Defendants similarly focused on—and spoke frequently about—the importance of turnaround times. For example at the 18th Annual Morgan Stanley Global Healthcare Conference during the Class Period, VanOort described "[t]urnaround time" as "a very important metric and measure for clients." During the Q4 2020 earnings call on February 24, 2021, VanOort described how the Company's "whole Clinical team . . . pour[s] [sic] through" feedback data from customers, and "turnaround time has always been an important attribute and probably perhaps the most important." After assuming the CEO role, Mallon likewise recognized that to "keep growing share" in its "core business," "we've got to maintain … great turnaround time." (3Q 2021 Earnings Call Transcript, November 4, 2021). And as he touted NeoGenomics' "industry leading turnaround times," during the Q2 2021 Earnings Call on August 6, 2021, he stated that he had been "visit[ing] many of [the Company's] facilities."

200.    At the same time, the executive leadership at NeoGenomics, including

Defendants, received repeated, firsthand information about the Company's

longstanding problems with laboratory operations—including glacial turnaround times

and NGS failings.

201.    CW-5 confirmed the high-level understanding of the problems. CW-5

stated that there were company-wide town hall meetings that occurred at least twice

per year during CW-5's employment, and that turnaround times were brought up on

"every town hall meeting," including "how they could fix the turnaround times because

it was a struggle." The town hall meetings were conducted via Zoom and were

recorded, per CW-5. CW-5 recalled that the recorded meetings were available for

viewing by employees at a later date though a central electronic repository. During the

town hall meetings, "[e]verything was brought up" regarding the turnaround times,

"from impacting customers to impacting customer care. Everyone knew it was a

concern," CW-5 emphasized. CW-5 added that NeoGenomics was "a mess" and it was

"hard to miss" the turnaround time issues.

202.    CW-5 confirmed that the Company's executives participated in these town

hall meetings, with CFO McKenzie moderating the meetings, and both VanOort and

Mallon attending when they were in the CEO role. CW-5 said that CFO Bonello also

"frequently" attended the meetings. CW-10 confirmed that VanOort led the meetings

while he was with the Company.

203.    During the meetings, according to CW-5, the executives informed the

attendees: "It [turnaround times] is going to better. Hold tight." CW-5 recounted that

the executives "brought in so many different people" to try to get a handle on the turnaround time issues, but "nothing changed." CW-5 said that the executives were also aware of the problem with high QNS rates, as sales people "always brought up those issues," including on the town hall meetings. According to CW-5, the goal of senior management was to "drive for more volume" in order to conceal the loss of business and "keep the stock" price high.

204.    Per CW-10, during the meetings, an executive provided updates on the turnaround times, including turnaround times for each department, and discussed why departments were not meeting turnaround time goals. CW-10 stated that VanOort attended the town hall meetings in which turnaround times were discussed. CW-9 also recalled having several "very honest conversations" with VanOort while he was CEO, in which CW-9 brought up various problems. For example, CW-9 recalled raising concerns that the team "was burned out" because they were under so much pressure to work quickly to improve turnaround times. CW-9 said that VanOort "took notes" during these conversations.

205.    CW-5 also stated that the turnaround problem was well known to senior management, and that CW-5 had personally alerted higher-ups to the problem, including then Vice President of Sales Michele Buzhardt, then President of Clinical Services Rob Shovlin, and current President of Clinical Services Warren Stone. CW-5 also stated that many other members of the sales organization voiced concerns to management too. Similarly, CW-2 recalled that the turnaround-time problem was of such a well-known magnitude within the Company that a former Company CFO had

77

been tasked with resolving the problem, but that NeoGenomics never effectively solved the problem.

206.    CW-6 recounted how complaints about turnaround times were regularly raised in a weekly Clinical Services sales call. "Turnaround times were a big deal on these calls," CW-6 said. CW-6 recalled that as CEO, Mallon "gave a lot of talking points" on these Friday sales calls. According to CW-6, Mallon "used to be a salesman" before he became the chief executive officer at NeoGenomics, and the Clinical Services sales representatives "had a lot of questions" for Mallon on the calls. Mallon seemed to "have an affinity for" the NeoGenomics sales staff and engaged with them "very frequently." CW-6 recounted that Mallon made statements along the lines of: "I hear what your complaints are and we are working on trying to fix them," specifically in relation to the issue of delayed turnaround times. CW-6 emphasized, "Across the board, people were not happy with turnaround times."

207.    CW-10 recalled being asked by Bryan Hill, the Aliso Viejo Site Director, and Vice President of Clinical Operations Jason Allchin why "turnaround time looks so bad," with them informing CW-10 that they had to "review this with Doug [VanOort]."

208.    CW-3, as Chief Scientific Officer and Chief Medical Officer, had knowledge of the Company's turnaround-time problems. CW-3 discussed the turnaround-time problem with Mallon while Mallon was CEO, before CW-3 departed in May 2021. CW-3 not only identified the problems, but also "mentioned possible solutions" to Mallon.

209.    CW-8, as Vice President of Research and Development from March 2019 through early 2021, and then as Chief Scientific Officer of the Clinical Services division until July 2022, likewise had knowledge of the Company's turnaround-time problems, QNS problems, and the fact that NeoGenomics was not competitive in the NGS solid tumor business because of those problems. CW-8 reported to CEOs VanOort and Mallon as Chief Scientific Officer.

210.    CW-8 stated that NeoGenomics implemented a "tracker" to monitor the number of reports each pathologist completed per day in order to gauge turnaround times. CW-8 said that the Chief Medical Officer put the tracker in place and that "Doug [VanOort] wanted to monitor this as well because it was a really big deal." CW-8 stated that the tracker consisted of an Excel-based spreadsheet, which listed each pathologist by name, the number of reports each pathologist completed on each day of the week, and whether any of the pathologists took paid time off. CW-8 stated that the tracker was distributed to executives on a regular basis, and that the tracker report appeared in meetings attended with the Chief Medical Officer, Shovlin, and VanOort.

211.    CW-8 said that VanOort was well aware of the issues with turnaround times and QNS results. CW-8 stated that VanOort closely monitored the number of reports the pathologist reviewed and that VanOort knew the pathologists represented a bottleneck in the NGS testing process. CW-8 stated, "We talked about it constantly. It was a point of contention with [the Chief Medical Officer] and myself on the science side." CW-8 recalled that VanOort asked, "Where can we shore up turnaround time? We have these issues. What can we do? How can we solve this?" CW-8 was tasked by

VanOort or the Chief Medical Officer at different times to devise a solution. CW-8 said the Chief Medical Officer was also responsible for "trying to figure out the turnaround time" and came to CW-8 to inform CW-8 of "huge issues." The two separately conducted research to better understand the issues and tried to come up with solutions. CW-8 said the Chief Medical Officer met with VanOort in one-on-one meetings and during regular executive meetings, and that CW-8 had conversations with the Chief Medical Officer on a daily basis about the issues. After the Chief Medical Officer departed NeoGenomics in early 2021, and before Mallon officially began his role as the chief executive officer, CW-8 had weekly meetings with VanOort pertaining to the issues. VanOort also set up *ad hoc* meetings attended by VanOort, CW-8, the Chief Medical Officer, and Shovlin to discuss the issues and plans for addressing them. These meetings occurred in 2020 and into 2021. CW-8 estimated having met with VanOort at least once per month to discuss the issue with turnaround times. "We got together and talked about the problem, then we would go off and research it, and then come back to the table to figure how and what needed to be done." Many of the meetings were conducted over the phone or via video conferencing (first using a Citrix-based video conferencing system, then Zoom, and later Microsoft Teams), but on some occasions, the meetings were held in in Aliso Viejo in a conference room or in either VanOort's or Shovlin's office there. In some of these meetings, the Chief Medical Officer brought the tracker and the data from the tracker was discussed.

212.    CW-8 also participated in "strategy sessions" with Shovlin and VanOort, in which the QNS issue was discussed. CW-8 recalled that discussions during these

meetings included NeoGenomics having a "really high QNS and TMP rate" for "solid tumor lung" testing and "you can't do that with a client." For months after Mallon took over as CEO, NeoGenomics had a "huge NGS problem," per CW-8, and Mallon was "thrown into the fire with that." CW-8 recalled being on the phone with Mallon at 10:00 pm on a Friday to discuss the NGS problem. CW-8 reported that Mallon had to deal with NGS, the turnaround time issue, "and everything else."

213.    CW-8 said that Bonello and McKenzie were "fully involved and fully knowledgeable" of the turnround time issues. According to CW-8, Bonello and McKenzie were "part of the executive team" that participated in the same executive leadership meetings that CW-8 did upon being promoted to the Chief Scientific Officer in 2021. CW-8 stated that the "solid tumor potential" growth was also discussed during these meetings. The executive leadership meetings occurred once per week, according to CW-8, with the attendees using the time to "work on their presentations to the board" and to discuss issues from a strategic perspective. CW-8 also attended board meetings and recalled that there were discussions at the board meetings regarding the "challenges" NeoGenomics was facing and "how we were trying to solution them." The presenters used slides and presentations to communicate to the board that the executive team had observed an issue with a high QNS rate. CW-8 said there was a "two-way discussion" at the board meetings during which board members might ask questions.

214.    CW-1, as Chief Operating Officer of Clinical Services, knew detailed information about the QNS problems, knew that NeoGenomics sometimes referred out

testing, and actively studied the turnaround-time and over-broad test offering problems discussed above.

215.    CW-1 reported to VanOoort while VanOort was CEO, and then reported to Mallon as CEO. VanOort asked CW-1 to take over Clinical Services operations in late 2020 or early 2021, after which CW-1 began with a "four-week assessment" of the various problems in operations at the Company, reporting the results to VanOort. CW-1 concluded that the Company needed "drastic improvements in operations," to achieve incremental progress on turnaround times. CW-1 identified operational problems contributing to slow turnaround times and presented solutions to executives and the board of directors, including slimming down the testing menu, since there were "way too many assays," and reforming the product development process to discourage developing so many new assays.

216.    CW-1 presented the problems along with recommended solutions to VanOort, Mallon, other members of the executive leadership team, and to the board of directors. CW-1 met with VanOort in or around February 2021 via Zoom to present CW-1's findings. "It was a tough conversation," CW-1 recalled. CW-1 informed VanOort, "There are a lot of things that need to be fixed here." CW-1 "laid things out" on "seven or eight slides" of what CW-1 "thought the issues were." According to CW-1, VanOort was receptive, and agreed that there were "things that definitely needed to be improved."

