USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/13/2026___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

DANIEL GOLDENBERG, individually and on : 
behalf of all others similarly situated, :
                                 :

                 Plaintiff, :

                                 :

            -against- :

                                   :

NEOGENOMICS, INC., DOUGLAS VANOORT, :
MARK MALLON, KATHRYN MCKENZIE, and :
WILLIAM BONELLO, :
                       Defendants. :

-----------------------------------------------------------------X

22-CV-10314 (VEC)

<u>OPINION AND ORDER</u>

**VALERIE CAPRONI, United States District Judge:**

Plaintiff sued NeoGenomics, Inc. ("NeoGenomics" or the "Company") and four of its former senior executives, Douglas VanOort, Mark Mallon, Kathryn McKenzie, and William Bonello (collectively the "Officer Defendants"),[1] on behalf of himself and all others who purchased or otherwise acquired NeoGenomics' publicly traded common stock between February 27, 2020, and April 26, 2022 (the "Class Period"), alleging claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and related regulations.  Plaintiff's claims concern alleged misrepresentations and omissions related to: NeoGenomics' publicly touted competitive differentiators and growth drivers (including, *e.g.*, the efficiency of its oncology tests, the breadth of its product offerings, and the quality of its testing technology) and the impact of dismantling one of its business units in light of regulatory compliance issues and a federal investigation into potential misconduct.

---

[1]     Douglas VanOort served as the Company's Chief Executive Officer until February 2021 and subsequently its Executive Chairman until October 2021.  Mark Mallon was Chief Executive Officer from April 2021 until March 2022.  Kathryn McKenzie was Chief Financial Officer until December 2021 before transitioning to the role of Chief Sustainability and Risk Officer.  William Bonello served as Chief Financial Officer from January 2022 until December 2022.

Plaintiff initiated his class action lawsuit on December 6, 2022.  *See* Compl., Dkt. 1.  The case was assigned to Judge Paul A. Engelmayer before being reassigned to Judge Jennifer H. Rearden.  *See* Dkt. 5.  On December 28, 2023, Plaintiff amended his complaint.  *See* Am. Compl., Dkt. 56 ("AC" or "Complaint").  Defendants moved to dismiss the Complaint on February 5, 2024.  *See* Dkt. 66.  On November 5, 2025, this case was reassigned to the Undersigned.  For the following reasons, Defendants' motion to dismiss is GRANTED.

<u>BACKGROUND</u>[2]

Founded in 2001, NeoGenomics is a cancer diagnostics and information services company that provides testing services to oncologists, pathologists, pharmaceutical companies, and academic centers worldwide.  AC ¶¶ 2, 32, 38.  The Company competes with the likes of Quest Diagnostics, Labcorp, Caris Life Sciences, Foundation Medicine, Guardant Health, Labcorp, and Tempus Labs.  *Id.* ¶¶ 39, 88.  NeoGenomics has sought to carve out a specific niche.  The Company focuses exclusively on oncology testing (unlike, *e.g.*, Quest Diagnostics and Labcorp) without limiting itself to a single *type* of cancer test or technology (unlike, *e.g.*, Guardant Health and Foundation Medicine).  *Id.* ¶ 40.  As of February 25, 2022 (and throughout the Class Period), the Company offered several testing methodologies: (i) flow cytometry, Fluorescence In-Situ Hybridication ("FISH"), and (iii) DNA/RNA molecular testing, including Next Generation Sequencing ("NGS"), a testing method that searches multiple genes simultaneously for mutations or disease markers.[3]  *Id.* ¶ 37.  According to its public filings,

---

[2]  At the motion to dismiss stage, the Court accepts all factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to Plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

[3]  According to Plaintiff, NGS is a crown jewel of diagnostic oncology testing, as it "is thought to facilitate more precise diagnoses and lead to more tailored treatments with better outcomes for patients."  AC ¶ 37.  While flow cytometry tests are low cost and low margin, more complicated NGS testing can net thousands additional dollars in revenue for testing companies like NeoGenomics.  *Id.* ¶ 118; *see also, e.g., id.* ¶ 37.

NeoGenomics can offer its clients hundreds of unique testing assays between the various methodologies and performs millions of tests each year. *See, e.g.*, Def. Ex. 24, Dkt. 67-24 at 6, 12.[4]

NeoGenomics is comprised of two divisions, both of which rely on the Company's diagnostic test offerings to generate revenue. AC ¶¶ 33, 37. The Clinical Services division serves as an "oncology reference lab" for health care providers. *Id.* ¶ 34. In layman's terms: clinicians send blood and tissue samples to NeoGenomics labs for testing (whether flow cytometry, FISH, NGS, or otherwise) and interpretation on behalf of patients that may require cancer treatment. *Id.* The Pharma Services division, on the other hand, supports pharmaceutical companies in their drug development efforts by providing testing for clinical trials and other research endeavors.[5] *Id.* ¶ 36. The Clinical Services division is the larger of the two, accounting for approximately 85% of NeoGenomics' annual revenue during the Class Period. *Id.* ¶¶ 35, 126, 227.

---

[4]      "Documents outside of the pleadings are not generally considered in the context of a motion to dismiss." *Noel v. Wal-Mart Stores, E. LP*, 764 F. App'x 17, 19 (2d Cir. 2019) (summary order). In addition to considering the facts alleged in the complaint, however, a district court may consider:

> documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint. For a document to be considered integral to the complaint, the plaintiff must rely on the terms and effect of a document in drafting the complaint[;] mere notice or possession is not enough. And even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and it must be clear that there exist no material disputed issues of fact regarding the relevance of the document.

*United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (internal citations and quotation marks omitted); *see also, e.g.*, *Mitchell v. Taro Pharm. Indus. Ltd.*, No. 24-CV-6818 (CS), 2025 WL 3003681, at *5 (S.D.N.Y. Oct. 27, 2025) (slip op.) (quoting *AECOM* and collecting cases). As such, the Court may consider the public investor documents, regulatory filings, and earnings call transcripts that Plaintiff has incorporated throughout the Complaint, and which Defendants have excerpted and appended to their briefing. *See* App'x A to Def. Br., Dkt. 67; *see also* Dkts. 67-1 to -41.

[5]      The Pharma Services division includes NeoGenomics' "Informatics" group, which provides pharmaceutical companies with data that the Company collects from its patient tests. AC ¶ 36.

3

When Defendant VanOort took the helm as Company CEO in 2009, NeoGenomics "was a tiny player in the cancer testing market, with only 114 employees and a market capitalization of just $26 million." *Id.* ¶ 42. By 2021, the Company had grown to more than 1,700 employees and generated a market capitalization of more than $6 billion. *Id.* Both before and throughout the Class Period, the Company publicly pegged its growth to a handful of core strengths: its "turnaround times" (*i.e.*, the speed with which NeoGenomics could complete and return test results to clients), and its "innovative service offerings" (*e.g.*, its use of technologically superior NGS tests and broad array of testing options that allowed NeoGenomics to operate as a "one stop shop" for any given client's testing needs). *Id.* ¶¶ 43, 48–59 (turnaround times), 72–91 (innovative service offerings).

Between 2019 and 2021, revenue from the Clinical Services division grew by more than $20 million annually. *Id.* ¶¶ 3, 125–127, 131, 225, 237. This was, according to the Complaint, largely due to the success of the division's Laboratory Collaborations and Implementations ("LCI") group. *Id.* ¶¶ 12, 111, 121–131. The LCI group[6] was responsible for helping physician groups and hospitals set up testing labs that would allow the provider to perform basic flow cytometry testing in-house. *Id.* ¶¶ 12, 112. NeoGenomics would then use the LCI touchpoint to cultivate a partnership with the client-providers, who would, in turn, funnel more of their higher-priced, higher-margin, higher-complexity tests to the Company. *Id.* ¶ 112. According to Plaintiff, this was a "phenomenally successful" strategy. *Id.* ¶ 113. The Complaint alleges that, during the Class Period, the LCI group accounted for approximately 70% of the Clinical Services division's organic growth, *id.* ¶¶ 113, 131, 227, 235, 336, and 40% of "Companywide" growth,

---

[6]    Plaintiff's confidential sources estimate that, in 2019, LCI's business unit grew from three employees to ten. *Id.* ¶ 222. By 2021, prior to LCI being dismantled, the group had thirty-two clients in its account portfolio. *Id.* ¶ 223.

*id.* ¶¶ 12, 111, 113, 131, 235, 313, 336. Even so, "NeoGenomics never publicly identified LCI as generating material organic growth" for the Company, instead "point[ing] to" the Company's other core strengths. *Id.* ¶ 115; *see also id.* ¶ 336.