217.    CW-1 repeated these efforts in May 2021, meeting with Mallon after Mallon had become CEO, at the Aliso Viejo office. At that meeting, CW-1 repeated to

Mallon the operational problems and solutions that CW-1 had discussed with VanOort months earlier.

218.    CW-1 stated that, in addition to the above meetings, CW-1 also participated in executive leadership meetings, held once a week or once every two weeks via Zoom. The meetings lasted one or two hours, generally. CW-1 stated that there were 10 to 12 attendees, including "all the senior leadership" who reported to VanOort and later to Mallon, as well as the CEO at the time. CW-1 stated that McKenzie and Bonello also attended these meetings. During the executive leadership meetings, CW-1 recalled discussing the operational problems and recommended solutions. "All the time we talked about this stuff," CW-1 recalled. CW-1 recalled Bonello stating during one of the discussions on the topic of the operational problems and solutions CW-1 identified: "You are absolutely right."

219.    CW-1 attended "most of the board meetings" while employed with the Company too. Many of the meetings were virtual, via Zoom, though at least the last meeting that CW-1 attended was held in Fort Myers, Florida. CW-1 presented the operational problems and the solutions that CW-1 identified to the board, with several of the slides that CW-1 had used to present to VanOort in February 2021, albeit with less detail. CW-1 stated that CW-1 presented "a lot of information" on the operational problems and solutions to the board. CW-1 stated that CW-1 had no knowledge of the solutions being implemented before CW-1 left the Company, though more recently the Company has demonstrated improvement.

2. **Executive leadership's knowledge relating to LCI's outsize impact on organic revenue growth and about impact of terminating LCI on organic revenue going forward.**

   a. **The outsize impact of LCI on the Company's organic revenue growth.**

220.    The importance and financial impact of LCI within the Company was well-known, including at the highest reaches of the Company and by Defendants.

221.    As early as 2019, LCI had grown to the point that the Company had to begin treating it differently. CW-11, an LCI Manager from June 2019 to November 2022, stated that LCI began with a small, core group of employees led by Ryan Angell. CW-11 recounted that, as LCI's first-year business grew, NeoGenomics quickly expanded the group from three core employees with overlapping responsibilities to group of 10 employees with differentiated roles by mid-2019. According to CW-4, who served as LCI Director from January 2019 to May 2022, NeoGenomics "established [LCI] as a unique business unit" in 2019.

222.    CW-11 stated that NeoGenomics made this decision after seeing "such a significant revenue stream" from referrals from Tennessee Oncology, a healthcare practice with whom the Company had consulted on internal laboratory set-up. NeoGenomics tasked LCI with securing similar lucrative collaborations.

223.    According to CW-12 and CW-11, LCI's account portfolio grew to 32 clients before the Company took actions in April 2021 that suspended further growth. All of this earned Angell a well-known reputation as "one of the rain makers" of NeoGenomics, per CW-2, made it so his team was considered the "A" team, per CW-2, and propelled Angell "very high" in the rank of the corporate hierarchy, according to

CW-13. Angell took advantage of this status, "pushing for opportunities and flexibility from executives for different chances" to continue to grow the LCI business, said CW-11.

224.    CW-5 stated that LCI's portfolio included "big, huge accounts" like Texas's Center for Blood and Cancer and New York Blood and Cancer, with whom NeoGenomics enjoyed lucrative referral relationships. CW-4 confirmed that LCI had "huge" accounts, and named other major, multi-location oncology practices like West Cancer Center and University Blood and Cancer. LCI clients like these sent large volumes of "high margin, high value" referral tests to NeoGenomics, according to CW-4.

225.    According to CW-4, these huge clients translated into largescale revenue growth. Per CW-4, downstream testing revenue from LCI accounts totaled $20 million in 2019, $35 million in 2020, and $50 million in 2021 (even though the shut-down of LCI began in the spring of 2021).

226.    CW-4 stated that the Company rewarded the LCI team by paying them commissions based on the percentage of revenue attributed to the group. CW-11 reported making commissions on LCI revenue that sometimes totaled more than $20,000 per month. CW-11's percentage was 0.6% of LCI revenue, which mathematically confirms that LCI revenue was in the range of $20 to 50 million from 2019 to 2021, as reported by CW-4.

227.    This revenue was equal to about *70% of organic annual Clinical Services growth* during 2020 and 2021. A similar figure was acknowledged in a presentation just

prior to the COVID-19 pandemic at a national salesforce meeting, according to CW-11, in which the annual numbers showed that "new revenue flagged for LCI accounts represented 70 percent of new business." Clinical Services accounted for more than 85% of NeoGenomics' total revenue for those years, and in fact was referred to as the "core" of NeoGenomics' business. *See,* e.g., Q2 2020 Earnings Call, July 28, 2020; Q4 2020 Earnings Call, Feb. 24, 2021. LCI represented a crucial driver of growth for the Company as a whole during the Class Period. As CW-12 emphasized, LCI "held them through COVID because [it was] bringing the clients on" and producing steady volume and growth at a time when the Company faced operational issues and lockdowns kept its general sales force from soliciting healthcare providers in person.

### b. Defendants' knowledge of the outsize LCI revenue

228.    CW-11 reported that NeoGenomics kept internal sales projections about LCI revenue. According to CW-12, an LCI Implementation Manager from March 2019 to March 2023, LCI head Ryan Angell maintained a "pipeline" spreadsheet that tracked in-the-works LCI deals and contained both near-term and long-term revenue projections. CW-12 recalled that the pipeline spreadsheet contained, for each prospective client: (1) its name; (2) its test volume; (3) its number of sites and their addresses; and (4) projected revenue for that client. CW-12 stated that Angell used the pipeline spreadsheet to project LCI revenue and that the pipeline was also used to keep NeoGenomics' operations team abreast of what to expect in testing volume..

229.    Angell shared these data and projections with NeoGenomics executives.
CW-11 stated that Angell visited NeoGenomics' headquarters often in 2020 and 2021
and that Angell reported having good meetings with executives about LCI's growth.
CW-12 confirmed that Angell reported meeting "[a]ll the time" with VanOort and
President, Clinical Services Robert Shovlin. According to CW-12, Angell regularly
conveyed information about LCI's revenue projections and new partnership prospects
to VanOort, who along with Shovlin "wanted to see what LCI was doing, what [it was]
bringing it." Specifically, CW-12 stated that Angell regularly shared his Pipeline data,
including the spreadsheet, with VanOort. As described by CW-11, VanOort was a
"hands-on CEO" who "was aware of what was going on across the business." CW-9
confirmed that VanOort was "an engaged CEO" who regularly sought input from
lower-level employees.

230.    Mallon also had knowledge of LCI's outsize contribution to
NeoGenomics' revenue and growth—and its projected growth for 2021 and beyond.
CW-2 stated that revenue attributable to LCI was "material enough" that NeoGenomics'
Compliance Chief Stephanie Bywater raised concerns about the LCI business model
with Mallon in 2020. CW-12 recalled that while Bywater's concerns had never
previously gained traction, they ultimately resonated with Mallon, who made the
decision to suspend its operations. According to CW-4, Mallon "thought that if [LCI]
made that much money for the company, it had to be dirty."

231.    One of Mallon's first initiatives as CEO was to terminate Angell, according
to CW-2. CW-4 confirmed that Mallon "got rid of Ryan Angell."

232.    CW-4 stated that Mallon was "of course" informed that shutting down LCI would have a negative impact on revenue and that Angell had specifically warned Mallon of that outcome. CW-12 confirmed that Mallon knew the impacts on NeoGenomics' top line when he began dismantling the LCI group—including jeopardizing at least 11 new deals set to close and 30 prospective clients in the pipeline. CW-12 stressed that three of these eleven customers that were "just waiting to be signed" were large, with numerous physician group sites.

233.    CW-12 stated that after Angell's departure, the remaining LCI group members had "four or five" meetings with Mallon, in which Mallon made comments touching on LCI's projected new business. CW-12 recalled having specifically warned Mallon of the financial impact of terminating the LCI group. During a 2021 meeting after Angell's departure, CW-12 asked Mallon whether he knew what he was doing to the business: "Why are you doing this? We were so busy and this business is not going to wait forever." In response, Mallon told CW-12, "We thought about this," referring to the loss of business.

234.    According to CW-4 and CW-12, these warnings about the effect of halting LCI's growth on Company revenue played out as expected. CW-12 added that it was "absolutely true" that NeoGenomics was "losing money" as a result of these decisions, which CW-12 said were "detrimental to the business." CW-12 added: "We had so many [clients] ready to sign, we could not believe [Mallon] did that. We were shocked." According to CW-4, shutting down the LCI group was a "major factor" that contributed

to the company's not being able to attain its revenue projections—it "had a huge effect on revenue."

### c. LCI was critical to NeoGenomics' core operations.

235.    For several years, LCI was a primary driver of organic revenue growth for NeoGenomics. During the Class Period, as explained above (*supra* para. 106), LCI was responsible for approximately 40% of *Companywide* organic revenue growth and approximately 70% of Clinical Services' organic growth (with Clinical Services constituting by far the largest of the Company's divisions).

236.    Given these outsized contributions to NeoGenomics' overall financial health, it is reasonable to infer that Defendants were well aware of LCI, its operations, and its outsize importance to the Company's core operations. LCI—rather than the publicly touted competitive strengths—was substantially driving organic growth for the Company's Clinical Services division.

237.    LCI revenue served as ballast for NeoGenomics, as the Company struggled mightily with its purported top competitive strengths. And when the Company's management placed a freeze on new LCI business, coupled with the subsequent OIG investigation and the efforts to begin to dismantle the LCI team, that is exactly what happened: LCI revenue growth—and thus NeoGenomics' revenue growth—disappointed. After the Company reported Clinical Services organic growth of over $20 million in each of 2019, 2020, and 2021, the number dropped to $15 million in 2022.

238.    The centrality of LCI to NeoGenomics' core operations during the Class

Period makes the Company's relative silence on the topic all the more noteworthy and

supports an inference that Defendants knowingly and/or recklessly made materially

false and misleading statements and omissions about the Company's financial state,

competitive strengths, and true drivers of growth.