While lucrative, LCI's business model was legally dubious and potentially ran afoul of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). AC ¶¶ 114, 132. When Defendant Mallon took over as CEO in April 2021, he immediately fired the head of LCI, froze all new LCI business, and began to dismantle the group. *Id.* ¶¶ 116 131, 159, 167, 183, 317, 318. In November 2021, NeoGenomics self-reported LCI's potentially unlawful conduct to the Office of the Inspector General of the U.S. Department of Health and Human Services and the U.S. Department of Justice. *Id.* ¶¶ 114, 116, 152, 189, 242. The self-disclosure kicked off an internal investigation that ultimately resulted in NeoGenomics accruing a "$10.5 million reserve for potential damage and liabilities associated with Federal Health Care program revenue received spanning multiple years." *Id.* ¶¶ 151, 156, 324 & n.20. When the Company publicly revealed the investigation on November 4, 2021, NeoGenomics common stock fell 17.6% from $46.53 to $38.53 per share. *Id.* ¶ 151. NeoGenomics representatives nonetheless assured investors that the investigation's findings would not "have a meaningful impact on revenue," as the inquiry was "linked to a small number of contracts and customers." *Id.* ¶¶ 153, 164, 326, 329. During an earnings call in late 2021, Defendant McKenzie likewise stated that the Company would not "need to restate any financials as a result of th[e] investigation." *Id.* ¶¶ 153, 328. Despite the investigation, securities analysts remained bullish about the Company's prospects. *Id.* ¶¶ 164–165.

NeoGenomics' business, however, continued to decline. In mid-2022, Defendant Mallon stepped down as CEO. *Id.* ¶¶ 154, 168. The Company withdrew its annual financial guidance

on March 28, 2022, *id.* ¶ 168, causing the Company's share price to drop another 29.8%, from $17.79 to $12.49 per share, *id.* ¶ 169.  NeoGenomics explained that the revenue headwinds were the result of "a notable decrease in lab efficiency over the course of the past year;" the Company attributed the downtick in efficiency "largely . . . to increased complexity of both our product offerings and our lab processes, due in part to efforts to respond to customer requests for customization."  *Id.* ¶ 176.  During an April 2022 earnings call, when asked how turnaround times compared to NeoGenomics' peers, Company representatives indicated that they were "a work in progress."  *Id.* ¶ 177.  In the day preceding the conclusion of the Class Period on April 27, 2022, NeoGenomics share price fell an additional 3.8%, from $10.85 to $10.44 per share.  *Id.* ¶ 178.

In the months following the Class Period, NeoGenomics' public filings continued to identify "consistent timeliness of results by our Clinical Services segment" as a competitive strength.  *Id.* ¶ 192.  But during a subsequent earnings call in 2022, the Company's new CEO, Christopher Smith, suggested that although NeoGenomics had seen "meaningful improvements in turnaround time," it remained "an area where 'we have a lot of room for improvement.'"  *Id.* ¶ 193.

<u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  In general, "a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enter. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014).  The Court accepts all factual allegations

6

in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff. *See, e.g.*, *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To state a claim under these provisions, a plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

In addition to the pleading requirements set forth in *Twombly* and its progeny, a "complaint alleging securities fraud must satisfy the heightened pleading requirements" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") of 1995 "by stating with particularity the circumstances constituting fraud." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319–20 (2007)). To satisfy Rule 9(b), a securities fraud complaint based on alleged misstatements or omissions must

7

"(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  Further expanding the pleading requirements of Rule 9(b), the PSLRA requires that "securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (cleaned up).

<u>DISCUSSION</u>

**I.      Confidential Witnesses**

As corroboration for his fraud claims, Plaintiff relies heavily on information and statements provided by thirteen confidential witnesses ("CWs") made up of "former NeoGenomics employees and executives knowledgeable about the facts and events relevant to the allegations." *See* AC at *vi–ix*.  At the threshold, this is not inherently problematic.  But as the Second Circuit has noted, confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). This Court has held that:

> [I]n evaluating facts attributed to unidentified sources, courts have coalesced around certain inquiries: (1) whether the source is described with specificity so as to make clear that he or she was in position to know the facts attributed to them; (2) whether the confidential source "situate[d] in time relevant occurrences," for otherwise, such occurrences may not "establish that the [issuer's] challenged statements were knowingly false when made"; (3) whether the confidential source's factual allegations are pled with sufficient particularity; and (4) whether the facts

attributed to the confidential source are corroborated, as otherwise, such statements are apt to be disregarded.

*In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023) (citing *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799–800 (S.D.N.Y. 2020)).

With the exceptions of CW-1 and CW-8 (and, perhaps, CW-3), Plaintiff does not allege that any of the CWs reported directly to any of the Officer Defendants. *See generally* AC at *vi–ix*. And while the Complaint includes the conclusory assertion that "all [CWs] were in positions where they were able to learn the facts described as part of their job function," *see id*. at *vi*, the Complaint does not describe, with any semblance of particularity, the actual *functions* of any individual CW's job. Instead, the Complaint lists the CWs' tenures and position titles, the latter of which are, for the most part, exceedingly vague and provide the Court with little insight, beyond mere speculation, into how the CW would have been positioned to "possess the information alleged." *Blanford*, 794 F.3d at 305 (quoting *Novak*, 216 F.3d at 314). Moreover, many of the CWs bounced between roles at NeoGenomics—some of which seem potentially relevant[7] to Plaintiff's allegations, while others are less so.[8]

---

[7]    CW-1, for example, worked as a Senior Vice President, Pharma Services and—for a short while—as Chief Operating Officer, Clinical. AC at *vi*. In the latter role, CW-1 reported directly to various Officer Defendants. *Id*. CW-8 held multiple positions at the Company, including a stint as Chief Scientific Officer, a role in which she reported to Defendants VanOort and Mallon. *Id*. at *viii*. The Complaint indicates that CW-3 served as the Chief Scientific Officer and Chief Medical Officer from 2018 to 2021. The Court assumes that CW-3 would have reported to some (or all) of the Officer Defendants, although the Complaint does not make that clear.

[8]    Consider CW-6, who worked for NeoGenomics from December 2020 to March 2022. *Id*. at *vii*. Until November 2021, he/she served as an "Engagement Manager." Thereafter, CW-6 was "Head of Data Strategy and Analytics." *Id*. The Complaint does not identify to whom CW-6 reported, but it was presumably not an Officer Defendant. In any event, it is not clear that someone in either of the positions that CW-6 occupied would have been privy to specific information relevant to Plaintiff's claims. The same is true of CW-2, who appears to have worked in a communications role and as a director of "Scientific Collaborations and Engagement." *Id*. at *vi–vii*. CW-7 worked at NeoGenomics for just over a year as a director of "Informatics." *Id*. at *viii*. CW-9 had a nearly decade-long tenure at the Company, but never (it would seem) in positions in which he/she would have had any occasion to substantively interact with the Officer Defendants. *Id*. at *viii*. (CW-9, a "Laboratory Supervisor," reported to the "Operations Manager of the FISH Department," who themselves reported to the "Site Director of NeoGenomics' Aliso Viejo facility." *Id*. Not a single person in CW-9's direct hierarchy occupied an executive leadership position. As best the Court can tell, CW-9 would have been several degrees removed from any of the Officer Defendants.) This representative sample sheds light on a theme common among many (although, not all) of the CWs.

For the most part, the Court finds that "the CWs' positions and responsibilities are not described with sufficient detail to 'indicate a high likelihood that they actually knew facts underlying their allegations.'" *Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 452 (S.D.N.Y. 2025) (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011)). Indeed, as previously noted, the Complaint fails to describe virtually any of the CWs' job duties, other than by passively referring to a CW's attendance at a group meeting or in a team call, or by identifying people within the Company that the CW may have spoken to about the Company's alleged operational issues. *Compare* AC at *vi–ix*, *with Blanford*, 794 F.3d at 307 ("[T]he Complaint specifies each witness's position, length of employment, and job responsibilities."), *and In re Blue Apron Holdings, Inc. Sec. Litig.*, No. 17-CV-4846 (WFK), 2020 WL 1950783, at *7 (E.D.N.Y. Apr. 22, 2020) (same). The Complaint contains very few allegations from CWs affirmatively claiming to have first-hand knowledge about the topics and conversations upon which Plaintiff has grounded his lawsuit.[9]

Finally, and as Defendants note repeatedly in their briefing, most of the statements attributed to the CWs are not anchored in time. CW statements referenced in the Complaint consist of some variation of the general allegation that "the Company faced *unspecified* 'issues' and 'problems' . . . at *unspecified* times.'" Def. Br., Dkt. 66 at 3; *see also id.* at 4 ("The Complaint [] relies on vague and largely-undated allegations from confidential witnesses[.]"), 10 ("Instead of pleading such specifics as to how any of the challenged statements were false or misleading when made, Plaintiff largely marshals generalized allegations – often entirely

---

[9]    The Court's observation is borne out throughout the Complaint. For example, CW-1 explicitly states that he/she "could not quantify the number of customers lost" as a result of NeoGenomics' allegedly ongoing issues. *Id.* ¶¶ 66–68. Likewise, CW-8 had no "direct communications with customers" and, as a result, "only heard that the Company had lost customers due to the problems" alleged. *Id.* ¶ 68. *But see infra* pp. 24–25 (discussing CWs -4, -5, -11, and -12).