**B. The abrupt departures of two CEOs, the head of LCI, and the Chief Compliance Officer all within less than a year of each other strongly support an inference of scienter.**

239.    The circumstances surrounding the departures of certain key executives

and senior managers just prior to, and immediately following, the first public

revelations of the Company's compliance troubles further corroborate the accounts of

numerous former executives and employees to establish scienter.

240.    NeoGenomics' first public revelation of the OIG investigation and

compliance matter on November 4, 2021, marked the existence of a dark period for the

Company. That announcement was preceded by an internal investigation starting in the

first half of 2021. Investors were not told of this growing crisis, which dramatically

impacted the core operations of one of the Company's most profitable initiatives, until

November. But executives at NeoGenomics knew exactly how central LCI was to the

Company's overall revenue, and to its revenue growth in 2020 and 2021, as well as the

impact that its shut-down would have. VanOort departed the Company shortly before

the OIG investigation and compliance matters were made public. Others, such as

Angell, were fired or forced out for their roles in and after April 2021.

241.    NeoGenomics first announced that VanOort would be stepping down as CEO on February 24, 2021, shortly before NeoGenomics began its compliance investigation, and Mallon fired Angell the day before formally taking over as CEO. The announcement about VanOort's departure stated that he would transition to a new role as executive chairman of the Board of Directors.[11] Yet, on October 12, 2021, just three weeks before the Company publicly disclosed the compliance matter and OIG investigation, and after serving as executive chairman for just eight months, NeoGenomics abruptly announced that VanOort would be stepping down from that role as well, with plans to fully enter retirement before the end of the year.[12] The timing could not have been better for VanOort to cash in his stock and avoid the dark period that was about to ensue. All totaled, VanOort sold more than $14 million in stock between November 12, 2020 and November 16, 2020, all before the LCI revelations were made,[13] and left the regulatory mess and dismantling of one of the Company's biggest growth drivers for his successor to deal with.

242.    While VanOort fared well in his departure from the Company, others were not so lucky. In April 2021, Ryan Angell was unceremoniously fired the day before Mallon formally became CEO. Shortly after NeoGenomics disclosed the compliance matter and OIG investigation to investors, another high-level executive exited: Stephanie Bywater, the Company's Chief Compliance Officer.

---

[11] [NeoGenomics Announces CEO Succession :: NeoGenomics, Inc. (NEO)](#)
[12] [NeoGenomics Announces Board of Directors' Transition :: NeoGenomics, Inc. (NEO)](#)
[13] According to publicly available Form 4s filed with the SEC, in November 2020, Defendant VanOort sold off some $14,283,574 in NeoGenomics stock.

243.    Finally, Mallon was forced out of the Company just a few months later, lasting less than a year as the CEO. The situation was so bad that the Company did not immediately announce even an intermediate CEO, leaving the Company temporarily leaderless. The timing and circumstances of Mallon's exit from the Company corroborate the statements of CW-12, that Mallon was explicitly warned about the significant impact that shutting down the LCI business would have on the Company's revenue, and yet he hid that fact from investors.

244.    The conspicuous number and timing of executive resignations and firings during key segments of the Class Period strongly supports an inference that the Defendants acted with scienter, and it corroborates the accounts of many of the former NeoGenomics employees on the knowledge of senior managers and executives.

## IX.    Defendants' Materially False and Misleading Statements and Omissions During the Class Period

245.    Throughout the Class Period, Defendants made materially false and misleading statements, and omitted material information that they had a duty to disclose. These were materially false and misleading in that they: (a) suggested that NeoGenomics had consistently strong and industry leading turnaround times; (b) suggested that NeoGenomics' turnaround times positively fueled growth and demand for the Company's services; (c) omitted the fact that the Company had serious, longstanding failures relating to delivering acceptable turnaround times, which caused a loss of customers and revenue; (d) suggested that the Company's NGS offerings were technologically superior, including with solid tumor NGS, and delivered results even

for small tissue samples, (e) omitted the fact that the Company's NGS offerings lagged behind the competition, frequently delivering unusable results; (f) suggested that the Company's broad clinical testing menu, including NGS, attracted demand for one-stop-shopping at NeoGenomics, while omitting that the Company outsourced testing to competitor labs and that its broad menu befuddled customers; (g) omitted the fact that a major driver of organic revenue growth—perhaps the single biggest such driver Companywide—was LCI; (h) concealed the known impact that freezing new LCI business and beginning to dismantle the LCI team would have on revenue along with the corollary fact that the Company would require costlier means to drive substantial organic revenue growth in the future; and (i) mispresented the extent of the revenue impact related to the actions taken with respect to LCI, the compliance matter, and the OIG investigation disclosed in November 2021.

246.    The disclosures in November 2021 and in March and April 2022 were partial disclosures of the true facts, as well as materializations of concealed risks that were foreseeable to Defendants, resulting in negative and material declines in the Company's stock price.

**A. NeoGenomics touts its consistently strong, industry leading turnaround times as fueling growth and positively driving demand for the Company's Clinical testing services, while omitting the fact that the turnaround times consistently disappointed, causing the Company to lose customers and revenue**

### 1. Defendants' claims that NeoGenomics delivers consistently strong and industry leading turnaround times

247.    In its annual Form 10-K filings, NeoGenomics repeatedly represented that

the Company's Clinical Services division returned test results rapidly, touting

NeoGenomics' "industry-leading turnaround times" and "consistent timeliness of

results."

248.    On February 28, 2020, the Company filed its Form 10-K for FY 2019,

signed by VanOort and McKenzie. The Company stated:

> **Competition**
>
> For our Clinical Services segment, the genetic and molecular testing niche of the laboratory testing industry is highly competitive and, given the opportunities in this industry, we expect it to become even more competitive. Competitive factors in genetic and molecular testing generally include the reputation of the laboratory, range of services offered, pricing, convenience of sample collection and pick-up, quality of analysis and reporting, medical staff, timeliness of delivery of completed reports (i.e. turnaround times) and post-reporting follow-up for clients.
>
> *            *            *
>
> We intend to continue our efforts to gain market share by *offering industry-leading turnaround times*, a broad service menu, high-quality test reports, new tests including proprietary ones, enhanced post-test consultation services, and the personal attention from our direct sales force.

249.    NeoGenomics repeated this language verbatim in its 10-K for FY 2020, filed February 25, 2021, and signed by VanOort and McKenzie, and its 10-K for FY 2021, filed February 25, 2022, and signed by Mallon and Bonello.

250.    NeoGenomics also listed "Turnaround Times" as the first of its "Competitive Strengths" in its 10-K for FY 2019, filed February 28, 2020, and signed by VanOort and McKenzie:

> **Competitive Strengths**
>
> *      *      *
>
> <u>Turnaround Times</u>
>
> We strive to provide industry leading turnaround times for test results to our clients nationwide, both in the Clinical Services and Pharma Services segments. ***By providing information to our clients in a rapid manner***, physicians can begin treating their patients as soon as possible. ***Our consistent timeliness of results by our Clinical Services segment is a competitive strength*** and a driver of additional testing requests by referring physicians. Rapid turnaround times allow for the performance of other adjunctive tests within an acceptable diagnosis window in order to augment or confirm results and more fully inform treatment options.

251.    The Company repeated this language verbatim in its 10-K for FY 2020, filed February 25, 2021, and signed by VanOort and McKenzie and its 10-K for FY 2021, filed February 25, 2022, and signed by Mallon and Bonello, as well as in its Q1 2020 10-Q, filed April 29, 2020 and signed by Defendants VanOort and McKenzie, its Q2 2020 10-Q, filed July 31, 2020, and signed by VanOort and McKenzie, its Q3 2020 10-Q, filed October 29, 2020, and signed by VanOort and McKenzie, its Q1 2021 10-Q, filed May 6, 2021, and signed by Mallon and McKenzie, its Q2 2021 10-Q, filed August 9, 2021, and

signed by Mallon and McKenzie, and its Q3 2021 10-Q, filed November 4, 2021, and signed by Mallon and McKenzie.

252.    In press releases, investor presentations, and on earnings calls throughout the Class Period, Defendants repeated claims about the Company's success in offering rapid, industry-leading turnaround times.

253.    On April 9, 2020, NeoGenomics issued a press release with a COVID-19 business update. The press release included a statement by VanOort praising turnaround times: "I am extremely proud of our employee response to this unprecedented situation. ***Throughout this crisis we have continued to provide*** critical testing services to cancer patients with ***excellent quality, turn-around time***, and customer service." (Form 8-K)

254.    Later that month, during the Q1 2020 earnings call on April 28, 2020, VanOort stated:

> Importantly, all of our main lab facilities have remained open throughout this crisis and ***we have been able to continue all of our testing services with excellent quality and turnaround time*** without interruption or delay.
>
> \*       \*       \*
>
> I think you would be as proud as I am about our NeoGenomics employees [sic] response to this unprecedented situation. ***Throughout this crisis they have continued to provide*** critical testing services to cancer patients with ***excellent quality, turnaround time***, and customer service. My hats [sic] off to them.

255.    Later in the call, in response to an analyst question about the COVID-19 pandemic's effect on clinical lab opening, VanOort stated:

> [W]e continue to work hard to make sure that we're able to deliver the kind of service with [the] same kind of quality, same kind of turnaround time, in fact *our turnaround time is frankly improved during this pandemic*.

256.    On April 28, 2020, NeoGenomics issued a press release boasting "11% Revenue Growth to $106 Million in the First Quarter." The press release included a statement by VanOort:

> Our employees have worked with enormous dedication and professionalism to continue our essential testing service for cancer patients throughout this extraordinary time. We have been able to keep all of our main laboratory facilities open, and *have maintained excellent quality and turn-around-time, without interruption or delay.* I could not be more proud of our team.

257.    During the Q4 2020 earnings call on February 24, 2021, VanOort again emphasized the importance of the Company delivering industry-leading turnaround times:

> Turnaround time is important for patients and clients. *Neogenomics [sic] has traditionally had industry-leading turnaround time*, whether it's liquid circulating tumor DNA or tissue based testing, we want to make sure that we are the best in the industry.

258.    On August 6, 2021, during the Q2 2021 earnings call, Mallon touted the Company's "industry leading turnaround times":

> From the big picture perspective, I've been very impressed by several strengths of Neo in my first 100 days on the job. …
>
> \*      \*      \*
>
> I must say that I've been equally impressed by our culture, as I've now had the pleasure of meeting hundreds of my fellow teammates and [sic] NeoGenomics. And this is truly a feeling of patient first mentality at all levels of the organization as I

have visited many of our facilities [it] is obvious that our lab employees are dedicated to patients are [sic]. ***This consistent dedication has translated into industry leading turnaround times in many of our test modalities*** and is also reflected in both our strong Net Promoter Scores and the extremely high customer retention rate.