unmoored in time[.]").  To be sure, each CW worked at NeoGenomics during the Class Period (at least for some amount of time).  *Cf., e.g.*, *Damri*, 772 F. Supp. 3d at 452–53 (complaint largely failed to specify CWs' length of employment; only two CWs worked at company during the class period).  To that end, Plaintiff contends that Defendants "disregard[] the accounts of [CW]s who confirm that" NeoGenomics's issues "persisted *throughout* the class period."  Pl. Opp., Dkt. 73 at 12 (emphasis added); *see, e.g.*, AC ¶¶ 61, 64.  But merely because a CW was *employed* during the Class Period cannot alone transform generalized and undated testimony about "ongoing" "problems" and "issues" at NeoGenomics into corroboration for Plaintiff's allegations that Defendants made *specific*, fraudulent statements *between* February 2020 and April 2022.  *See, e.g.*, *Blanford*, 794 F.3d at 307.[10]

For these reasons, courts in this District tend to "view attributions to CWs with caution and care."  *Damri*, 772 F. Supp. 3d at 452.  It is with these shortcomings in mind that the Court will turn to its analysis of allegedly actionable statements and omissions.

## II.    Defendants' Material Misstatements and Omissions

For a plaintiff to plead adequately a claim of securities fraud, the alleged statement or omission must be both material, such that it "would have been viewed by the reasonable investor as having significantly altered the total mix of information available," *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (cleaned up), and false or misleading, "evaluated not only by literal

---

[10]    Plaintiff cites one case—*Blanford*—in support of his argument that throughout-the-Class-Period-type allegations are sufficiently specific to corroborate fraud claims in PSLRA actions.  Pl. Opp. at 12 (citing *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015)).  The plaintiff in *Blanford*, however, relied on CW statements that were decidedly more specific than those here.  The *Blanford* witnesses credibly discussed buildups of *specific* expiring inventory related to *specific* orders that was discarded at *specific* times—*i.e.*, right before audits, with the aim of duping the auditors.  *Blanford*, 794 F.3d at 307.  And although not strictly necessary, the Second Circuit found persuasive that witness accounts "of the fraudulent [] order [was] *closely linked* to [Defendants'] misleading statements during the second quarter investor call."  *Id.* (emphasis added).

truth, but by context and manner of presentation," *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (cleaned up).

"To base a claim on an omission—such as failing to disclose a material business risk—a plaintiff must also plead that the defendant had a duty to disclose the omitted fact." *Constr. Laborers Pension Tr. for So. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 531 (S.D.N.Y. 2020) (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). While Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), speakers have a duty to disclose when a statement would otherwise be "inaccurate, incomplete, or misleading" without the omitted material, *Stratte-McClure*, 776 F.3d at 101. *See also Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[T]he lack of an independent duty is not . . . a defense to . . . liability because upon choosing to speak, one must speak truthfully about material issues.").

Defendants' allegedly material misrepresentations[11] can be grouped into three general categories: (1) statements concerning NeoGenomics' testing turnaround times and how they measured up against competitors' turnaround times, *see* AC ¶¶ 247–268, Pl. Opp. at 10–16, (2) statements concerning the quality of NeoGenomics' NGS technology and its ability to function as a "one-stop-shop" for its customers due to the breadth of its testing options, *see* AC ¶¶ 269–

---

[11]    The Complaint specifically identifies forty-two alleged misrepresentations made during the Class Period. *See* AC ¶¶ 247–331. When broken into discreet subparts, the challenged statements total nearly one hundred. *See* App'x A to Def. Br. at A-1 to A-41. For ease of analysis, and because the substance of the alleged misrepresentations remains the same throughout the Class Period, the Court will address them in their logical subgroups.

311, Pl. Opp. at 16–19, and (3) statements concerning LCI, its future, and the importance of the group to NeoGenomics' overall business, *see* AC ¶¶ 312–316, 324–331, Pl. Opp. at 19–21. Separately, Plaintiff alleges material omissions primarily related to the LCI business—namely, that Defendants concealed LCI's outsize impact on the Company's growth, its revenue, and the ultimate decision to freeze the business in the wake of its regulatory compliance woes. *See* AC ¶¶ 317–323, Pl. Opp. at 28–32.

As to the first two categories of statements (*e.g.*, regarding turnaround times and NGS), Plaintiff has failed to plead particularized facts that support his assertions that Defendants' statements were false or misleading when made. Each of the statements that Plaintiff has identified on these two topics is far too vague and conclusory to be actionable as securities fraud. Most are unmoored in time, and many more are more accurately characterized as puffery or optimistic statements of opinion from Company executives. Because Plaintiff has failed to plead particularized, factual material that would permit the Court to infer that Defendants' statements on these two topics were false or misleading when made, Plaintiff has failed to sustain his pleading burden as to statements on these subjects, specifically.

Some of Defendants' statements and omissions regarding LCI, however, are different in kind. Unlike allegations that embrace ambiguous references to "issues" or "problems" with turnround times or NGS tests (of which the Complaint is replete), the Complaint includes well-pled factual material that tends to suggest that some of Defendants' statements (and omissions) about the nature and scope of the Company's LCI business, particularly its status as a money-driver (or, lack thereof) following the Company's regulatory investigations, even if "not literally false," are actionable as half-truths that necessitated further disclosure. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 759 (S.D.N.Y. 2017). In short, based on the allegations in the

13

Complaint and the sources incorporated therein, the Court can make a reasonable inference that NeoGenomics misstated and withheld material information about the "elephant in the room"— *i.e.*, LCI's overall business impact, particularly after its fall from grace in light of the group's compliance troubles. *Id.*; *see also, e.g.*, AC ¶¶ 151–153, 324–328. Accordingly, and as discussed more thoroughly below, various of Defendants' alleged misstatements and omissions regarding LCI narrowly survive the first prong of the Court's fraud inquiry.

1.    Statements Concerning Turnaround Times Are Not Actionable

Plaintiff identifies ten statements concerning the Company's turnaround times that he alleges were false or misleading when made. *See* AC ¶¶ 45, 51–52, 56–57, 160, 163, 192, 247–248, 250, 253–257, 261, 263, 266–267, 280. At a high level, these include statements related to turnaround times serving as a "competitive strength" for the Company, *see id.* ¶¶ 45, 51, 192, 247, 250, 263, and Defendants' assertions that NeoGenomics offered "industry leading turnaround times," *see id.* ¶¶ 50–51, 56–57, 160, 163, 247–248, 257–258, 261, 266–267, 280. Throughout the Class Period, "the Company touted its turnaround times as 'industry leading' and rapid,' and boasted of 'consistent timeliness,'" including during the COVID-19 pandemic. *See id.* ¶ 45; *see also, e.g., id.* ¶¶ 50, 52, 253–256. In each of its annual and quarterly regulatory filings, NeoGenomics listed its turnaround times as one of its "Competitive Strengths." *Id.* ¶ 48. These representations, Plaintiff contends, were false. In reality, "NeoGenomics faced chronic delays in delivering its tests to oncologists," Pl. Opp. at 11 (citing AC ¶¶ 61–70, 200–219), which "persisted throughout the class period," *id.* at 12 (citing AC ¶¶ 61, 64). Plaintiff also alleges that NeoGenomics' turnaround times "lagged behind the competition." *Id.* at 13; *see also* AC ¶¶ 60–71, 82–83. Plaintiff's ultimate contention is that Defendants' statements about the Company's turnaround times were false or misleading because, in actuality, "the Company[]

14

[had] longstanding turnaround time problems [that] cost the Company customers and revenue, [and that] LCI"—not the Company's testing efficiency—"was the major driver of Clinical Services organic revenue growth."  AC ¶ 268.