259.    In the context of each of the above statements and documents, Defendants omitted the fact that Company had grave and longstanding turnaround-time problems, which were a constant and well-known source of problems internally and for the Company's customers.

## 2. Defendants' claims that the Company's speedy turnaround times were a top competitive strength, fueling growth and positively driving demand for the Company's clinical testing services

260.    Defendants went beyond praising NeoGenomics' ability to provide industry-leading, rapid turnaround times. They repeatedly told investors that NeoGenomics' success in that key marker was behind the Company's revenue growth and that it fueled demand for the Company's services.

261.    On February 28, 2020, the Company filed its Form 10-K for FY 2019, signed by VanOort and McKenzie. The Company stated:

> **Competition**
>
> For our Clinical Services segment, the genetic and molecular testing niche of the laboratory testing industry is highly competitive and, given the opportunities in this industry, we expect it to become even more competitive. Competitive factors in genetic and molecular testing generally include the reputation of the laboratory, range of services offered, pricing, convenience of sample collection and pick-up, quality of analysis and reporting, medical staff, timeliness of delivery of completed reports (i.e. turnaround times) and post-reporting follow-up for clients.

\*       \*       \*

We intend to continue our efforts to gain market share *by offering industry-leading turnaround times*, a broad service menu, high-quality test reports, new tests including proprietary ones, enhanced post-test consultation services, and the personal attention from our direct sales force. …

262.    NeoGenomics repeated this language verbatim in its 10-K for FY 2020, filed February 25, 2021, and signed by VanOort and McKenzie, and its 10-K for FY 2021, filed February 25, 2022, and signed by Mallon and Bonello.[14]

263.    NeoGenomics also listed "Turnaround Times" as the first of its "Competitive Strengths" in its 10-K for FY 2019, filed February 28, 2020, and signed by VanOort and McKenzie:

**Competitive Strengths**

\*       \*       \*

<u>Turnaround Times</u>

We strive to provide industry leading turnaround times for test results to our clients nationwide, both in the Clinical Services and Pharma Services segments. By providing information to our clients in a rapid manner, physicians can begin treating their patients as soon as possible. *Our consistent timeliness of results* by our Clinical Services segment *is a competitive strength and a driver of additional testing requests by referring physicians*. …

264.    The Company repeated this language verbatim in its 10-K for FY 2020, filed February 25, 2021, and signed by VanOort and McKenzie and its 10-K for FY 2021, filed February 25, 2022, and signed by Mallon and Bonello, as well as in its Q1 2020 10-

---

[14] In its 10-K for FY 2021, NeoGenomics removed "the" in the last sentence, instead stating, "and personal attention from our direct sales force."

Q, filed April 29, 2020 and signed by Defendants VanOort and McKenzie, its Q2 2020

10-Q, filed July 31, 2020, and signed by VanOort and McKenzie, its Q3 2020 10-Q, filed

October 29, 2020, and signed by VanOort and McKenzie, its Q1 2021 10-Q, filed May 6,

2021, and signed by Mallon and McKenzie, its Q2 2021 10-Q, filed August 9, 2021, and

signed by Mallon and McKenzie, and its Q3 2021 10-Q, filed November 4, 2021, and

signed by Mallon and McKenzie.

265.    Defendants repeated similar claims in press releases, investor

presentations, and on earnings calls throughout the Class Period.

266.    On February 19, 2021, VanOort gave a presentation at the BTIG Virtual

MedTech, Digital Health, Life Science and Diagnostic Tools Conference. He described

NeoGenomics' customer service—in particular, its ability to offer rapid turnaround

times—as driving organic growth and customer retention (at p. 2):

> I would say generally that our whole team is sort of fanatical about delivering exceptional service, it's sort of built into our DNA, and services while we grow. And I think the net promoter score, it is literal because in the last score, I think 70 – . . . 73% of our clinical customers rated us either a 9 or a 10. And so, they really truly are promoters of us and *so that's why we grow, one reason we grow organically like we do, because our customers are talking about us*. So, it's very important to us.
>
> Now, I said that this is sort of built into our DNA as part of our culture and we really invest a lot in that culture. *We've been investing to make sure that our employees are always fanatical about delivering that service*. And we've done some things even in the pandemic where other companies were having lay-offs, we said we're not going to lay off anyone, we invested in our people, in our culture, and I think it sort of pays it off in terms of really good customer retention, as you say, around 95% and these good scores.

\*    \*    \*

> *When a customer is not happy, we're not happy. And so,*
> *services, it's turnaround time,* but it takes the pathologists. …

267.    During the Q3 2021 earnings call on November 4, 2021, Mallon pointed to

NeoGenomics' "great turnaround time" as a key growth driver for the Company,

stating:

> *I think the things that have led to our success we've got to*
> *maintain those with great service, great turnaround time,* sort
> of being that leading partner to the community pathologists
> and oncologists *will allow us to keep driving here*. That's how
> we're going to grow faster in the market, we have to take here
> -- we are a leader. But there is [sic] so many players and so
> many patients, there is still room to leverage growth and
> growing share. And we're going to -- we've got a track record
> of continuously improving our assays so that we are always
> very current and at the highest quality with our assays and
> we're going to continue to do that.

268.    In the context of each of the above statements and documents, Defendants

omitted the fact that the Company's longstanding turnaround-time problems cost the

Company customers and revenue, while also omitting the fact that LCI was the major

driver of Clinical Services organic revenue growth—perhaps the single biggest such

driver Companywide.

**B. NeoGenomics touts its "Innovative Service Offerings" as a top "Competitive Strength," including by virtue of technologically superior next generation sequencing (NGS) and ability to provide one-stop-shopping for healthcare providers, while neither truly drove revenue growth as the NGS offerings lagged technologically behind the competition and the Company resorted to outsourcing test requests to competitor laboratories.**

**1. NeoGenomics claims to utilize superior NGS technology that empowers healthcare providers to derive useful clinical information from very small patient samples.**

269.    In NeoGenomics' Form 10-K for FY 2019, filed February 28, 2020, and

signed by VanOort and McKenzie, the Company stated:

> ***NeoGenomics is a leading provider of Molecular and next-generation sequencing ("NGS") testing.*** These tests are interpreted by NeoGenomics' team of Molecular experts and are often ordered in conjunction with other testing modalities. NGS panels are one of our fastest growing testing areas and ***clients can often receive a significant amount of biomarker information from very limited samples.***

270.    NeoGenomics repeated this language in its 10-K for FY 2020, filed

February 25, 2021, and signed by VanOort and McKenzie, and included nearly identical

language[15] in its 10-K for FY 2021, filed February 25, 2022, and signed by Mallon and

Bonello.

271.    In its Q1 2020 Form 10-Q, filed April 29, 2020, and signed by VanOort and

McKenzie, NeoGenomics repeated:

> ***NeoGenomics is a leading provider of Molecular and next-generation sequencing ("NGS") testing.*** These tests are interpreted by NeoGenomics' team of Molecular experts and are often ordered in conjunction with other testing modalities. NGS panels are one of our fastest growing testing areas and

---

[15] In the Company's 10-K for FY 2021, the first sentence read: "We are is [sic] a leading provider of Molecular and NGS testing."

> *clients can often receive a significant amount of biomarker information from very limited samples.*

272. The Company made identical statements in subsequent Quarterly Reports throughout the Class Period. The same language appeared in the Q2 2020 Form 10-Q, filed July 31, 2020, and signed by VanOort and McKenzie; the Q3 2020 Form 10-Q, filed October 29, 2020, and signed by VanOort and McKenzie; the Q1 2021 Form 10-Q, filed May 6, 2021, and signed by Mallon and McKenzie; the Q2 2021 Form 10-Q, filed August 9, 2021, and signed by Mallon and McKenzie; and the Q3 2021 Form 10-Q, filed November 4, 2021, and signed by Mallon and McKenzie.[16]

273. Within its test menu, NeoGenomics touted its superior next-generation sequencing capabilities. During the Q4 2019 earnings call on February 27, 2020, VanOort praised the Company's NGS offerings:

> *Technologically, we significantly enhanced our next-generation sequencing capabilities* and are rapidly emerging as one of the largest providers of oncology-focused molecular testing in the country. In fact, during the fourth quarter we performed over 70,000 molecular and next-generation sequencing tests in our Clinical Division, representing about 25% of our total volume of testing. This test category grew at a rate of approximately 50% compared with the prior year and we expect its growth rate to remain very strong.
>
> \*     \*     \*
>
> Clearly the organic growth is being driven partly by next-generation sequencing and molecular testing. We mentioned that those growth rates have been approximating 50% and we have really restructured in some respects, our NGS panels. And *we think they are very, very high quality panels. We*

---

[16] The first sentence of the Q3 2021 Form 10-Q abbreviated "next-generation sequencing" as "NGS": "NeoGenomics is a leading provider of Molecular and NGS testing."

> *continue to make improvements in them, in terms of number of genes and in our reporting capabilities and the marketplace is reacting very favorably to that.* So our next-generation sequencing panels in the clinical business should continue to fuel growth.

274.    At the Bank of America Securities Health Care Conference on May 14, 2020, VanOoort stated:

> So, as I said in my opening remarks, any test virtually that a pathologist or an oncologist wants to be able to diagnose, monitor, treat their patient, they can be pretty assured that NeoGenomics is going to offer that test for them. So it's a one-stop-shop, a very comprehensive menu, it's very up-to-date. We offer *the most advanced kinds of testing that can be offered*.
>
> People have talked a lot about high growth areas *like next-generation sequencing* and those areas, we offer obviously all of that. …

275.    During the Raymond James Virtual Human Health Innovation Conference on June 18, 2020, VanOort stated:

> One part of our business is growing the fastest in our Clinical division and Pharma is next generation sequencing, including liquid biopsy testing by the way. *And we spend a lot of time and energy developing which we think is one of the highest quality next generation sequencing assays available today in the country, both for hematologic and for solid tumor disease.*

276.    At the 18th Annual Morgan Stanley Global Healthcare Conference on September 14, 2020, VanOort stated:

> *We are investing heavily in next-generation sequencing*. And it is an important part of our business. It's the fastest growing part of our business. It's the fastest growing part of our business, and we think it will be for quite some time. Now when you think about NGS, there are a lot of different aspects to it. So *we have a very, very high quality solid tumor next-*

> *generation sequencing assay* that we break down -- we have over 300 genes in that solid tumor assay, and we do things like micro satellite instability, tumor mutation burden, TMB, but we also break this down to disease state.