Accounts from CWs serve as the primary scaffolding for Plaintiff's allegations.  *See, e.g., id.* ¶ 61 (collecting CW statements)  Some witnesses indicate that turnaround times were a "constant" issue at NeoGenomics.  *See, e.g.*, *id.* (CW-1).  Others recall that "there were problems with turnaround times" (CW-3), "major turnaround issues" (CW-4), and that "turnaround times look[ed] so bad" (CW-10).  *Id.*  Turnaround times were, CW-7 noted, a "big issue."  *Id.*  CW-6 indicated that, "[a]cross the board, people were not happy with turnaround times," and that "[e]verything was taking too long to get results back."  *Id.*

Even when considered together, these "allegations from Plaintiff's [CWs] are so vague as to be meaningless."  *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 302 (S.D.N.Y. 2019).  As previously discussed, there is little in the Complaint to adequately assure the Court that any of the individuals speaking about the (largely unspecified) "issues" with NeoGenomics' turnaround times were in a position to have any actual knowledge about the scope or severity of the problems.  As an attempted failsafe, the Complaint alleges that "turnaround problems were *well known*" around the Company, as CW-5 "personally alerted higher-ups to the problem, including then Vice President of Sales Michele Buzhardt, then President of Clinical Services Rob Shovlin, and current President of Clinical Services Warren Stone" (none of whom is an Officer Defendant).  AC ¶ 205 (emphasis added).  Likewise, CW-2 "recalled that the turnaround time problem was of such a *well-known magnitude within the Company* that a former Company CFO had been tasked with resolving the problem, but that NeoGenomics never effectively solved the

problem." *Id.* (emphasis added).[12]  But "Plaintiff[] cannot rely" only "on assertions that the information presented by confidential witnesses was known or common knowledge" as support for his *ipse dixit* allegations that "issues" were actually manifesting within the Company.[13]  *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (citing *In re Am. Express Co. Sec. Litig.,* No. 02 Civ. 5533 (WHP), 2008 WL 4501928, at *7–8 (S.D.N.Y. Sept. 26, 2008)).  "[G]eneric and conclusory allegations" from Plaintiff's CWs regarding NeoGenomics' turnaround times, "based upon rumor or conjecture[,] are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA]."  *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

Perhaps in implicit recognition of the insufficiency of his purported intel, Plaintiff tries to buoy the CW statements by pointing to one-off examples that, he contends, are indicative of the larger turnaround time problem.  This also fails.  For one, Plaintiff alleges that the Company was "losing customers because of" allegedly problematic turnaround times.  AC ¶¶ 66–68.  But only once in the 137-page, 368-paragraph Complaint does Plaintiff attempt to specifically identify a client that was actually lost as a result of the Company's timing struggles.  *See, e.g., id.* ¶ 67.[14]  And even then, the Complaint does not specify *when* the client was lost, leaving the Court to

---

[12]    It is difficult to imagine a vaguer allegation than that contained in Paragraph 205 of the Complaint. Plaintiff asks the Court to accept as sufficient that, at *some unspecified time*, CW-2 had heard that, at *some* point, *someone* told *someone else* to fix a problem *related to* turnaround times, which was not done "effectively."  Under the heightened pleading standards of Rule 9(b) and the PSLRA, this simply will not do.

[13]    In other words, allegations that many people were aware of an issue does not cure the Complaint's failure to plead sufficient facts that tend to show that the issue existed in the first place.

[14]    The Complaint passively references Scripps, Kaiser, and one "big one" in the "Northeast U.S." as having also been lost but does not plead any factual matter to directly connect those departures to issues with turnaround times, nor does the Complaint allege when those clients left NeoGenomics.  *See* AC ¶ 70.  In fact, later in the Complaint, Plaintiff seems to suggest that these three clients were lost due to "the Company's inability to deliver timely, usable NGS results," *not* just because of NeoGenomics' turnaround times.  *Id.* ¶ 104.

16

speculate whether it was during the Class Period at all.[15]  Moreover, as Defendants rightly note, "Plaintiff never specifically alleges how the loss of a single customer's business could be enough to render Defendants' statements false or misleading, particularly where the Company has *thousands* of customers."  Def. Br. at 13 (citing *Stadnik v. Vivint Solar, Inc.*, No. 14-CV-09283 (KBF), 2015 WL 8492757, at *14 (S.D.N.Y. Dec. 10, 2015)).  Nor does Plaintiff make a compelling effort to allege specific examples of discrete tests that were delayed.  Indeed, only a single paragraph in the Complaint identifies individual tests (two) that were adversely impacted by the Company's purported turnaround time issues.  *See* AC ¶ 62.  And even if the Court accepts the allegations in Paragraph 62 as true, as it must, it is implausible for the Court to conclude that "[a] delay in two tests out of more than a million [] is []sufficient to [] allege that Defendants' statements were, on the whole, false or misleading when made."  Def. Br. at 14.[16] On both fronts, the Court agrees with Defendants that a minute number of testing delays and a single instance of a client leaving due to unacceptable turnaround times is insufficient to demonstrate the falsity of Defendants' statements regarding the Company's testing efficiency writ large.

Plaintiff has also utterly failed to plead particularized facts to support his allegations related to the falsity of NeoGenomics' claim that it had "industry leading turnaround times." "[V]ague references" to the Company's problems with turnaround times are "not sufficient to

---

[15]    Apparently, pinning down the timing would be a fool's errand, as the Complaint later contradicts itself and suggests that the "lost" client was not, in fact, gone for good, and was instead "on and off, on and off."  AC ¶ 67. The lack of particularity comes as no surprise, as one of Plaintiff's CWs readily admits that he did not work "in sales and [had no] direct communications with customers," *id.* ¶ 68, and had only "heard that the Company had lost customers to the problems" with turnaround times, *id.*  CW-1 "could not quantify the number of customs lost," but "was sure that the Company was losing customers." *Id.*

[16]    This is particularly true when, as here, one of the two allegedly delayed tests may not have occurred during the Class Period.  *See id.* ¶ 62 (NGS test delayed at some unspecified time).

plead falsity," and Plaintiff makes no meaningful attempt to demonstrate, for example: (i) which of NeoGenomics' thousands of tests were delayed, (ii) whether the delays caused the Company's turnaround times as a whole to lag behind the competition, or, most importantly, (iii) how competitor turnaround times stacked up against Defendants'—even assuming that some tests were, in fact, delayed. *See In re Nokia Corp. Sec. Litig.*, No 19-CV-03509 (ALC), 2021 WL 1199030, at \*15 (S.D.N.Y. Mar. 29, 2021); *see also* Def. Br. at 12. As Defendants point out, Plaintiff rarely attempts specifically to compare NeoGenomics' turnaround times to those of its competitors. *See* AC ¶ 64. The sole anecdote in Paragraph 64 recounts an occurrence that took place *before* the Class Period and implicates only a single test type (NGS solid tumor). Other than conclusory assertions from CWs that delays continued "forever," *see id.* ¶¶ 45, 61, the Complaint is bereft of particularized allegations sufficient for the Court to conclude that testing delays were endemic during the Class Period, or that delays would have had an impact on more than a subset of the Company's hundreds of test offerings. *See* Def. Br. at 12.

As to the Complaint's lack of specificity, Plaintiff responds "that there is no 'need for absolutely particularity' when substantial corroboration comes from 'many confidential sources who all say the same thing.'" Pl. Opp. at 10 (quoting *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 358–59 (S.D.N.Y. 2003)). It is true that when confidential "sources are corroborated by a vast number of media reports (including admissions by insiders), as well as intensive investigations by both state and federal agencies," the need for additional corroboration may be obviated. *In re Initial Pub. Offering*, 241 F. Supp. at 358–59. But that is not the case here. The CWs have each other as corroboration—and not much else. In this sense, the PSLRA's pleading requirements remain more stringent than those of RCA Records: While

50,000,000 Elvis fans can't all be wrong,[17] Plaintiff's thirteen CWs may be.  Hence the need for at least some additional, particularized factual allegations that tend to provide evidentiary support for the narrative that the CWs are pitching.

Plaintiff is not required to plead every conceivable fact that tends to corroborate his claim that Defendants' statements about turnaround times were false or misleading.  *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89–90 (S.D.N.Y. 2015) (citing *Novak*, 216 F.3d at 313–14).  But he must allege *some* particularized facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission."  *Id*. at 89.  For the reasons discussed, he has failed to do so.  Defendants' statements related to turnaround times are, therefore, not actionable as fraud.

> 2.    Statements Concerning NGS Technology and "One-Stop Shopping" Are Not Actionable

Defendants' statements regarding the quality of its NGS technology and the Company's ability to serve as a "one-stop shop" for customers are not actionable for many of the same reasons.  Plaintiff takes umbrage with Defendants' public declarations that NeoGenomics was a "leading provider" of NGS testing, offering "high quality NGS panels" that were contributing to the Company's growth.  AC ¶¶ 269–282, 302–303.  He also challenges Defendants' statements regarding the Company's broad menu of test offerings and whether its status as a "one-stop shop" contributed to NeoGenomics' expansion.  *Id.* ¶¶ 274, 302–315, 357.

As to Defendants' NGS technology, Plaintiff's general theory is that the statements were false and misleading because Defendants failed to inform investors that (i) "problems plagu[ed]" the Company's "NGS offerings, including the alarming frequency with which NGS failed to deliver usable results," *id.* ¶ 281, (ii) the Company's NGS technology was "antiquated," *id.*,

---

[17]    Elvis Presley, *50,000,000 Elvis Fans Can't Be Wrong: Elvis' Gold Records, Volume 2* (RCA Victor 1959).

and (iii) the NGS "problems" "caused a loss of revenue and customers," *id.* ¶ 301.  Regarding Defendants' statements that NeoGenomics testing menu permitted "one-stop-shopping" for customers, Plaintiff claims that the statements were false or misleading because Defendants did not disclose that it "often outsourced testing to competitor laboratories, and the breadth of its clinical test menu frustrated and confused healthcare providers."  *Id.* ¶ 311.