277.    During the JP Morgan 39th Annual Healthcare Virtual Conference on

January 11, 2021, VanOort stated:

> Now on Page 13, the next slide, you can see that what we do is *we bring the same innovative, high-quality oncology testing as you might expect to receive [at] a leading academic center* to communities across America. …
>
> *    *    *
>
> … And consistent with NeoGenomics' comprehensive approach to our test menu, *we also offer a wide variety of and range of next-generation sequencing tests. And this is one of the things that differentiates NeoGenomics. And we believe that we have a very high quality capability to meet the needs of merely [sic] any client,* and we continue to invest heavily in next-generation sequencing, and we are determined to be a market leader for next-generation sequencing.

278.    At the 20th Annual Needham Healthcare Conference on April 15, 2021,

CEO VanOort stated:

> Well, Mike, we -- you know, we don't actually talk about this as much as we should. We introduce almost every year, 60 to 80 tests. And we do it very efficiently, and we're changing our menu. We're updating our menu. We're making it current because this is precision oncology. I mean, the world is changing very fast, so we're constantly introducing things. And *we just introduced probably the best next-generation sequencing RNA-based fusion assay anywhere*. And we did it with little fanfare, I guess. So we're always introducing new products.

279.    In the context of each of the above statements and documents, Defendants

omitted the fact that the Company's NGS testing services lagged technologically behind

the competition and frequently failed to deliver usable results due to purportedly too-small sample sizes.

280.    During the Q3 2021 earnings call on November 4, 2021, NeoGenomics had the opportunity to come clean to investors about the Company's inadequate NGS offerings. But the Company doubled down, instead touting its expanding laboratory capabilities to meet NGS demand:

> Q – Joseph Conway
>
> *[Are] there any areas where Neo has been lagging,* whether it's from a changing diagnostics landscape or just lower market share in general and what's going to be done to increase adoption in the next five years?
>
> A – George A. Cardoza
>
> So I will start with our capacity. Obviously we're sitting here in Fort Myers looking over in our brand new laboratory, we actually even processed our first test there this week. So as Mark said, our teams are moving over there in stages in the coming weeks. But it's significantly larger than the laboratory we had and it probably over triples our capacity, if not even more in terms of what we can do. We also mentioned that we're adding laboratories, again we're sort of going where the techs are for some of our dry lab and analysis tech. We've opened up in Phoenix, Arizona. And we're also expanding in Atlanta, Georgia to again add those capabilities and to be able to recruit talent wherever we need it.
>
> So we are growing, we are substantially increasing our capacity, and even in California, which is the one place where we are probably the tightest right now, we are looking to expand there as well and certainly, expand our capabilities in NGS testing, which is the fastest-growing modality that we have. Our RaDaR assay is actually going to be processed in RTP and we have a beautiful new facility there to make sure that we have a dedicated facility so that we can have great turnaround times and really again follow the demand that we're expecting for that test.

281.    In the context of each of the above statements and documents, Defendants omitted mention of the problems plaguing the Company's NGS offerings, including the alarming frequency with which NGS failed to deliver usable results due to too-small tissue samples, the fact that its solid-tumor NGS was unable to compete with other labs' offerings, and the Company was relying on antiquated NGS technology.

### 2. NeoGenomics claims that its NGS offerings drive growth for the Company

282.    In the Company's Form 10-K for FY 2019, filed February 28, 2020, and signed by VanOort and McKenzie, the Company stated:

> *NeoGenomics is a leading provider of Molecular and next-generation sequencing ("NGS") testing.* These tests are interpreted by NeoGenomics' team of Molecular experts and are often ordered in conjunction with other testing modalities. *NGS panels are one of our fastest growing testing areas* and clients can often receive a significant amount of biomarker information from very limited samples. These comprehensive panels can allow for faster treatment decisions for patients as compared to a series of single-gene molecular tests being ordered sequentially. … *NeoGenomics expects our Molecular laboratory and NGS capabilities to be a key growth driver in the coming years.*

283.    NeoGenomics repeated this language in its 10-K for FY 2020, filed February 25, 2021, and signed by VanOort and McKenzie, and included nearly identical language[17] in its 10-K for FY 2021, filed February 25, 2022, and signed by Mallon and Bonello. It also repeated this language in the Q1 2020 Form 10-Q, filed April 29, 2020,

---

[17] In the Company's 10-K for FY 2021, the first sentence read, "We are a leading provider of Molecular and NGS testing," and the last sentence read, "We expect our Molecular laboratory and NGS capabilities to be a key growth driver in the coming years."

and signed by VanOort and McKenzie; in the Q2 2020 Form 10-Q, filed July 31, 2020, and signed by VanOort and McKenzie; the Q3 2020 Form 10-Q, filed October 29, 2020, and signed by VanOort and McKenzie; the Q1 2021 Form 10-Q, filed May 6, 2021, and signed by Mallon and McKenzie; the Q2 2021 Form 10-Q, filed August 9, 2021, and signed by Mallon and McKenzie; and the Q3 2021 Form 10-Q, filed November 4, 2021, and signed by Mallon and McKenzie.[18]

284.    During the Q4 2019 earnings call on February 27, 2020, VanOort pointed to the Company's NGS offerings as a driver of overall growth:

> Technologically, *we* significantly enhanced our next-generation sequencing capabilities and ***are rapidly emerging as one of the largest providers of oncology-focused molecular testing in the country***. In fact, during the fourth quarter we performed over 70,000 molecular and next-generation sequencing tests in our Clinical Division, representing about 25% of our total volume of testing. This test category grew at a rate of approximately 50% compared with the prior year and we expect its growth rate to remain very strong.
>
> *            *            *
>
> ***Clearly the organic growth is being driven partly by next-generation sequencing*** and molecular testing. We mentioned that those growth rates have been approximating 50% and we have really restructured in some respects, our NGS panels. And we think they are very, very high quality panels. We continue to make improvements in them, in terms of number of genes and in our reporting capabilities and ***the marketplace is reacting very favorably to that. So our next-generation sequencing panels in the clinical business should continue to fuel growth.***

---

[18] In its Q2 2020, Q3 2020, Q1 2021, Q2 2021, and Q3 2021 Form 10-Qs, NeoGenomics placed "one-stop shop" in quotation marks. In the Q3 2021 Form 10-Q, the Company abbreviated "next-generation sequencing" as "NGS" in the first sentence.

285.    During the same earnings call, VanOort attributed growth to the

Company's expanding NGS offerings:

> In terms of multi-gene panels, you know that we have a full portfolio of NGS and multi-gene panels using our multi-modality capabilities. ***And these multi-gene and multi-modality panels are growing very, very nicely.*** A lot of our customers like targeted panels. There are also some customers, who are ordering the large panels. Some customers are also ordering just single-gene molecular test [sic] and we offer the full spectrum of those product opportunities.

286.    At the Bank of America Securities Health Care Conference on May 14,

2020, VanOort stated:

> In our own case, I would say that for years, ***we've been growing faster than the market***. We tend to think that the market is growing at a rate of around 6% to 8% a year. We've been growing more than twice as fast as that, ***a lot of that comes from these competitive advantages that I've talked about. We've got really terrific capabilities in some of these fast growing areas, like … next-generation sequencing.***

287.    During the Raymond James Virtual Human Health Innovation Conference

on June 18, 2020, VanOort stated:

> ***One part of our business [that] is growing the fastest*** in our Clinical division … ***is next generation sequencing***, including liquid biopsy testing by the way.

288.    Later in that presentation, VanOort stated:

> ***Now there are three particular areas of growth that we like to talk with investors about. The first one is next generation sequencing***, we are a leader in next generation sequencing. …
>
> So we're offering single gene tests, we're offering small NGS panels and we're also offering large 300-plus gene panels for next generation sequencing testing. ***And clearly we're a leader in next generation sequencing.... [A]nd certainly, next***

*generation sequencing is growing faster than any other test modality we have* and we're investing pretty heavily in the continued growth of this test modality.

289.    During NeoGenomics' Q2 2020 Earnings Call on July 28, 2020, VanOort

tied its NGS offerings to its growth position:

[W]e believe that our strategic decisions to invest in growth is enhancing our competitive positioning and will pay dividends in both the near term and long term. *In fact, we believe that we are even better positioned for growth than we were before the pandemic hit.* We now have a full suite of liquid biopsy test [sic], which further *strengthens our next generation sequencing product portfolio and solidifies our comprehensive oncology test menu.*

290.    On September 14, 2020, during the 18th Annual Morgan Stanley Global

Healthcare Conference, VanOort stated:

*We are investing heavily in next-generation sequencing.* And it is an important part of our business. *It's the fastest growing part of our business, and we think it will be for quite some time.* Now when you think about NGS, there are a lot of different aspects to it. *So we have a very, very high quality solid tumor next-generation sequencing assay that we break down --* we have over 300 genes in that solid tumor assay, and we do things like micro satellite instability, tumor mutation burden, TMB, but we also break this down to disease state.

So if a physician wants to order a colon panel or a brain cancer panel, we will only offer the mutations of significance to that particular disease type, and we bundle those, as I say, with other test modalities. So we also have a very, very important hematologic assay with about 300 genes. We're investing a lot. So we just invested in a liquid biopsy offering. We've rolled out three liquid biopsy tests, which are a next-generation sequencing assay. And we just bought a company back in January of this year, seems like ages ago now that does whole exome sequencing for pharma industry. *So we're investing a lot in NGS. I think, it will continue to grow for a long time.*

110

291.    During NeoGenomics' Q3 2020 Earnings Call on October 27, 2020,

VanOort stated:

> Yeah, the [COVID-19] recovery really was pretty broad based and really did progress and strengthen as the quarter ended and is continuing to strengthen into October. *I think the area that has strengthened the most has been next generation sequencing* as we mentioned in our prepared remarks. *There has been a lot of natural growth for us in next-generation sequencing over the last number of quarters and that really continued in quarter three and we would expect to grow next-generation sequencing kinds of products at an outsized pace even going forward.*

292.    During the Company's Q4 2020 Earnings Call on February 24, 2021,

VanOort stated:

> *Our fastest areas of growth continue to be next generation sequencing,* pharma services, and informatics. Interestingly, these product and service offerings were minimal in size just five years ago. *As we close the books on 2020, these three growth drivers account for nearly one-third of Neogenomics' [sic] core revenue.*

293.    On the same call, McKenzie reiterated the role of NGS in growing clinical

revenue:

> As Doug highlighted, overall revenue grew 18% year-over-year to $126 million. *Importantly, our core oncology revenues increased 10% year-over-year, driven by strong growth in NGS*, pharma services and informatics.