In support of his positions, Plaintiff relies on a familiar playbook, stringing together a raft of conclusory statements from various CWs that indicate, in sum and substance, that "'Neo[Genomics] was not good at NGS,'" and that its "NGS capabilities were not comparable to other players in the industry."  *E.g.*, *id.* ¶¶ 11, 46, 94; *see also* Pl. Opp. at 16–17 (collecting CW statements about NGS).  Plaintiff again fails to plead any particularized facts that sufficiently allege *how* NeoGenomics' NGS offerings actually stacked up against its peers during the Class Period.  The nearest Plaintiff comes to supporting his falsity claims are a handful of allegations that, "[f]or NeoGenomics competitors, including Caris, Tempus, and Foundation Medicine . . . 'even a 10 percent [NGS test fail rate] rate would be high,'" while "[a]t NeoGenomics, the [NGS test fail rate] rate could be '50 percent' or more."  AC ¶ 98.  But even accepting these contentions as true, as the Court must, the allegations do little to support Plaintiff's argument that dozens of Defendants' statements regarding the quality and competitiveness of its NGS offerings were misleading *when made*.  The allegations in Paragraph 98 appear to relate to a *single* customer (Texas Oncology) in a *single* testing category (NGS solid tumor).  *Id.*; *see also* Def. Reply, Dkt. 75, at 8.  Moreover, the Complaint is devoid of specific allegations indicating that the issues identified in Paragraph 98 occurred (or were occurring) during the Class Period.  CW-5's vague assertion that the "issue persisted," and CW-8's apparent

confirmation that "NeoGenomics had an ongoing issue," AC ¶ 99, do not suffice. The PSLRA requires more.

Plaintiff's allegations related to NeoGenomics' NGS offerings as a source of growth are similarly deficient. The Complaint alleges that "NeoGenomics' revenue suffered" because customers left NeoGenomics due to "the Company's inability to deliver timely, usable NGS results." *Id.* ¶ 104; *see also id.* ¶¶ 11, 46–47, 77, 82–83, 281. But nowhere in the Complaint does Plaintiff specify "which, how many, or when those clients were purportedly 'lost' because of NGS testing issues." Def. Br. at 17 (emphases omitted) (citing *Stadnick*, 2015 WL 8492757, at *14). Whether NGS drove growth, even if minimally, remains a mystery.

On this point, Plaintiff argues that Defendants are improperly demanding "quantification of a negative, rather than defending their representation of NGS as a positive." Pl. Opp. at 18. Plaintiff relies on *In re Gentiva Securities Litigation* for the proposition that a PSLRA complaint can be sufficiently pled without an investor "quantifying the effect of the claimed misrepresentations." 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013). Maybe so. But it remains essential that Plaintiff plead sufficient factual matter that would allow the Court plausibly to infer that Defendants' statements regarding NGS driving its growth were false or misleading. That "some" clients took their business elsewhere due to purported turnaround times with NGS (at some unspecified time, *see* AC ¶ 104) does not permit a reasonable inference that, on the whole, NeoGenomics' NGS offerings were not driving the Company's expansion. And without knowing how lofty (or not) NeoGenomics' NGS sales goals were, the fact that CW-1 can report, second-hand, that "it was difficult to meet [] sales goals because of the [NGS] issues," is not particularly informative. *Id.*

Without particularized allegations to corroborate the CWs' vague and conclusory assertions that "Neo[Genomics] was not good at NGS," *see id.* ¶¶ 11, 46, 94, Plaintiff has not sufficiently demonstrated that "turnaround times and test offerings were not drivers of demand and growth," nor that NGS was "causing NeoGenomics to lose customers." *Id.* ¶ 47. Plaintiff has thus failed to allege that Defendants' statements concerning the Company's NGS technology were false or misleading.

The same is true of Defendants' statements regarding NeoGenomics as a "one-stop shop." Even if the Court accepts that "NeoGenomics at times outsourced testing," *id.* ¶ 106, "Plaintiff provides no particularized allegations about . . . when the outsourcing occurred (whether within the [] Class Period, or otherwise), how often it occurred, how many customers were affected, which tests were implicated, or any other basic details that might shed light onto whether any of the generalized 'one-stop-shop' statements were false or misleading when made." Def. Br. at 18 (emphases omitted). In response, Plaintiff harkens back to a handful of the ambiguous CW contentions referred to in the Complaint, *see* Pl. Opp. at 19, effectively "engaging the Court in a veritable hyperloop of conclusory allegations." *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 481 (S.D.N.Y. 2021). Plaintiff has, therefore, failed to allege sufficiently particularized facts that tend to show that Defendants' statements during the Class Period about NeoGenomics' being a "one-stop shop" for oncology testing were false or misleading.

In short, neither Defendants' statements regarding the Company's NGS technology nor its touting itself as a "one-stop shop" for customers are actionable as fraud.[18]

---

[18]    The parties spill much ink arguing whether the challenged statements regarding turnaround times and NGS technology are non-actionable "puffery" or opinions. *See* Def. Br. at 20–23; Pl. Opp. at 21–24. Defendants also argue that a number of these statements are protected under the PSLRA safe harbor for forward-looking statements. Def. Br. at 23–25. *But see* Pl. Opp. at 24–27. While the Court tends to agree that many of Defendants' statements

3.      Statements and Omissions[19] Concerning LCI Business Are Actionable

Next, Plaintiff identifies a handful of Defendants' statements made shortly after the disclosure of the Company's internal investigation related to the LCI business as false and misleading.  AC ¶¶ 324–340.  Plaintiff's primary allegation is that, by stating that the regulatory investigation was "linked to a small number of contracts and customs" and denying that the investigation would have a "meaningful impact" on revenue, Defendants misled investors about the material consequence of the regulatory inquiry: the shuttering of operations for one of the Company's blockbuster groups.  *Id.* ¶¶ 327–331.

Defendants argue that statements about the investigation being linked to a "small number of contracts and customers" were not false or misleading because, as the Complaint alleges, the LCI group had only thirty-two customers—"a 'small number' by any metric."  Def. Br. at 19.  Defendants ask the Court to "employ 'judicial experience and common sense' to confirm that [thirty-two] customers is, indeed, a 'small number' here."  Def. Reply at 10 (quoting *In re Universal Health Servs., Inc., Deriv. Litig.*, No. 17-2187, 2019 WL 3886838, at *28 (E.D. Pa. Aug. 19, 2019)).

Here, Defendants are attempting, unsuccessfully, to sidestep the core of Plaintiff's LCI-related allegations.  Regardless of whether thirty-two (or seventy, or more, *see* AC ¶¶ 150, 223,

regarding turnaround times, NGS, and "one-stop shopping" are nonactionable expressions of corporate optimism and intent, given the utter dearth of particularized facts in the Complaint to support Plaintiff's contentions that Defendants' Class Period statements were false or misleading as to any of these topics, the Court will not devote substantial space to discussing whether the statements are opinions or are immaterial (and therefore non-actionable) as a matter of law.

[19]      Plaintiff challenges two categories of omissions related to the Company's LCI group.  First, Plaintiff alleges that "Defendants unlawfully concealed LCI's outsize impact on growth."  *See* Pl. Opp. at 28 (citing AC ¶¶ 122–126, 128–129, 131, 263–264, 277, 284).  Second, Plaintiff alleges that "Defendants unlawfully concealed its LCI freeze" and its resulting impact on the Company's revenue in light of the Company's regulatory compliance investigation.  *See* Pl. Opp. at 30–32 (citing AC ¶¶ 127, 140, 144–146, 320–331).  For the reasons stated in this section, Defendants' omissions as to the LCI freeze and impact on revenue of the regulatory investigation are actionable.  For the reasons stated in the following section, the allegations related to Defendants' alleged concealment of LCI's impact on growth are not.  *See infra* pp. 27–29.

232 (noting that the LCI group had over forty clients in the "pipeline")) constitutes a "small number of clients" in nominal terms, Plaintiff contends that these were "big, huge accounts." *Id.* ¶ 123.  A reasonable investor would have understood Defendants' statement that the investigation was linked to very few customers to mean that the affected population was immaterial, and thus there would not be a "meaningful impact to revenue." *Id.* ¶¶ 327, 328; *see also* Pl. Opp. at 20.  Based on the well-pled allegations in the Complaint, this was misleading at best, and blatantly false at worst.  In fact, the investigation precipitated the dismantling of the LCI group, which allegedly cost "NeoGenomics millions in lost revenue."  Pl. Opp. at 20 (citing AC ¶¶ 145, 232–234).  The Complaint also alleges that, before the investigation came to light and LCI was disbanded, the group accounted for a whopping 40% of the Company's overall organic growth.  AC ¶ 113.  Immediately following the LCI freeze in April 2021, NeoGenomics' growth was stunted.  *Id.* ¶ 157. "[W]hen growth later resumed, it underwhelmed."  Pl. Opp. at 31 (citing AC ¶¶ 156, 168).  Plaintiff estimates that LCI's revenue was diminished to the tune of "some $30 million," courtesy of the LCI lockdown.  Pl. Opp. at 32 (citing AC ¶¶ 127, 145–146).