294.    During the call, VanOort also stated:

> And what – we've talked about in the past, our Pharma division, our Informatics division, *things like next-generation sequencing,* minimal residual disease, *these are the kinds of products that are going to drive outsized growth for us in the future.*

295. Also during the call, VanOort stated:

> *Our next-generation sequencing product line is continuing to grow nicely.* We've made a lot of changes to it. We're continuing to make changes to it. We're investing a fair amount in next-generation sequencing. And by the way, our new Fort Myers laboratory is going to have a brand new next-generation sequencing lab, which we think will improve service as we have -- we will have then East Coast and West Coast capabilities. So, we're really investing in next-generation sequencing. And the RNA Fusion that Dr. Weiss and the R&D team just recently launched is I think a testament that our continued investment in assay development as well as in facilities and infrastructure.

> The liquid biopsy launch as I just mentioned, I think is going well and we think it's going to gain traction sequentially as the year unfolds. *So next-generation sequencing has been a high growth area for us. We think it'll continue to be a high growth area for us.* … *So, we're pretty bullish on our NGS portfolio.*

296. At the 20th Annual Needham Healthcare Conference on April 15, 2021, VanOort stated:

> *Next-generation sequencing is one of the fastest-growing areas*, but frankly, FISH testing is still growing pretty fast too. So -- and I think, most of our test areas, modalities, we call them are growing, but *NGS, we think long term is going to be a fast, if not the best as a growth area.* And remember, next-generation sequencing includes liquid biopsy also.

297. During NeoGenomics' Q1 2021 Earnings Call, on May 5, 2021, McKenzie stated:

> *Despite the impact of the ongoing pandemic,* total revenue in Q1 grew 9% year-over-year to $116 million. Importantly, *our core oncology revenues increased 7% year-over-year, driven by strong growth in NGS*, pharma services and informatics.

298.    Later during the call, Mallon stated:

In the clinical division, *I'll be especially focused on our incredible portfolio of NGS assays, including our liquid biopsy test. This portion of the business is already growing more than 30% annually* and I think there are opportunities to accelerate growth further.

299.    On the same call, Mallon reiterated:

I'll say, for me the biggest opportunity [for the Company] was one I highlighted initially which is *I think we've got a great set of NGS and liquid biopsy assays that have had success and [are] already growing faster than 30%*, but I think we can do more.

300.    During NeoGenomics' Q2 2021 earnings call on August 6, 2021, Chief Strategy and Corporate Development Officer Doug Brown repeated the claim that NGS was a major driver of Company growth:

I believe our Q2 results have confirmed that *our strategy is working* and we will ensure value for shareholders and patients. *We achieved 40% growth* driven by record test volumes in a clinical service division and grew gross profit ahead of revenue. *Fully one third of our business now comes from our growth drivers* a [sic] pharma services, informatics and *NGS testing.*

301.    In the context of each of the above statements and documents, Defendants omitted mention of the problems plaguing the Company's NGS offerings, the fact that these problems had caused a loss of revenue and customers, and that a major driver of organic revenue growth—perhaps the single biggest such driver Companywide—was instead LCI.

3. **The Company touts one-stop-shopping as a driver of growth and demand because of healthcare providers' preference to rely on a single laboratory.**

302.    In NeoGenomics' Form 10-K for FY 2019, filed February 28, 2020, and signed by VanOort and McKenzie, the Company stated:

> NeoGenomics is a leading provider of Molecular and next-generation sequencing ("NGS") testing. These tests are interpreted by NeoGenomics' team of Molecular experts and are often ordered in conjunction with other testing modalities. … NeoGenomics has one of the broadest Molecular menus in the industry and our targeted NeoTYPE panels include genes relevant to a particular cancer type, as well as other complementary tests such as immunohistochemistry and FISH. ***This comprehensive menu means that NeoGenomics can be a one-stop-shop for our clients who can get all of their oncology testing needs satisfied by our laboratory. This is attractive to our clients as patient samples do not need to be split and then managed across several laboratories.***

303.    NeoGenomics included nearly identical language[19] in its 10-K for FY 2020, filed February 25, 2021, and signed by VanOort and McKenzie; its Q1 2020 Form 10-Q, filed April 29, 2020, and signed by VanOort and McKenzie; its Q2 2020 Form 10-Q, filed July 31, 2020, and signed by VanOort and McKenzie; its Q3 2020 Form 10-Q, filed October 29, 2020, and signed by VanOort and McKenzie; its Q1 2021 Form 10-Q, filed May 6, 2021, and signed by Mallon and McKenzie; its Q2 2021 Form 10-Q, filed August 9, 2021, and signed by Mallon and McKenzie; and its Q3 2021 Form 10-Q, filed November 4, 2021, and signed by Mallon and McKenzie.

---

[19] In its 10-K for FY 2020 and Q1 2020 Form 10-Q, NeoGenomics placed "one-stop-shop" in quotation marks. In its Form 10-Qs for the second and third quarters of 2020, as well as the first, second, and third quarters of 2021, NeoGenomics placed "one-stop shop" in quotation marks with one hyphen rather than two. In its Q3 2021 Form 10-Q, NeoGenomics abbreviated immunohistochemistry as IHC.

304.    The Company included similar language in its 10-K for FY 2021, filed

February 25, 2022, and signed by Mallon and Bonello:

> We are is [sic] a leading provider of Molecular and NGS
> testing. These tests are interpreted by NeoGenomics' team of
> Molecular experts and are often ordered in conjunction with
> other testing modalities. … We have one of the broadest
> Molecular menus in the industry and our targeted NeoTYPE
> panels include genes relevant to a particular cancer type, as
> well as other complementary tests such as IHC and FISH. In
> addition, we offer molecular-only NGS targeted
> and comprehensive panels which combine DNA and RNA
> into a single work stream in order to report a full spectrum of
> genomic alterations, including mutation, fusions, copy
> number variations, and gene expression. ***This comprehensive
> menu means that NeoGenomics can be a "one-stop shop" for
> our clients who can get all of their oncology testing needs
> satisfied by our laboratory. This is attractive to our clients
> as patient samples do not need to be split and then managed
> across several laboratories.***

305.    In the Company's Form 10-K for FY 2019, NeoGenomics also stated, "***Our

broad and innovative test menu of molecular, including NGS***, immunohistochemistry,

and other testing has helped ***make us a 'one stop shop' for many clients who value that

all of their testing can be sent to one laboratory***." The Company repeated this claim

throughout its 10-K, stating, "[O]ur molecular testing menu remains a strong selling

point as it ***enables us to offer clients a 'one stop shop' where they can send all of their

oncology testing rather than using multiple labs***."

306.    Later in its 10-K, the Company claimed that its broad menu fueled

growth:

> ***We continue to realize growth in our clinical testing revenue***
> which we believe is the direct result of the Genoptix
> acquisition and our efforts to innovate ***by developing and***

115

> *maintaining one of the most comprehensive cancer testing menus in the industry*. *Our broad test menu* enables our sales teams to identify opportunities for increasing revenues from existing clients and *allows us to gain market share from competitors as well as attract new clients looking for a one-stop shop.*

307.     In Quarterly Reports throughout the Class Period, NeoGenomics also listed "Innovative Service Offerings" as among the Company's "Competitive Strengths." In the Q1 2020 Form 10-Q, filed April 29, 2020, and signed by VanOort and McKenzie, NeoGenomics stated:

> *Our menu enables us to be a true one-stop-shop for our clients as we can meet all of their oncology testing needs.*

The same language (with minor punctuation changes) appeared in the Company's Q2 2020 Form 10-Q, filed July 31, 2020, and signed by VanOort and McKenzie, in the Q3 2020 Form 10-Q, filed October 29, 2020, and signed by VanOort and McKenzie, in the Q1 2021 Form 10-Q, filed May 6, 2021, and signed by Mallon and McKenzie, in the Q2 2021 Form 10-Q, filed August 9, 2021, and signed by Mallon and McKenzie, and in the Q3 2021 Form 10-Q, filed November 4, 2021, and signed by Mallon and McKenzie.

308.     During the Bank of America Securities Health Care Conference on May 14, 2020, VanOort explained that the Company's "comprehensive test menu" enabled it to compete successfully in the diagnostics market:

> We compete in this area very well. The market is growing, as most of you know, but *we're taking market share and that's adding to our growth. We do that by having a very, very comprehensive test menu. It's an innovative comprehensive menu. Essentially, a hospital can use NeoGenomics for essentially all of their testing needs.*

309.    When asked how NeoGenomics differentiates itself from its competitors,

VanOort responded:

> One way that we differentiate ourselves from the large laboratory companies like Quest and LabCorp and Mayo and other very good companies is with our focus in oncology. So, all we do is oncology testing, and we tend to be very expert at it. ***We also differentiate ourselves by being a one-stop-shop for our clients.*** So, as I said in my opening remarks, ***any test virtually that a pathologist or an oncologist wants to be able to diagnose, monitor, treat their patient, they can be pretty assured that NeoGenomics is going to offer that test for them. So it's a one-stop-shop, a very comprehensive menu, it's very up-to-date.*** We offer the most advanced kinds of testing that can be offered.