It is compelling that Plaintiff's LCI-related allegations are corroborated by the small handful of CWs who appear to have been positioned to understand the impact LCI had on NeoGenomics' business.  The Complaint's LCI narrative is primarily sourced from four individuals: CWs -4, -5, -11, and -12.  Each worked within the LCI group for some period of time; at least three did so during the Class Period.  CW-4 was Director, Laboratory Collaborations from January 2019 to May 2022 and reported to the head of the LCI group, Ryan Angell.  AC at *v*.  CW-5 served as a national director for the LCI Group from January to April 2019.  *Id.* at *vi*.  CW-11 worked as a manager in the LCI group from June 2019 to November 2022, also reporting to Angell.  *Id.* at *viii*.  CW-12 was an Implementation Manager, Laboratory

24

Collaborations for the duration of her tenure at NeoGenomics, from March 2019 to March 2023. *Id.* In fact, "CW-12 was one of only a handful of employees at the Company that was part of the LCI group for the entire duration of the Class Period." *Id.* CW-12, too, reported to Angell, the LCI chief. *Id.* Although the Complaint lacks a detailed description of the roles of these individuals or their exact job functions, the Court finds that there is just enough information in the Complaint that, when cobbled together, permits an inference that these folks had direct insight into LCI's growth strategy, revenue prospects, and broader impact on the Company.[20] Moreover, the CWs' accounts of LCI's revenue are corroborated (at least indirectly) by the Company's own regulatory filings, as detailed in the Complaint. *See, e.g., id.* ¶¶ 126–127 & n.8 (citing NeoGenomics' FY 2019, 2020, and 2021 Form 10-Ks).[21]

Defendants have no rebuttal to Plaintiff's LCI-related allegations other than to contend that "the Company *did* disclose in November 2021 that the Company had reserved $10.5 million in connection with the investigation." Def. Br. at 20. But a reserve to account for "potential damages and liabilities primarily associated"[22] with the regulatory investigation is not akin to

---

[20]     For example, CW-4 reports that "NeoGenomics meticulously tracked the revenue coming in as a result of the LCI group," and was able to recount, in detail, "the process by which revenue attributable to LCI's consulting efforts was calculated and credited to LCI employees as commission." AC ¶ 124 (explaining LCI revenue structure). CW-4 describes "[t]he new revenue that was attributable to LCI" as "massive," recalling that "LCI was responsible for generating approximately $20 million in revenue in 2019, $35 million in 2020, and $50 million in 2021." *Id.* ¶ 125. At a sales meeting (at which CW-11 seems to have been present), "the numbers presented indicated that 'new revenue flagged for LCI accounts represented 70 percent of new business.'" *Id.* (emphasis omitted). CW-11 has first-hand knowledge of his/her own LCI-based income, revealing that, "at times," he/she made "commissions of $20,000 or more per month at [LCI's] peak." *Id.* ¶ 128 (emphasis omitted). CW-12 discussed with specificity LCI's business structure, explaining that the group "charged clients a flat one-time fee of $15,000 to set up the lab, validate flow cytometry tests, and train personnel over the course of several months." *Id.* ¶ 136. These details sufficiently demonstrate that these specific CWs are familiar enough with the LCI group to speak knowledgably about, and with some depth of understanding of, the group's inner workings.

[21]     Using CW accounts and NeoGenomics' public filings, Plaintiff estimates that "LCI's annual revenue made the operation the single largest driver of Clinical Services revenue during the Class Period," "[a]nd the Clinical Services division was responsible for approximately 85% of all revenue in the Company during the 2019, 2020, and 2021 fiscal years." *Id.* ¶ 126.

[22]     *See* Def. Ex. 27, Dkt. 67-27 at 36.

properly disclosing that the investigation could have a significant negative impact on the Company's revenue stream, nor did the disclosure address the fact that, in connection with the investigation, the Company would be dismantling one of its more lucrative business units. *See* Pl. Opp. at 20.[23] Put differently: Defendants' disclosure about damages does nothing to remedy the misleading nature of Defendants' contemporaneous statement that the investigation was not expected to have a meaningful financial impact on the Company.

Finally, Defendants contend that they were not "required to disclose more information about the ongoing investigation" than what was revealed publicly. Def. Br. at 20 (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AC*, 752 F.3d 173, 184 (2d Cir. 2014)). This is not why Plaintiff is suing. Plaintiff objects only to Defendants' failure to honestly disclose the *impact* of the investigation (whatever its scope might be) on day-to-day business operations, including how it effectively precipitated LCI's demise and likely contributed to subsequent revenue shortfalls. *See* Pl. Opp. at 21. On top of that, Defendants' LCI-related statements are particularly salient because Defendants put the Company's revenue (in relation to the investigation) at issue by affirmatively stating that the investigation would *not* have a meaningful impact on earnings, as only a handful of clients were affected. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

---

[23]    Defendants argue that the reserve disclosure was not strictly limited to federal *penalties* that might result from the LCI investigation. *See* Def. Br. at 20. That position is hard to square with the plain text of the disclosure, which expressly contemplated that the reserve was for "damages and liabilities." Def. Ex. 27, Dkt. 67-27, at 36. Defendants' position would also make little sense in light of Defendants' separate stance that the investigation would have no meaningful impact on the Company's go-forward *revenue*. *See* AC ¶¶ 153, 317, 327, 330. Further still, Defendants' disclosure indicated that "the Company is unable to predict the duration, scope, result, or related costs associated with any further investigation, including by the OIG, or any other governmental authority, or what penalties or remedial actions they may seek. Accordingly, at this time, the Company is unable to estimate a range of possible loss in excess of the amount reserved." *Id.* It is implausible that Defendants would have been unable to estimate the range of potential losses associated with freezing all business for one of the Company's business units, regardless of the unit's size or importance. Thus, either the disclosure is misleading or the reserve was exclusively for potential penalties associated with remedial action by the government. The Court is inclined to conclude the latter.

At bottom, the Court finds that Plaintiff has managed to plead enough factual matter to support an inference that Defendants misleadingly downplayed the significance of the LCI investigation by misstating (or altogether omitting) material details about the likely impact that the investigation would have on the Company's go-forward business. Plaintiff is correct that "[b]y emphasizing the 'small number' of clients, while leaving out the outsize financial importance of those accounts, Defendants misled." Pl. Opp. at 20. In "commenting on [the investigation's likely impact on] revenue," Defendants "omitted to reveal the—or, at least an—elephant in the room": that one of its premier business groups was, as a result of the investigation, imploding. *In re Braskem*, 246 F. Supp. 3d at 759. This narrow subset of alleged misstatements and omissions were material. They are, therefore, actionable.[24]

   1.  Plaintiff's Other Alleged Omissions Are Not Actionable[25]

Plaintiff takes a belt-and-suspenders approach by reframing as omissions various of Defendants' alleged misstatements regarding (i) Defendants' failure to disclose the Company's turnaround time issues, *see* AC ¶ 245(c), and (ii) Defendants' failure to disclose that the

---

[24]    Defendants offer a tepid argument that the challenged statements related to the LCI group are forward-looking and not actionable under the PSLRA's safe harbor and the bespeaks causation doctrine. *See* Def. Br. at 23–25. This argument is not compelling largely for the reasons discussed in this section. By listing "Risk Factors" in Company filings that caution investors about the *potential* of regulatory action, Defendants do nothing to remedy the effect of Defendants' affirmative assertion that the then-ongoing investigation was not expected to have a material impact on Company revenue. As Plaintiff has adequately alleged, the investigation kicked off a series of events that caused the risks (outlined in the Company's disclosures) to materialize. Defendants nonetheless denied that those risks—which, per the Complaint, were manifesting—would have a material impact on revenue. This was, at best, misleading. The Company's vague, boilerplate risk disclosures are insufficient to insulate the statements challenged here. *See, e.g.*, *Gregory v. ProNAi Therapeutics, Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018) ("[C]autionary language [that] did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss' is insufficient." (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002))).

[25]    The Complaint alleges that Defendants had an independent duty to disclose various undisclosed facts pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303. *See* AC ¶¶ 332–340. In *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024), however, the Supreme Court clarified that failures to disclose information under Item 303 cannot alone support a private action under Rule 10b-5(b). Thus, Defendants cannot, as a matter of law, be found liable under a pure-omission theory for items not disclosed as part of Item 303. On April 18, 2024, Plaintiff withdrew his Item 303-based argument. *See* Dkt. 74. This portion of the motion to dismiss is, therefore, moot, and the Court will not address it further.