310.    During the William Blair 40th Annual Growth Stock Conference on June

10, 2020, when asked about NeoGenomics' competitive advantage, VanOort stated:

> [T]here really is no other player like NeoGenomics. We really are unique in a lot of respects. One is we have deep expertise in oncology. And that's all we do, other than a little COVID testing now. So we really do have a lot of domain expertise in oncology. And because of that, we are a very comprehensive one-stop shop for our clients. ***So for a hospital client, they don't -- we'll do almost every test that they can imagine for somatic cancer testing. They don't have to send their tests to three or four or five other labs. They can just use NeoGenomics as a one-stop-shop.*** We keep our test menu very innovative, very comprehensive. We have leading edge technologies. We have over 600 tests on our test menu and we use every kind of technology that can be made available for this.
>
> We also have the largest market share in somatic cancer testing in the United States, and we're gaining market share. So, the proof is in the putting [sic] on the question about, well, we're competing against very good players like LabCorp and Quest and Mayo and BioReference. On one side, these are very, very good laboratory companies. But we're holding our own and winning some. I'd say that you can see ***because of our volume growth over the last number of years, we clearly***

*are gaining market share. So these attributes that I'm talking about are quite meaningful.*

311.    In the context of each of the above statements and documents, Defendants omitted mention of the fact that it often outsourced testing to competitor laboratories, that the breadth of its clinical test menu frustrated and confused healthcare providers, and that a major driver of organic revenue growth—perhaps the single biggest such driver Companywide—was instead LCI.

**C.  NeoGenomics concealed the outsize revenue impact of LCI and then, upon freezing new LCI business, the Company misrepresented its prospects for future revenue while failing to disclose that a major driver of revenue had been terminated.**

**1.  NeoGenomics concealed the fact that LCI was one of the largest drivers of revenue at the Company.**

312.    From the beginning of the Class Period until Mallon became CEO in April 2021, concurrently with its misrepresentations and omissions about that rapid turnaround time, NGS capabilities, and "one-stop shopping," the Company was concealing the fact that LCI's operations were, in fact, one of the largest—and possibly the single largest—drivers of organic revenue growth.

313.    In 2020 and 2021, the revenue growth credited to LCI's operations was equal to approximately 40% of the Company's annual organic revenue growth.

314.    To state the obvious, it was highly material to NeoGenomics' investors to know what part of the business was driving such a significant portion of the Company's revenue growth, and analysts asked about revenue drivers every quarter during the Class Period.

315.    Whenever the Company issued public statements concerning the drivers of revenue growth it had a duty to refrain from misleading investors. That duty required not just that NeoGenomics avoid making affirmative misrepresentations, as it did when it misrepresented the strength of its turnaround times, NGS capabilities, and "one-stop shopping." It also required that when NeoGenomics spoke about the significant drivers of growth that it not be misleading by omitting one of the single largest drivers of growth—LCI.

316.    Thus, when NeoGenomics spoke about the main drivers of growth and revenue, as it did in every quarter throughout the Class Period, it had a duty to disclose to investors that one of if not the largest drivers of revenue in the entire Company was LCI.

## 2. NeoGenomics concealed the known impact that freezing new business and otherwise beginning to dismantle LCI would have on revenue.

317.    By the same token, NeoGenomics also concealed its decision to freeze new LCI business in the spring of 2021, and the known impact of that decision on NeoGenomics' revenue. Immediately upon taking over as CEO, Mallon fired Angell (the head of LCI) and ordered a freeze on all new LCI business. The Company also proceeded to begin dismantling LCI, reassigning and terminating the employment of LCI team members, and Mallon also ordered that all 32 of the LCI contracts be cancelled immediately and that the clients be pressured to sign new contracts. "No one wanted to do that" explained CW-5, and it "made a lot of LCI clients mad," and eventually many of them dropped NeoGenomics. These were "big, huge accounts." Multiple CWs

confirmed that "of course" Mallon was informed that shutting down the business

would have a negative impact on revenue, and he was specifically warned of this by

Angell, according to CW-12, whom Mallon had terminated on his very first day as CEO,

meaning that Mallon had been warned about the revenue impact prior to implementing

the decision to begin dismantling LCI.

318.    But none of this was disclosed to investors. Instead, from the time Mallon

fired Angell in April 2021 and began dismantling LCI, until the November 4, 2021

earnings call, through and after the disclosure of the OIG investigation (which was itself

deliberately misleading) the Company said *nothing* about freezing one of its most

profitable and successful business units.

319.    At the same time that NeoGenomics was silent about this decision and its

known material impact to revenue, NeoGenomics continued to make statements to the

market that, while not referring to LCI by name, clearly reference activities performed

by the LCI team, and at the same time gave the impression that operations (and the

Company's supposed competitive strengths) were proceeding as usual.

320.    For example, NeoGenomics made the same statement in both its Q1 2021

10-Q filed on May 6, 2021, and its Q2 2021 10-Q filed on August 9, 2021—each of which

was after the decision to freeze LCI had been made and implemented, but before any

disclosure had been made whatsoever concerning the Company's known compliance

violations—stating as follows:

> In addition, we directly serve oncology, dermatology and
> other clinician practices that prefer to have a direct
> relationship with a laboratory for cancer-related genetic

testing services. We typically service these types of clients with a comprehensive service offering where we perform both the technical and professional components of the tests ordered. ***In certain instances, larger clinician practices have begun to internalize pathology interpretation services, and our tech-only service offering allows these larger clinician practices to also participate in the diagnostic process by performing the PC interpretation services on TC testing performed by NeoGenomics. In these instances, NeoGenomics will typically provide all of the more complex, molecular testing services***.

321.    These statements were misleading for multiple reasons. First, the phrasing "larger clinician practices have begun to internalize pathology interpretation services" misleadingly omits the material fact that NeoGenomics is the one in many instances that helped these clients set up that capability through LCI, and that LCI was the division within NeoGenomics that performed the "tech-only service" that is referred to. As such, it was highly misleading to discuss these services broadly, without also disclosing that NeoGenomics had recently made the decision to freeze new LCI business, cancel its 32 LCI contracts, and begin dismantling the group.

322.    Similarly, NeoGenomics continued to represent each quarter that "NeoGenomics expects our Molecular laboratory and NGS capabilities to be a key growth driver in the coming years." (identical statements filed in NeoGenomics' 10-K filed on February 25, 2021, 10-Q filed on May 6, 2021, and 10-Q filed on August 9, 2021. This references the same downstream "more complex, molecular testing service" that was typically conducted as a result of LCI's client relationships. Yet NeoGenomics failed to disclose the known impact that the LCI freeze would have on these

relationships, and thus the impact it would have to growth in the molecular and NGS testing business.

323.    When NeoGenomics spoke to the market about its "tech-only service" and about the ways in which that part of the business was expected to "be a key growth driver," it had a duty to not be misleading in those statements, including by omitting the salient fact that it had already begun dismantling LCI, which Defendants knew would have a significant impact on revenue.

**3.    NeoGenomics misrepresented the extent of the revenue impact even when it finally disclosed the compliance investigation.**

324.    As explained above, the market learned about the OIG investigation on November 4, 2021, when NeoGenomics disclosed on its Q3 2021 earnings call that it was "conducting an internal investigation with the assistance of outside counsel that focuses on the compliance of certain consulting and service agreements with federal health laws and regulations" and that it had recently "notified the Office of the Inspector General of the U.S. Department of Health and Human Services of our investigations." On that call, the Company further disclosed that it "accrued a reserve of $10.5 million for potential damage and liabilities associated with the Federal Health Care program revenue received spanning multiple years." *Id.* The Company included substantially similar disclosures in its 10-Q Form filed the same day.[20]

---

[20] In its Q3 2021 Form 10-Q, the Company disclosed:

> With the assistance of outside counsel, the Company is voluntarily conducting an internal investigation that focuses on the compliance of certain consulting and service agreements with federal healthcare laws and regulations, including those

325.    At the Q3 2021 Earnings Call on November 4, 2021, even as the Company partially disclosed the compliance issue, Defendants still deliberately misled investors about the nature and scope of the OIG's investigation in an apparent and misguided attempt at damage control.

326.    Specifically, Mallon stated that the investigation was "*linked to a small number of contracts and customers* and as more information becomes available, we'll provide an update. And that's basically what we can say about the investigation."

327.    On the same earnings call, other executives went out of their way to clarify that the Company's revenues would be unaffected by the investigation. George Cardoza, then-President and Chief Operating Officer of Lab Operations stated, "*We don't expect that this [investigation] will have a meaningful impact on our go-forward revenue*."

328.    McKenzie used even more bullish language, stating:

> I'll go ahead and talk about the financials and then to you as far as the steps we've taken. So I just want to clarify, *there is not going to be a meaningful impact to revenue on a go-forward basis* and we have worked closely internally as well with our external counsel in evaluating any impact to historical financial statements. We have no need to restate any financials as a result of this investigation. The revenue from

---

relating to fraud, waste and abuse. Based on this internal investigation, the Company voluntarily notified the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG") of the Company's internal investigation in November 2021. The Company's review of this matter is ongoing. As of September 30, 2021, the Company has accrued a reserve of $10.5 million in other long-term liabilities on the Consolidated Balance Sheets for potential damages and liabilities primarily associated with the federal healthcare program revenue received by the Company in connection with the agreements at issue that were identified during the course of this internal investigation.

> historical perspective is not impacted, but I'll turn it to Mark on some of the steps we've taken from a remediation perspective.

329.    These statements were false and misleading at the time they were made. The LCI problems were not "linked to a small number of contracts and customers." Rather, as Defendants knew at the time, the Company had frozen all new LCI business (which included dozens of prospective clients, many of whom were ready to sign contracts, and several of which were very large, representing significant revenue, per CW-12), had begun dismantling the LCI team, and had cancelled all 32 of the LCI contracts that had been in place. Customers were "furious," and many of them dropped NeoGenomics.

330.    In fact, Defendants knew at the time that there *would* be a "meaningful impact to revenue." LCI clients were "big, huge accounts," and represented a significant amount of the Company's revenue, as discussed above. Defendants had the LCI "pipeline" spreadsheet showing all of its revenues, and therefore knew that there were tens of millions of dollars in annual revenue in jeopardy.

331.    Nevertheless, Defendants continued to push an unrealistic revenue growth story on the market. During the Stephens Annual Investment Conference, held December 3, 2021, Bonello stated:

> *[H]istorically we're seeing really good growth in NGS*. I think we said, all our modalities, *the growth was impacted by COVID. But we would expect that to rebound as well*. We don't tend to break out growth by modality. I think from time-to-time, we'll talk about how NGS growth is doing, but we haven't given guidance yet for next year. And so, I don't want to be much more specific than to say, it should --

> *growth there should improve like it should across all the*
> *modalities*.

That statement was highly misleading because it omitted the fact that LCI had been the

primary pipeline fueling volume growth in NGS testing at NeoGenomics, and that

NeoGenomics had at that time halted new business and jeopardized relationships with

the existing LCI clients.