Company's NGS technology was outdated.  *See id.* ¶ 245(e).  This effort fails for many of the reasons discussed in the foregoing sections: Plaintiff has not pled with the requisite particularity any facts that support the inference that Defendants actually experienced turnaround time failings, nor that the Company's NGS technology was antiquated or had a negative impact on NeoGenomics' business or growth prospects.[26]

Plaintiff also challenges Defendants' failure to disclose the LCI group's allegedly outsized impact on Company growth throughout the Class Period generally.  *See id.* ¶ 131.  The Court sees no reason why Defendants would have been required to disclose LCI's impact as a singular entity.  Contrary to the position Plaintiff takes in his briefing, the Complaint suggests that LCI did *not* "independently drive growth."  *See* Pl. Opp. at 30.  The LCI group's primary function was to invest in providers (potentially in violation of federal law) with the hope that, by teaching them how to operate their own basic testing labs, the providers would in turn funnel their more complex (and, importantly to NeoGenomics, more lucrative) testing needs to the Company.  The latter depended, in part, on NeoGenomics' ability to beat its competitors with regard to, *e.g.*, turnaround times, breadth of testing options, and NGS offerings.  Nowhere does Plaintiff allege that LCI-specific services stimulated growth.  In other words, although NeoGenomics leaned on the LCI group to open doors to customer populations, its general service lines and identified differentiators, including the breadth of its offerings, efficiency of its testing, and quality of its technology, are what caused those customers to turn to NeoGenomics

---

[26]    Even if there were grains of truth to these categories of allegations, it is not clear to the Court that omissions regarding either of these subjects would be sufficiently "material" to be actionable as fraud—especially considering the vague and perfunctory manner in which Defendants talked about its turnaround times and NGS technology.  And, as discussed throughout, Plaintiff has demonstrated a chronic inability to cite more than a handful of ambiguous examples that would support any inference that the omissions were material.

for their additional testing needs.  That, in turn, drove Company growth.[27]  As Defendants put it, "LCI's customers contributed to [the Company's stated] growth factors just as non-LCI customers did."  Def. Reply at 16; *see also, e.g.*, Def. Br. at 27.  Although not perfectly analogous, this situation is comparable to that discussed in *Local #817 IBT Pension Fund v. XPO Logistics*, where the Second Circuit held that a company need not identify a specific *client* as a major contributor of revenue growth when the client was simply a customer of the company's service lines—which *were* identified as growth drivers.  No. 21-986, 2022 WL 2358414, at *2 (2d Cir. June 30, 2022).[28]

Plaintiff's allegations focused on omissions regarding LCI's contribution to growth are, therefore, not actionable.

## III.    Plaintiff Has Not Pled Facts Giving Rise to a Strong Inference of Scienter

The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference" that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud."  15 U.S.C. § 76u-4(b)(2)(A); *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  To plead scienter, a

---

[27]    This is the critical distinction between the present action and the cases that Plaintiff cites in his briefing papers.  In *Oklahoma Firefighters v. Lexmark*, defendant-company selectively disclosed one growth driver while entirely omitting another.  367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019).  In *City of Roseville Employees' Retirement System v. Horizon Lines*, defendant-company attributed strong financial performance to the wrong source altogether.  686 F. Supp. 2d 404, 415–16 (D. Del. 2009).  And in *In re Dentsply Sirona*, the court deemed it misleading when a company indicated that strong demand for products drove revenue, while the true driver of growth was not demand, but was minimum purchase requirements attached to products (that created artificial demand regardless of market desire).  665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023).  Here, NeoGenomics depended on LCI clients to drive growth in the same way as non-LCI clients: by buying into the Company's purported strengths and, as a result, sending more business to NeoGenomics.

[28]    *ITT Education Services, Inc. Sec. & Shareholder Derivatives Litigation*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012), which Defendants cite in their moving papers, *see* Def. Br. at 27 n.18, is also informative.  There, plaintiffs challenged as misleading a school's statement that its growth was driven by increased enrollment.  *Id.*  Conspicuously absent was the concession that increased enrollment was the result of predatory recruitment practices.  *Id.*  The Court nonetheless held that statements about enrollment were "not misleading because they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring."  *Id.*

plaintiff must allege "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168–69 (2d Cir. 2000)).  In considering whether a plaintiff has pled facts giving rise to a strong inference of scienter, "the court must take into account plausible opposing inferences."  *Id.* (quoting *Tellabs*, 551 U.S. at 323).  A plaintiff has alleged a strong inference of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  For forward-looking statements, a plaintiff must demonstrate that defendants had "actual knowledge" that their statements were false when made. 15 U.S.C. § 78u-5(c)(1)(B)(i).

Plaintiff makes no effort to plead that Defendants had a motive or opportunity to commit fraud, alleging only that Defendants "knew or were deliberately reckless in not knowing the materially false or misleading nature of the misrepresentations and omissions."  AC ¶ 197. "Without showing motive," however, "the[] uphill battle to plead a strong inference of scienter becomes that much steeper,"  *N. Mia. Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021), and a plaintiff's circumstantial allegations of conscious misbehavior or recklessness must be "correspondingly greater," *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2021).  Plaintiff argues that he has summited this imposing pleading mountain.  The Court thinks not.  The Complaint falls woefully short of pleading facts that give rise to a strong inference that Defendants' statements (or omissions) were made recklessly or with conscious disregard of the truth.

30

As to the challenged statements regarding turnaround times, NGS technology, and "one-stop shopping," Plaintiff relies almost exclusively on CW assertions that Defendants "received repeated, firsthand information about the Company's longstanding problems" in each of these areas. AC ¶¶ 200–219. Such allegations are insufficient to support an inference of scienter for multiple reasons. First, as the Court previously noted, very few of Plaintiff's thirteen CWs reported directly to any of the Officer Defendants. Thus, it is not clear whether most of them would have been in a position to know what specific information Officer Defendants were receiving throughout the Class Period. Second, as Defendants correctly observe, "eighteen of the twenty-two paragraphs that Plaintiff dedicates to alleging scienter on turnaround times, NGS, and 'one-stop-shopping,' are either undated or provide only an indefinite time period." Def. Br. at 32. This, too, is problematic, as "allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011). Third, and as discussed *ad nauseum* throughout this opinion, the CWs' allegations about amorphous "problems" with turnaround times and NGS technology are so vague as to be meaningless, and they certainly do not demonstrate what, if any, specific contradictory information was available to Defendants when they made the purportedly misleading statements. *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (collecting cases). That ambiguous "concerns," "issues," "challenges," and "complaints" were raised in town hall meetings, executive teams meetings, and weekly sales calls does little to advance the ball, particularly when the Complaint is devoid of allegations about what information was given to which Defendant, when that information was provided, and how that information contradicted public statements about turnaround times, NGS, and/or "one-stop shopping" when the public statements

31

were made.  In the absence of any specific information directly demonstrating the falsity of Defendants' statements, Plaintiff may not rely on conclusory assertions that the Company's issues were so "well known internally," *see, e.g.*, AC ¶ 259, that Defendants *must* have been aware of the contradictory facts (whatever they may have been).  *See Harris v. AmTrust Fin. Sers., Inc.*, 135 F. Supp. 3d 155, 176 (S.D.N.Y. 2015) (finding that "broad allegations that Defendants knew" of the falsity of their statements "lack[] the specificity required to plead a securities fraud claim" (internal quotation marks omitted)); *In re Citigroup Inc.*, 753 F. Supp. at 245 ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company; these assertions are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity.").

That a handful of CWs are alleged to have had some direct communication with the Officer Defendants does not save the day, largely for the same reasons.  The fact that at some unspecified time CW-9 discussed with Defendant VanOort "various problems," AC ¶ 204, tells the Court nothing about the details that were discussed (if any) or how those details contradicted any of the Defendants' contemporaneous public statements—even if the conversations were "very honest" and Defendant VanOort "took notes," *id.  See also* Def. Br. at 34.  Nor are other allegations about meetings between various CWs and the Officer Defendants sufficient to allege scienter.  *See, e.g.*, AC ¶¶ 139, 204, 208–217; *see also* Pl. Opp. at 34–35 & n.3.  All are insufficient, both jointly and severally, to give rise to a strong inference of scienter because the allegations do not include specific details about what was discussed or how such information would have contradicted Defendants' public statements.  By that same token, neither the fact that NeoGenomics maintained a "turnaround tracker" (even if during the Class Period, which is not

itself clear), nor that the purported turnaround tracker was "distributed to executives on a regular basis," AC ¶ 210,  leads, *ipso facto*, to an inference that Defendants had *specific* information at their disposal sufficient to render their public statements about the Company's turnround times false or misleading.[29]  *See, e.g.*, *Quad/Graphics, Inc.*, 521 F. Supp. 3d at 493 ("[A]bsent particularized allegations of specific information Defendants had at their disposal that rendered their statements false or misleading, allegations of circumstantial evidence . . . are not sufficient to plead scienter, even considered in their totality.").