**D.    NeoGenomics' failure to disclose the LCI group's outsize impact on revenue growth, as well as the freezing of new LCI business and steps taken to begin dismantling the group, was also contrary to a duty to disclose arising under Item 303 of Regulation S-K.**

332.    SEC regulations require public companies to make certain disclosures in

their financial filings. Item 303 of Regulation S-K outlines required disclosures within

the management discussion and analysis (MD&A) section of Form 10-K and 10-Q filings

with the SEC. The objective of MD&A is "to provide material information relevant to an

assessment of the financial condition and results of operations of the registrant

including an evaluation of the amounts and certainty of cash flows from operations and

from outside sources," with emphasis on the company's prospects for the future. 17

C.F.R. § 229.303(a). As Item 303(a) explains:

> The discussion and analysis must focus specifically on
> material events and uncertainties known to management that
> are reasonably likely to cause reported financial information
> not to be necessarily indicative of future operating results or
> of future financial condition. This includes descriptions and
> amounts of matters that have had a material impact on
> reported operations, as well as matters that are reasonably
> likely based on management's assessment to have a material
> impact on future operations. . . . A discussion and analysis
> that meets the requirements of this paragraph (a) is expected

to better allow investors to view the registrant from the management's perspective.

17 C.F.R. § 229.303(a).

333.    Item 303(b) states:

(b) Full fiscal years. The discussion of financial condition, changes in financial condition and results of operations must provide information as specified in paragraphs (b)(1) through (3) of this section and such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations. Where the financial statements reflect material changes from period-to-period in one or more line items, including where material changes within a line item offset one another, describe the underlying reasons for these material changes in quantitative and qualitative terms. Where in the registrant's judgment a discussion of segment information and/or of other subdivisions (e.g., geographic areas, product lines) of the registrant's business would be necessary to an understanding of such business, the discussion must focus on each relevant reportable segment and/or other subdivision of the business and on the registrant as a whole.

334.    Item 303(b)(2) requires that the MD&A section of a company's Form 10-K and 10-Q filings with the SEC, among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the

relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

17 C.F.R. § 229.303(b)(2).

335.    In addition to duties to disclose that arise independently from this regulation, NeoGenomics violated the affirmative disclosure duties imposed by Item 303 of Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose the LCI group's outsize contribution to Company revenue growth.

336.    As detailed above, throughout the Class Period, Defendants repeatedly touted their competitive strengths as being rapid turnaround times and innovative service offerings (including superior NGS offerings and a broad test menu that allowed for one-stop shopping), and said those strengths drove demand and fueled grow for Clinical Services. In reality, apart from a temporary spike in COVID PCR sales, LCI was what drove the vast majority of organic growth in the Clinical Services division during the Class Period, amounting to about 70% of the Clinical Services divisions' organic revenue growth and about 40% of all Companywide organic revenue growth. Despite the outsize impact of LCI, NeoGenomics never publicly identified LCI as generating material organic revenue growth.

337.    In addition, on or around April 19, 2021, the Company fired the head of LCI and then promptly ordered a freeze on all new business for LCI, ordered the termination of all existing LCI contracts, terminated or reassigned many if not most of LCI's employees. These actions had the immediate effects of cutting off revenue growth

generated by LCI and jeopardizing preexisting revenue and client relationships generated by LCI. To this day, NeoGenomics has never publicly acknowledged those actions or their effects.

338.    Given the foregoing, NeoGenomics failed to disclose (i) underlying reasons for material changes in its financial statements, which showed year-over-year Clinical Services revenue growth in 2019, 2020, and 2021, followed by slowed growth in 2022, even though doing so was necessary to an understanding of NeoGenomics' business; (ii) unusual or infrequent events or transactions or significant economic changes that materially affected the amount of reported income from continuing operations and the extent to which income was so affected, including significant components of revenues that would be material to an understanding of NeoGenomics' results of operations; and (iii) known trends or uncertainties that had or that were reasonably likely to have a material favorable or unfavorable impact on Company revenues from continuing operations.

339.    The Company first violated the Item 303 duty to disclose on February 28, 2020, when the Company filed its Form 10-K for FY 2019 but made no mention of the LCI group or its disproportionate effect on Clinical Services' organic revenue growth. NeoGenomics continued to violate the affirmative disclosure duty in subsequent filings with the SEC throughout the Class Period, including its Forms 10-K for FY 2020 and 2021 and its Form 10-Qs for the first, second, and third quarters of 2020 and for the first quarter of 2021. NeoGenomics then violated the Item 303 disclosure duty in its Form 10-Q for the second quarter of 2021, when it made no mention of the actions being taken

with respect to the LCI group. The Company continued to violate the Item 303 disclosure duty in subsequent filings with the SEC throughout the Class Period, including its Form 10-Qs for the third quarter of 2021 and its Form 10-K for FY 2021.

340.    Each of the concealed facts was presently known to Defendants at the time of the above-referenced SEC filings, was reasonably likely to have material effects on the registrant's financial condition or results of operations, and was a fact that satisfies the materiality standard articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

## X.    Applicability of Presumption of Reliance: Fraud on The Market Doctrine

341.    At all relevant times, the market for NeoGenomics securities was an efficient market for the following reasons, among others:

a.    NeoGenomics shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, NeoGenomics filed periodic public reports with the SEC;

c.    NeoGenomics regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  NeoGenomics was followed by many securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

342.    As a result of the foregoing, the market for NeoGenomics securities promptly digested current information regarding NeoGenomics from all publicly available sources and reflected such information in the price. Under these circumstances, all purchasers of NeoGenomics securities during the Class Period suffered similar injury through their purchase of NeoGenomics securities at artificially inflated prices and the presumption of reliance applies. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## XI.    No Safe Harbor

343.    Neither the "bespeaks caution doctrine," nor any statutory safe harbor provided for forward-looking statements under the PSLRA, shields the Defendants from liability for the material misrepresentations and omissions included in this complaint.

344.    Defendants acted with scienter because at the time they issued public documents and other statements in the Company's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and

130

misleading or omitted material facts. Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws. As set forth in detail throughout this complaint, Defendants, by virtue of their control over, and/or receipt of, the Company's materially misleading statements and their positions within the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results.

345.    With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

346.    Alternatively, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

347.    Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the

very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

### XII.    Class Action Allegations

348.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired NeoGenomics publicly traded securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of NeoGenomics and their families and affiliates.

349.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of May 9, 2022, there were more than 123.6 million shares of NeoGenomics common stock outstanding, owned by at least thousands of investors.

350.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.    Whether Defendants violated the Exchange Act;

    b.    Whether Defendants misrepresented material facts;

    c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      d.   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and/or misleading;

      e.   Whether the price of NeoGenomics securities was artificially inflated;

      f.   Whether Defendants' conduct caused the members of the Class to sustain damages; and

      g.   The extent of damages sustained by Class members and the appropriate measure of damages.

351.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

352.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

353.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIII.  Counts

### A.  Count I: Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

354.    Lead Plaintiff repeats, incorporates, and re-alleges each and every allegation contained above as if fully set forth herein.

355.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as

alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase NeoGenomics securities at artificially inflated prices.

356. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NeoGenomics securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

357. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal material information in that they: (a) suggested that NeoGenomics had consistently strong and industry-leading turnaround times; (b) suggested that NeoGenomics' turnaround times positively fueled growth and demand for the Company's services; (c) omitted the fact that the Company had serious, longstanding failures relating to delivering acceptable turnaround times, which caused a loss of customers and revenue; (d) suggested that the Company's technologically advanced NGS offerings delivered results even for small samples while fueling growth; (e) omitted the fact that the Company's NGS offerings lagged behind the competition and frequently delivered unusable results; (f) suggested that the Company's broad clinical testing menu, including NGS, attracted demand for one-stop-shopping at NeoGenomics, while omitting that the Company outsourced

testing to competitor labs and that its broad menu befuddled customers; (g) omitted the fact that a major driver of organic revenue growth—perhaps the single biggest such driver Companywide—was the LCI group; (h) concealed the known impact that freezing new LCI business would have on revenue along with the corollary fact that the Company would require costlier means to drive substantial organic revenue growth in the future; and (i) mispresented the extent of the revenue impact related to the compliance matter and OIG investigation disclosed in November 2021.

358.    During the Class Period, Defendants made the statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

359.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose of concealing NeoGenomics' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.

360.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NeoGenomics securities. Lead Plaintiff and the Class would not have purchased the Company's

securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

361.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

362.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**B. Count II: Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

363.    Lead Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

364.    Defendants VanOort, McKenzie, Mallon, and Bonello acted as controlling persons of NeoGenomics within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about NeoGenomics, the Individual Defendants had the power and ability to control the actions of NeoGenomics and its employees.

365.    During the Class Period, these Defendants were able to and did control, directly and indirectly, the content of the public statements made by NeoGenomics, including its materially misleading financial statements, thereby causing the

dissemination of the false and misleading statements and omissions of material facts as alleged herein.

366. By reason of such conduct, the Defendants named in this Count, as a group and individually, were controlling persons of NeoGenomics within the meaning of Section 20(a) of the Exchange Act and are liable pursuant to the same.

## XIV.   Prayer for Relief

367. **Wherefore**, Lead Plaintiff prays for judgment as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## XV.   Jury Trial Demand

368. Lead Plaintiff demands a jury trial.

Dated: December 19, 2023

Respectfully submitted,

/s/ Corban S. Rhodes

David Stein (*pro hac vice*)
Kyla Gibboney (*pro hac vice*)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ds@classlawgroup.com
kjg@classlawgroup.com

*Lead Counsel for Lead Plaintiff*
*Daniel Goldenberg*

Corban S. Rhodes
James D. Baskin (*pro hac vice forthcoming*)
Bruce D. Bernstein
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suit 1001
New York, New York 10017
Telephone: (646) 933-1000
Facsimile: (646) 494-9648
crhodes@dicellolevitt.com
jbaskin@dicellolevitt.com
bbernstein@dicellolevitt.com

Adam J. Levitt
Jeremy Levine-Drizin (*pro hac vice*)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
Facsimile: (312) 253-1443
alevitt@dicellolevitt.com
jlevinedrizin@dicellolevitt.com

*Additional Counsel for Lead Plaintiff*
*Daniel Goldenberg*