Even the handful of statements that survive the first prong of the Court's fraud inquiry fail at the second.  Although various of the statements about the LCI business in relation to the ongoing regulatory investigation were misleading, Plaintiff has not pled any factual material that gives rise to an inference of scienter.  The Complaint includes a handful of allegations that the LCI group constituted NeoGenomics' "core operations," and that "the importance and financial impact of LCI within the Company was well-known, including at the highest reaches of the Company and by Defendants." AC ¶ 220; *see also id.* ¶¶ 221–227.  Thus, Plaintiff proffers, "[t]he centrality of LCI to NeoGenomics' core operations . . . supports an inference that Defendants knowingly and/or recklessly made materially false or misleading statements and omissions about the Company's financial state [and] competitive strength." *Id.* ¶¶ 235–238.  The

---

[29]    Defendants again harp on the fact that allegations related to the so-called tracker are insufficient because they "nowhere explain[] how anything contained in the tracker contradicted any of Defendants' statements," nor is it "alleged that the tracker contained any details comparing the turnaround times to the Company's competitors, or listed any information relating to turnround times by customers." Def. Br. at 35.  Defendants beat this same drum steadily throughout their moving papers.  Their persistence was wearing, but it was not wrong. *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304–05 (S.D.N.Y. 2008) (references to documents that executives have seen "is probative of scienter only if the complaint alleges specific contrary information . . . of which the [] defendant had reason to know" (cleaned up)).

Court need not weigh the ultimate viability of the core operations theory,[30] as Plaintiff concedes that it "does not establish scienter alone," and can, at best, be used to "bolster other allegations." Pl. Opp. at 38–39 (citing *In re Avon Sec. Litig.*, No. 19-CV-01420 (CM), 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019)).[31]

Unfortunately for Plaintiff, the Complaint's "other allegations" that might benefit from core-operations bolstering are severely deficient in terms of their ability to support a plausible inference that Defendants had specific, contradictory information about the LCI group available to them at the time of the challenged statements and omissions. Plaintiff's core operations allegations cannot get them over the hump. *See Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (argument that business sector was "of such core importance to the Corporate Defendants that their senior officers must have know the challenged statements were false" is, without more, "a naked assertion . . . plainly insufficient to raise a strong inference of . . . scienter"). For example, various of Plaintiff's LCI-related scienter allegations include speculation from CWs as to what *other* individuals *may* have told Officer Defendants about the LCI group.[32] It is difficult for the Court to credit statements, predicated on hearsay upon hearsay, from CWs who admit that

---

[30]    *See, e.g.*, *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 n.4 (2d Cir. Oct. 25, 2022) ("We have not clearly affirmed the validity of [the core operations doctrine] following the passage of the PSLRA.").

[31]    In all events, the Court agrees with Defendants that, regardless of whether the core operations doctrine survived enactment of the PSLRA, it would not be applicable here. *See* Def. Br. at 36–37. The Complaint estimates that the LCI group contributed 4.9%, 7.9%, and 10.3% of the Company's revenue in 2019, 2020, and 2021, respectively. *See, e.g.*, AC ¶¶ 126–127 & n.9; *see also* Def. Br. at 37. This is more than a negligible portion of the Company's bottom line. Even still, courts generally require "that the operation in question constitute nearly all of a Company's business before finding scienter." *Frankfurt-Tr. Inv. Luxemburg AG v. United Tech. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018). Even if the Court accepts that LCI was also responsible for 40% of the company's *go-forward growth*, *see* AC ¶ 235, the allegations in the Complaint do not come close to alleging adequately that LCI constituted NeoGenomics' core operation.

[32]    *See, e.g.*, AC ¶¶ 228–230 (discussing LCI "pipeline" tracker that LCI head Ryan Angell (not a Defendant or a CW) would have "shared . . . with NeoGenomics executives"), 232 (noting that Angell would have "specifically warned" an Officer Defendant about the "negative impact on revenue" that "shutting down LCI would have"), 323 (conclusory allegation that "Defendants knew [dismantling LCI] would have a significant impact on revenue").

they lack personal knowledge about what, exactly, was said to the Officer Defendants about the LCI group, and when.  And, as Defendants again point out, "these allegations lack any identification of the 'specific contradictory information' purportedly shared with Defendants in these discussions" for which the CWs were not themselves present.  *See* Def. Br. at 37. Plaintiff's lone allegation that a CW had a direct conversation with an Officer Defendant is similarly devoid of factual matter that would allow the Court to infer what, in particular, was said about the "financial impact of terminating the LCI group"—even if the Court accepts as true that LCI's financial impact was, in fact, a topic of the conversation.  *See* AC ¶ 233.[33]

Plaintiff throws another argument at the wall, alleging that certain departures of high-level officials at NeoGenomics "strongly supports an inference that Defendants acted with scienter." *Id.* ¶ 241; *see also id.* ¶¶ 242–244.  This argument, like those made before it, fails to stick.  "[A] resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind.  Standing alone, however, an employee's resignation does not raise a strong inference of scienter." *Schiro*, 396 F. Supp. 3d at 303.  Beyond characterizing the departures as "conspicuous," AC ¶ 244, Plaintiff

---

[33]     The Complaint alleges that CW-12, an LCI implementation manager, had "four or five" meetings with Defendant Mallon during which CW-12 "specifically warned Mallon of the financial impact of terminating the LCI group." *See id.* ¶ 233.  Defendants quarrel that the Complaint lacks allegations about CW-12's job responsibility and question whether CW-12 would "have insight into Company-wide revenue impacts."  Def. Br. at 38.  As previously discussed, Plaintiff has pled enough details (albeit, indirectly) about his LCI witnesses that, when considered together, allow the Court to infer that these CWs can speak knowledgeably about LCI, its revenue, and its status within the Company. *See supra* pp. 24–25.  But as to the second prong of the fraud inquiry, this matters not: a vague allegation that CW-12 discussed "the financial impact" of LCI's dismantling is simply too nebulous to support an inference of scienter, even if CW-12 had some insight into what that impact may have been.

In response, Plaintiff assumes that the "financial impact" discussed by Defendant Mallon and CW-12 was the alleged $30 million in revenue that CW-4 believed would be lost because of the LCI freeze. *See* Pl. Opp. at 38. Defendants are quick to point out, however, that "there is nothing in the Complaint alleging that the $30 million figure asserted by CW-4 was known to CW-12, or shared with [Defendant] Mallon (or any other Defendant)."  Def. Reply at 4.  Thus, the Court is left to wonder what was said to the Officer Defendants about the financial impact of terminating LCI, whether by CW-12 or someone else.  And the "Court should not be made to guess what 'contradictory information' (if any) was given to Defendants, and when."  Def. Reply at 5.

makes no effort to tie the withdrawals from the Company to any alleged fraud, *see* Def. Br. at 39. That failure is dispositive.  *See, e.g.*, *In re Molycorp, Inc. Sec. Litig.*, No. 13 Civ. 5697 (PAC), 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015) (executive departures alone "provide[] no support for a finding of scienter" "without factual allegations linking [the departures] to the alleged fraud").

In sum, Plaintiff has failed to allege facts giving rise to any inference of scienter, let alone a strong one.  Moreover, there is at least one more compelling, non-fraudulent inference that can be drawn from Plaintiff's alleged series of events: namely, that the Officer Defendants sincerely believed in the superiority of their product offerings and business model throughout the Class Period, as evidenced by NeoGenomics' reportedly buying back millions of dollars of its own shares during the time in which Plaintiff alleges the Company's stock prices were artificially inflated.  *See* Def. Ex. 19, Dkt. 67-19 at 36–38; *Frankfurt-Tr. Inv. Luxemburg AG v. United Tech. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) ("[I]t would make no economic sense for a company to buy back its stock at a price it knows to be inflated."); *see also, e.g.*, *Tellabs*, 551 U.S. at 324.

## IV.    Plaintiff's Section 20(a) Claim Fails

Plaintiff separately alleges a violation of Section 20(a) of the Exchange Act against each Officer Defendant.  AC ¶¶ 363–366.  Having failed to allege a viable primary violation of the Exchange Act, Plaintiff has no basis to maintain a claim under Section 20(a).  *See* 15 U.S.C. § 78t(a).  Accordingly, Count II must be dismissed.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in full.  Because Plaintiff has now had two bites at the apple, and because the arguments made in response to the

motion to dismiss give no indication that the Complaint's defects are curable, Plaintiff is denied leave to amend.  *See* Fed. R. Civ. P. 15(a)(2); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505–06 (2d Cir. 2014).  The operative Complaint, Dkt. 56, is, therefore, DISMISSED with prejudice.  The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 65 and to CLOSE this case.

**SO ORDERED.**

**Date:  March 13, 2026**                                        **VALERIE CAPRONI**
**        New York, New York                                        United States District Judge**

37